## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHILLIP JONES, on behalf of himself and all others similarly situated, | Case No. |
| *Plaintiff*, | |
| v. | **CLASS ACTION COMPLAINT** |
| FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; FANATICS HOLDINGS, INC.; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS, INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL PLAYERS ASSOCIATION; ONETEAM PARTNERS LLC, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff Phillip Jones ("Plaintiff"), on behalf of himself and all others similarly situated, upon personal knowledge as to the facts pertaining to himself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint against Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LCC, and Fanatics Holdings, Inc. (collectively, "Fanatics"); Major League Baseball ("MLB"); Major League Baseball Properties, Inc. ("MLBP"); Major League Baseball Players Association ("MLBPA"); MLB Players, Inc. ("MLBPI"); National Football League ("NFL");

NFL Properties LLC ("NFLP"); National Football League Players Association ("NFLPA"); NFL

Players, Inc. ("NFLPI"); National Basketball Association ("NBA"); NBA Properties, Inc.

("NBAP"); National Basketball Players Association ("NBAPA"); and OneTeam Partners LLC

("OneTeam") (collectively, "Defendants"), for violations of federal and state laws, seeking

actual damages, treble damages, disgorgement of profits, injunctive relief, a declaratory

judgment, reasonable costs and attorneys' fees, and pre- and post-judgment interest.

## I.    NATURE OF THE ACTION

1.    This is a class action brought by Plaintiff on behalf of himself and all other

similarly situated persons and entities in the United States who, at any time from January 1, 2022

until such time as the anticompetitive conduct alleged herein ceases (the "Class Period"),

purchased from a non-Defendant distributor (*e.g.*, big-box or other retailer, local trading card

shop, or online store) newly-issued, fully-licensed MLB, NFL, or NBA (collectively, "the Major

U.S. Professional Sports Leagues" or "the Leagues") trading cards produced by Fanatics.

2.    Defendants have engaged in an anticompetitive scheme in the market for newly-

issued, fully-licensed Major U.S. Professional Sports Leagues trading cards produced by

Fanatics ("Pro Sports Trading Cards"), resulting in inflated prices and reduced competition for

purchasers of such cards.

3.    Pro Sports Trading Cards featuring professional athletes are valued both as

collectibles and as investments, creating a thriving and competitive market. To effectively

compete in this market, manufacturers must obtain licenses from both professional sports players

associations to use the names, images, and likenesses of players, and from professional sports

leagues to use the names, logos, and uniforms of the players' teams.

4.    Historically, licenses from professional sports leagues and professional sports

players associations were awarded through a public bidding process resulting in non-exclusive

license agreements or in exclusive license agreements typically of five years or less, and with staggered terms, wherein no single licensee controls exclusive rights across all of the major sports player leagues and players associations at once.

5.     Beginning in August 2021, Fanatics announced the acquisition of the leading professional sports licenses in North America: professional baseball from the MLB and the MLBPA; professional men's basketball from the NBA and the NBAPA; and professional men's football from the NFL and the NFLPA (MLBPA, NBAPA, and NFLPA are referred to as the "Players Associations"). Thus, for the first time, one licensee, Fanatics, secured exclusive licenses across all six major professional sports licensors.

6.     Fanatics obtained long-term exclusive licenses—at least 10 years, and in most cases, 20 years—by promising sports leagues and players associations an equity stake in its future monopoly profits in exchange for those long-term exclusive licenses. Fanatics made this deal with all major sports leagues and sports players associations, eliminating competitors and securing monopoly power. These were "back room" deals, accomplished without any open bidding process.

7.     Making matters worse, in January 2022, Fanatics acquired Topps, which was the dominant producer of MLB player trading cards, and which had an exclusive license with MLB until 2025 and a semi- exclusive license with the MLBPA through 2022. By acquiring Topps, Fanatics eliminated one of its major competitors and gained immediate dominance of the market for MLB player trading cards.

8.     Fanatics also acquired a controlling share of GC Packaging ("GCP"), an essential card manufacturer used by Fanatics' only remaining professional sports trading card competitor, Panini America Inc. ("Panini"), and then restricted production to choke off Panini's supply,

resulting in supply disruptions and contract cancellations. GCP provides highly-specialized manufacturing services, and, according to Panini, is the only provider able to meet Panini's technological quality and capacity requirements, handling over 90% of Panini's production needs.

9.     Thereafter, Fanatics began leveraging its unlawfully-acquired exclusive license agreements with the Leagues and Players Associations, using threats and false statements to poach dozens of Panini's employees, further undermining Panini's ability to compete. For example, Fanatics threatened to blacklist Panini employees from ever working in the industry again when Fanatics' exclusive long-term licenses took effect unless they immediately quit Panini and joined Fanatics.

10.     Fanatics strong-armed athletes to refuse agreements with Panini, using a similar combination of payoffs and threats. For example, Fanatics threatened that players would never get an autograph deal when Fanatics' long-term contracts took effect in the future unless they immediately signed with Fanatics, essentially paying players not to provide autographs of the most important player trading cards during the critical early years of their careers.

11.     Fanatics spread false statements about Panini's business and pressured distributors, retailers, and "case breakers" to cut ties with Panini, declaring that—after the anticompetitive campaign Fanatics itself had orchestrated—Panini was now, "dead." For example, Fanatics told players, agents, and players associations that Panini would soon lose all licensing rights, go bankrupt, and be unable to fulfill its financial and contractual obligations to athletes.

12.     Fanatics used its monopoly over sales of professional sports jerseys and memorabilia to block Panini from acquiring the jerseys necessary for production of some of

Panini's most valuable products, which integrate a piece of a player's jersey into that player's trading card. Prior to May 2023, Panini had a multi-year business relationship with Fanatics for the purchase of player jerseys; it was only after Fanatics entered the professional sports card trading market that Fanatics terminated sales of jerseys to Panini.

13.     Fanatics has used its monopoly power to control the distribution of Pro Sports Trading Cards to big-box retailers and other major retail outlets. After securing its exclusive licensing deals and acquiring Topps, Fanatics pressured distributors who supply Pro Sports Trading Cards to major retailers to agree to higher margins for the cards. If the distributors refused to comply, Fanatics threatened to cut them off entirely from the supply of fully-licensed Major U.S. Professional Sports Leagues trading cards.

14.     At the same time, Fanatics also renegotiated terms directly with big-box retailers requiring them to carry a more limited range of trading card products, specifically only those manufactured or distributed by Fanatics through Topps. By doing so, Fanatics reduced the overall variety of trading cards available to consumers at major retail outlets, further limiting consumer choice.

15.     Fanatics also leveraged its monopoly power to impose anticompetitive terms on local trading card shops. Fanatics' control over the market allowed it to dictate the terms under which local trading card shops could sell its products, even though these shops had previously operated with greater autonomy. Fanatics used this control to harm competition and limit consumer choice by forcing local trading card shops to accept restrictive terms or risk being cut off from the supply of highly sought-after trading cards.

16.     Fanatics distributed contracts to local trading card shops with terms that allowed Fanatics to unilaterally set minimum prices for its trading cards at any time. While Fanatics

5

referred to these price floors as "suggestions," the contracts made clear that failure to comply with these minimum prices could result in Fanatics suspending or terminating the shop's account. Fanatics' ability to enforce these terms was rooted in its control over the supply of trading cards for the NFL, NBA, and MLB. Local trading card shops therefore had little choice but to comply if they wanted to stay in business.

17.     In August 2023, Panini filed a lawsuit against Fanatics in the Middle District of Florida, alleging, among other things, that Fanatics monopolized the sports trading cards markets.[1] On October 31 2023, Panini's case was transferred to this District.[2] On March 10, 2025, the Court largely denied Fanatics' motion to dismiss Panini's complaint.[3] Critically, the Court found that Panini plausibly alleged that Fanatics monopolized and attempted to monopolized the sports trading card markets.[4] Additionally, the Court found that Panini plausibly alleged that Fanatics' exclusive licensing deals with the Leagues and the Players Associations amounted to unreasonable restraints of trade under Section 1 of the Sherman Act.[5]

18.     The anticompetitive effects of this conduct will continue, and will only intensify, once Fanatics' monopolistic takeover is complete. And because of high barriers to entry and the capital-intensive nature of the business, there is little chance that Panini or any other competitor will survive—let alone be in a position to challenge Fanatics—after its exclusive contracts across all major professional sports expire 10-20 years from now, which is presumably Fanatics' plan.

---

[1] https://www.reuters.com/legal/litigation/sports-card-platform-panini-sues-rival-fanatics-over-antitrust-claims-2023-08-03/; *see also* Amended Complaint, *Panini America, Inc. v. Fanatics, Inc et al*, No. 1:23-cv-09714 (S.D.N.Y. October 10, 2023), ECF 69.

[2] *Panini America, Inc. v. Fanatics, Inc et al*, No. 1:23-cv-09714 (S.D.N.Y. Nov. 3, 2023), ECF 75.

[3] *Panini America, Inc. v. Fanatics, Inc et al*, No. 1:23-cv-09714 (S.D.N.Y. March 10, 2025), ECF 164.

[4] *Id.* at 10-19.

[5] *Id.* at 19-22.

Consequently, consumers, like Plaintiff and members of the Classes, will have no choice but to buy trading cards at exorbitant, supracompetitive prices from a single company: Fanatics.

19.     Defendants' anticompetitive scheme has already reduced output and competition, and thereby artificially inflated prices, in the market for Pro Sports Trading Cards. Plaintiff and members of the proposed Classes have been injured by paying these artificially inflated prices and will continue to be injured in the future until the alleged unlawful conduct ends.

## II.   JURISDICTION AND VENUE

20.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members in the proposed Classes; and at least one member of each of the proposed Classes is a citizen of a state different from Defendant.

21.     This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1-2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2.

22.     **Supplemental Jurisdiction**. In addition to violations of the federal antitrust laws, Plaintiff also alleges violations of state laws. All claims under federal and state law are based upon a common nucleus of operative fact and the entire action, therefore, should be commenced in a single case to be tried as one judicial proceeding. This Court, therefore, has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). Exercising jurisdiction over the state law claims will avoid unnecessary duplication of actions and support the interests of judicial economy, convenience to the litigants, and fairness.

23.     **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business or may otherwise be found in this District.

7

24. **Venue.** Venue in this District is proper as Defendants transact business or have registered agents in this District. Venue is also proper in this District because Defendant's conduct, as alleged herein, caused harm to consumers in this District. Additionally, several Defendants are headquartered in this District or have offices in this District.

25. **Interstate Commerce**. Defendant's conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming consumers throughout the United States.

## III.  PARTIES

### A.  Plaintiff

26. Plaintiff Phillip Jones is a resident of Phoenix, Arizona. During the Class Period, Mr. Jones purchased Pro Sports Trading Cards from various outlets, including big-box retailers and online stores. The prices Mr. Jones paid for trading cards were artificially inflated as a result of Fanatics' and its co-conspirators' anticompetitive conduct.

### B.  Fanatics Defendants

27. Defendant Fanatics, Inc. is a Delaware corporation with its principal place of business in Jacksonville, FL.

28. Defendant Fanatics, LLC, is a sole-member Delaware LLC with its principal place of business in Jacksonville, FL.

29. Defendant Fanatics Holdings, Inc. is a Delaware corporation with its principal place of business in Jacksonville, FL.

30. Defendant Fanatics Collectibles Intermediate Holdco, Inc., d/b/a Fanatics Trading Cards, is a subsidiary of Fanatics Holdings, Inc., and a Delaware corporation with its principal place of business in Jacksonville, FL.

31.     Defendant Fanatics SPV, LLC, is a Delaware LLC with its principal place of business in Jacksonville, FL.

32.     Defendant Fanatics, Inc.; Fanatics, LLC; Fanatics Holdings, Inc.; Fanatics Collectibles Intermediate Holdco, Inc.; and Fanatics SPV, LLC are technically separate entities but operate as one unified company under the name "Fanatics". The allegations herein are against the Fanatics companies both individually, and collectively.

### C.  Professional Sports League Defendants

33.     Defendant Major League Baseball ("MLB") is an unincorporated association of the 30 Major League Baseball teams (29 from the United States), and is based in New York, NY.

34.     Defendant Major League Baseball Properties, Inc. ("MLBP") is a New York corporation with its principal place in New York, NY. It is responsible for licensing the names, marks, and logos of each of the MLB's teams, including trading card companies.

35.     Defendant Major League Baseball Players Association ("MLBPA") is the labor union representing Major League Baseball players, and is based in New York, NY.

36.     Defendant MLB Players, Inc. ("MLBPI") is a Delaware corporation with its principal place of business in New York, NY. It is a for-profit corporate subsidiary of MLBPA that is responsible for licensing the names, images, and likenesses of Major League Baseball players. MLBPI, markets the collective rights of MLB Players through the licensing of companies, sponsorship of brands that want to associate their products with Major League players and the development of new initiatives. Player-licensed products include trading cards, collectibles, electronic games, digital, apparel and novelties.

37.     Defendant National Football League ("NFL") is an association of the 32 National Football League teams, all from the United States, and is based in New York, NY.

38.    Defendant NFL Properties LLC ("NFLP") is a Delaware LLC based in New York, NY responsible for the licensing of the names, marks, and logos of each of the NFL's teams, including to trading card companies.

39.    Defendant NFL Players Association ("NFLPA") is the labor union representing National Football League players, and is based in Washington, DC.

40.    Defendant NFL Players, Inc. ("NFLPI") is the marketing and licensing subsidiary of NFLPA. It is responsible for licensing the names, images, and likenesses of National Football League players for products such as trading cards, collectibles, electronic games, apparel, and novelties. It is based in Washington, DC.

41.    Defendant National Basketball Association ("NBA") is an association of the 30 National Basketball Association teams (29 from the United States), and is based in New York, NY.

42.    Defendant NBA Properties, Inc. ("NBAP") is a New York corporation with its principal place in New York, NY. It is responsible for the licensing of the names, marks, and logos of each of the NBA's teams, including to trading card companies.

43.    Defendant National Basketball Players Association ("NBAPA") is the labor union representing National Basketball Association players, and is based in New York, NY. NBAPA is responsible for licensing the names, images, and likenesses of National Basketball Association players.

44.    Defendant OneTeam Partners, LLC, is a Delaware corporation with its principal place of business in Santa Monica, CA. OneTeam Partners was founded in 2019 as a joint venture between MLBPA and NFLPA, and it markets and licenses the names, images, and likenesses of the athletes and players associations that it represents.

### d. **Non-Parties**

45.     Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants.

46.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

47.     Each Defendant named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

48.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV.   RELEVANT MARKETS

### A. **Fully-Licensed Sports Trading Cards**

49.     The products at issue here are described as newly-issued, fully-licensed sports trading cards, and the business involved here concerns the design, production, marketing, and sale of these cards. Annual sales of new sports trading cards are estimated to be over $1 billion per year.

50.     Consumers, like Plaintiff and members of the Classes, most desire fully-licensed sports trading cards—meaning those that display the League logo, League players association logo, the team uniform, the color combinations of the team, and the player's name, image, and likeness (and sometimes more).

51.     Each League today controls not only its own marks and logos, but the names, marks, and logos of all the League's teams. But no League controls the intellectual property in player names, images, signatures, and the like. So no League can produce and sell any product

in-house that includes the use of player names, images, signatures, and the like and no League has a preexisting monopoly over such products.

52.     Similarly, today, each players association for each League (*i.e.*, MLBPA, NBAPA, and NFLPA), through a group-licensing agreement with its own member-athletes, generally controls the group licensing of the intellectual property of its members, and each of the players association's members agree to significantly restrict their ability to enter into individual licenses.

53.     The Leagues' Players Associations do not hold intellectual property that includes League marks, League logo, team names, team uniforms, and color combinations. So the Leagues' Players Associations cannot produce or sell any product in-house that includes the use of League logo, team names, team uniforms, and color combinations and no players association has a preexisting monopoly over such products.

54.     Accordingly, producing fully-licensed sports trading cards of players in each league complete with league logo, league players association logo, team uniform, color combinations, and player image today at least requires a license from both the player's League and a license from the player's Players Association (each referred to here as a "Major League License"). These two ingredients are critical. No other option exists for producing and selling fully-licensed trading cards, and no individual League or individual Players Association could produce and sell fully licensed trading cards on its own.

55.     Thus, unlike other holders of intellectual property, the Leagues and Players Association cannot effectively use their intellectual property independently to produce sports trading cards. For such cards to be fully licensed and meet consumer demand, there must be a combination of the right to use the player's name, image, and likeness; the right to use the name,

logo, and uniform of the player's team and League; and the intellectual property and expertise of the third-party card supplier such as Panini or Fanatics.

56.    If a third-party licensee secures licenses from both a League and that League's Players Association such that it can produce and sell fully-licensed trading cards of players in that League, that licensee can also seek out other licenses to further enhance their production and sale of fully-licensed sports trading cards. One of these further licenses is a license with an individual player.

57.    The group player rights licensed by the Players Associations typically include facsimile signatures of the players—rather than original, handwritten autographs that can be provided by players on an individual basis. This means a licensee also can add features to a trading card by contracting with an individual player for the right to use that individual player's original, handwritten autograph, pieces of that player's uniforms or shoes, and that player's name, image, and likeness on an individual rather than group basis.

58.    To recap, a League can license its intellectual property of League marks, team names, color combinations and the like. But doing so is not enough to produce and sell a fully licensed trading card of players in that League. A Players Association can license its intellectual property (received from its players) of the right to use player names, images, signatures, and the like on a group basis along with other players. But doing so is not enough to produce and sell a fully licensed trading card of players in that League. Thus, neither a League nor a Players Association can effectively use its intellectual property independently. Instead, both Leagues and Players Association require a third-party licensee (like Fanatics or Panini) to produce and sell fully-licensed sports trading cards. A third-party licensee can execute other deals to enhance the

fully licensed trading cards it seeks to produce and sell, such as deals with individual players for original, handwritten autographs.



**Figure 1: Example of a 2025 Topps MLB player trading card.**

**B. The Relevant Product Markets**

59.     The relevant market here is the market for all Major U.S. Professional Sports Leagues trading cards in the United States: a combined market including NBA player trading cards, NFL player trading cards, and MLB player trading cards.

60.     The relevant product market is limited to newly-issued, fully-licensed Major U.S. Professional Sports Leagues trading cards created by card producers and sellers like Fanatics and Panini. In industry terms, this is the "primary" market, and it is distinct from the resale—or "secondary"—market.

61.     The size and importance of the markets for other U.S. league sports—such as the National Hockey League ("NHL") and Major League Soccer ("MLS")—are marginal in comparison to the "big three" Major U.S. Professional Sports Leagues. Even if NHL and MLS trading cards are included within the market for Major U.S. Professional Sports Leagues trading

14

cards, the market definition, market-power, and competitive-effects allegations here would remain unchanged. So, too, for college sports.

62.    Major U.S. Professional Sports Leagues trading cards are distinct from and do not compete with other trading cards, including trading cards for other professional sports or collegiate sports.

63.    In the United States, the popularity, familiarity, and viewership of the "big three" Major U.S. Professional Sports significantly exceeds all other sports. And the interests, preferences, and loyalties of professional sports enthusiasts of Major U.S. Professional Sports Leagues dictate that only a Major League License will suffice to compete in the relevant markets. There is no close substitute for a Major League License in the associated professional sport to reach consumers devoted to that sport, a team in the associated League, and favorite players on that team or in that sport.

64.    Due to their popularity and long history, Major U.S. Professional Sports Leagues trading cards enjoy greater visibility and are more readily accessible for purchase by consumers, like Plaintiff and members of the Classes, than other sports trading cards. Among sports trading cards displayed at retailers, Major U.S. Professional Sports Leagues trading cards typically receive the most shelf space and are displayed more prominently than trading cards for other sports. At some retailers, Major U.S. Professional Sports Leagues trading cards are the only sports cards available. Similarly, at online retailers, Major U.S. Professional Sports Leagues trading cards are displayed more prominently on webpages and generally come up first in search results for sports trading cards.

65.    The trading cards of other sports teams—such as those for NHL, MLS, collegiate sports, and the WNBA—do not have significant cross-elasticity with Major U.S. Professional

Sports Leagues trading cards. For the same reasons, sports trading cards for other non-team sports, such as NASCAR, PGA, WWE, and UFC, are even less reasonable substitutes for Major U.S. Professional Sports Leagues trading cards.

66.     Other types of trading cards, such as Pokémon, Yu-Gi-Oh!, or Magic cards, are even more removed from the relevant markets. These cards are distinguished from Major U.S. Professional Sports Leagues trading cards in obvious ways, including price, appearance, use, and content. Consumers do not view these other types of entertainment trading cards as interchangeable with Major U.S. Professional Sports Leagues trading cards.

67.     A small but significant non-transitory increase in the price of Major U.S. Professional Sports Leagues trading cards would not substantially raise demand for other sports trading cards or other types of trading cards.

68.     The production and sale of sports trading cards requires—along with the licenses from the Leagues and Players Associations described above—access to specialized manufacturing techniques and specifications and employees skilled in the successful creation, design, and marketing of professional sports trading cards. There are substantial entry barriers to the business, including significant investments associated with development and manufacturing. To overcome these barriers, a licensee (like Fanatics or Panini) must be able to produce and sell trading cards for players of at least one Major U.S. Professional Sports League. NBA player trading cards, NFL player trading cards, and MLB player trading cards are the only three types of sports trading cards with sufficient consumer demand—and thus revenues—to allow a firm to secure and maintain a competitively substantial market presence.

69.     As a result of consumer preferences and a degree of product differentiation, the Major U.S. Professional Sports Leagues trading cards market is further divided by producers,

distributors, and consumers into markets for Mass Market trading cards and for Premium trading cards.

70.    Significant differences in price, distribution channels, quality of output, and product design distinguish Mass Market from Premium cards. Mass Market cards are sold at a low price—such as $5–15 per "packet" of eight to-ten cards—through mainstream channels such as Walmart, Target, pharmacy chains, and other retailers at which sports fans (or their parents) often shop. Premium cards sell for hundreds or even thousands of dollars per packet or case at specialist retailers known as local trading card shops (or hobby shops), online retailers, and through case breaking—i.e. opening new trading card cases and packets over an internet livestream.

71.    Premium cards include such features as hand-signed autographs or pieces of jerseys integrated into the cards—or both.



**Figure 2: Example of 2022 Premium Topps MLB card.**

72.    Some Mass Market card lines include cards with signatures or other special features, but the frequency is far lower than for Premium cards.

73.    Mass Market cards are targeted to casual collectors, such as youngsters and casual enthusiasts. These cards are the modern successor to the waxpaper-wrapped, bubble-gum packets

of decades past. Mass Market cards are likely to be found trading and circulating in the schoolyard or neighborhood.

74.    Among consumers, the product interchangeability between Mass Market cards and Premium cards is limited. Large price differences, for example, distinguish the two different types of cards, and transparent quality differences make the two types of cards suitable for different collectors with very different aims.

75.    There is also limited interchangeability between either Mass Market cards or Premium cards and other sports collectibles such as jerseys, hats, and apparel. The sports trading card market is distinguished from these other sports products by all the traditional indicia of market delineation: Defendants and the Leagues recognize that trading cards form a distinct market because they license trading cards separately from other memorabilia. Trading cards and other memorabilia are produced by different firms using different facilities. There are obvious differences in the construction, appearance, and use of trading cards (which are often traded or collected) and, for example, apparel (which may be worn). Very few consumers, if any, collect apparel related to more than one team. Retail outlets, appraisers, and other businesses specialize in trading cards. There are significant price differences between trading cards and other memorabilia. Put starkly, consumers do not view a baseball hat as interchangeable with a pack of baseball trading cards.

76.    There is minimal, if any, cross elasticity of demand between trading cards and other memorabilia. Indeed, Fanatics' conduct—its plan to monopolize the trading cards market— makes sense only because trading cards are a distinct product that consumers value independently of other types of memorabilia.

77.     Investing in art and non-card collectibles such as pens or watches is even less a substitute for collecting or trading Mass Market or Premium trading cards for the Major U.S. Professional Sports Leagues.

78.     Within the larger market for Major U.S. Professional Sports Leagues trading cards exist smaller submarkets, which include NBA player trading cards, NFL player trading cards, and MLB player trading cards. These submarkets are alleged in the alternative to be relevant markets for purposes of Plaintiff's claims.

79.     The NBA, NFL, and MLB consist of thirty, thirty-two, and thirty teams, respectively. In each League, each of the teams has agreed to give exclusive control over the licensing of their names, logos, and uniforms to their League for licensing the production and sale of the trading cards at issue here.

80.     For many fans of the "big three" Leagues, given the similarities in popularity, history, and consumer access to trading cards for players of these sports, there is significant cross elasticity of demand among NBA player trading cards, NFL player trading cards, and MLB player trading cards.

81.     However, many consumers do not view trading cards for players from one League as interchangeable with cards for players from another League. They prefer to collect cards from one of the Major U.S. Professional Sports Leagues over the cards from other Leagues. For example, some consumers do not view MLB player trading cards as interchangeable with NFL player trading cards. Even some fans of both sports do not regard their cards for one sport as interchangeable with cards for the other sport. Each of the Major U.S. Professional Sports Leagues is well-established, unique, and has its own devoted followers. For these customers, the interchangeability of cards is constrained in satisfying consumer demand.

82.     Accordingly, an entity that is able to monopolize and control the new professional trading card business for players in the NFL, NBA and MLB has a distinct ability to increase prices and engage in other anticompetitive activity.

83.     As with the Major U.S. Professional Sports Leagues trading cards market, the submarkets for NBA player trading cards, NFL player trading cards, and MLB player trading cards are further divided by producers, distributors, and consumers into markets for Mass Market trading cards and for Premium trading cards for the reasons discussed above.

84.     To recap, the products at issue here— newly-issued, fully-licensed sports trading cards— implicate two relevant markets: Mass Market and Premium cards for Major U.S. Professional Sports Leagues trading cards. In the alternative, sports trading cards implicate six relevant submarkets: Mass Market and Premium cards for each of (1) MLB player trading cards; (2) NBA player trading cards; and (3) NFL player trading cards. Collectively, these eight markets are referred to as the "Relevant Markets."

85.     In addition, for distributors and producers of cards, there is no substitutability for critical supply-side inputs. All the inputs described herein—including (a) licenses from sports leagues that control the use of team colors, logos, and names; (b) licenses from players associations for the use of player names, images, and likenesses; (c) contracts with individual players to provide their name, image, and likeness along with original autographs and clothing to embed in certain cards; (d) specialized manufacturing for production of the cards; and (e) employees skilled in the successful creation, design, and marketing of professional sports trading cards—are necessary to produce and sell trading cards in these markets.

86.     Each Relevant Market also may contain further submarkets with competitive significance for the actions here.

87.     In addition to the barriers to entry resulting from Fanatics' anticompetitive conduct, the Relevant Markets have barriers to entry, including (because of the need for licenses) the limits on individual teams granting their own licenses, limits on individual players granting their own licenses, the existence of exclusive licenses, specialized high-tech manufacturing requirements, and the need for skilled workers such as card designers, program designers, product developers, athlete-acquisition managers, and specialist-print managers.

88.     Where licenses are exclusive, a new prospective entrant typically would need to wait for one of the League or players association contracts to be approaching termination, then bid for the exclusive or nonexclusive license from that League or players association. By having the ability to produce and sell trading cards for players of at least one Major U.S. Professional Sports League, a firm could maintain a market presence that allowed it to compete in the future for the production and sale of trading cards for players of other Major U.S. Professional Sports Leagues. But any firm that fails to win the rights to produce and sell trading cards for players of at least one of the Leagues is eliminated as a competitor.

89.     These barriers inhibit new entry from firms outside the markets for Major U.S. Professional Sports Leagues trading cards.

## C. Relevant Geographic Market

90.     The appropriate geographic market is the United States. Sports trading cards are sold and distributed to customers throughout the United States, through both online stores and brick and mortar retail stores.

91.     Consumers generally purchase Major U.S. Professional Sports Leagues trading cards within their own country. Moreover, the interest in sports is generally country-specific, with the U.S. market focused on the Major U.S. Professional Sports Leagues, while foreign markets may favor other sports, such as cricket, rugby, or soccer. Thus, as to the market for

21

Major U.S. Professional Sports Leagues trading cards and the individual League submarkets, the relevant geographical area is the United States.

92.     Consumer preferences and demand for trading cards of particular Leagues also vary by country. In the United States, cards for NFL players, NBA players, and MLB players constitute the vast majority of trading card sales.

## V. ANTICOMPETITIVE CONDUCT IN THE RELEVANT MARKETS

93.     Before Defendants' anticompetitive conduct, there was competition in and for the Relevant Markets and third-party card suppliers like Panini obtained licenses through public bidding.

94.     For instance, Panini started with a four-year exclusive deal with the NBA, which it obtained after a public-bidding process. Panini then secured a five-year extension on that deal with the NBA. After a public-bidding process, Panini secured its current eight-year exclusive deal with the NBA. After the NBA and NBA Players Association split, Panini secured its current six-year exclusive deal with the NBA Players Association lasting for the same term as its original deal with the NBA.

95.     Panini has never had more exclusive Major League Licenses than three and never held a single Major League License for any period approaching or reaching twenty years. The single, ten-year deal Panini did secure happened after multiple, short-term, non-exclusive deals always subject to open, public bidding.

96.      This historical competitive landscape in the trading card industry has been completely altered by Defendants' anticompetitive conduct.

### A. Fanatics Gains a Long-Term Monopoly by Securing Exclusive Deals With All Major Sports Leagues

97.     Fanatics is a relatively new entrant into the Relevant Markets. Prior to August 2021, Fanatics had no licenses to produce goods sold in the Relevant Markets.

98.     This all changed in August 2021, when Fanatics simultaneously announced the acquisition of the leading professional sports licenses in North America: MLB, the MLBPA, the NBA, the NBAPA, and the NFLPA. Shortly after, Fanatics also acquired the NFL exclusive license, thus exclusively securing all six of the Major League Licenses for Major U.S. Professional Sports Leagues trading cards with terms beginning in 2025 and 2026. Accordingly, by 2026 Fanatics will control 100% of the Relevant Markets for a term of at least ten years.

99.     On January 4, 2022, Fanatics announced that it had acquired Topps, a trading card producer that was, at the time, Panini's only other competitor in the Relevant Market. By acquiring Topps and its licenses, Fanatics gained an immediate exclusive license with the MLB that lasts through 2025 and a semi-exclusive license — shared with Panini — with the MLBPA that expired at the end of 2022. Thus, by acquiring Topps, Fanatics was able to enter and begin to monopolize the Relevant Market even earlier than it anticipated.

100.     Fanatics' exclusive deals with the Major U.S. Professionals Sports Leagues and their players associations were of unprecedented length and scope. The extreme duration and combination of these key inputs is something the trading card industry has never seen before.

101.     Four of the licenses (the licenses that Fanatics acquired from the NFL, NFLPA, MLB, and MLBPA) are for twenty years. Fanatics' licenses with the NBA and NBAPA, the exact terms of which have not been made public, are for at least ten years.

102.     The durations of Fanatics' exclusive dealing arrangements are beyond anything that is necessary for any legitimate economic or other purpose. Twenty years, by a wide margin,

is an unprecedented exclusive dealing duration in the trading card business. There have never been exclusive deals close to that duration in the trading card industry.

103. The durations of Fanatics' exclusive deals are made even more problematic by their scope. It is not just that Fanatics has a twenty-year deal with the NFL or a twenty-year deal with the MLB. Rather, Fanatics has engaged in such an extreme combination of Major League Licenses that, for the first time ever, a single firm will hold all six Major League Licenses for the Major U.S. Professional Sports Leagues.

104. By combining long-term exclusive licenses of unprecedented duration covering every Major U.S. Professional Sports League and their players associations, Fanatics positioned itself to drive Panini and other actual or potential competitors out of the market and erected barriers to entry blocking their return.

105. Fanatics' exclusive agreements foreclose competition entirely in the markets for MLB player trading cards, NBA player trading cards, and NFL player trading cards. Fanatics' exclusive agreements thereby foreclose one hundred percent of the market for Major U.S. Professional Sports Leagues trading cards. Thus, Fanatics sought and is now poised to eliminate Panini and others from competing in the production and sale of trading cards by completely blocking an essential input for a long time—without a single opportunity to compete for a decade or more—and not by competition on the merits.

106. The unprecedented duration and scope of Fanatic's exclusive dealing agreements causes substantial harm to consumers, like Plaintiff and members of the Classes, and competition in the market for Major U.S. Professional Sports Leagues trading cards in part because competition cannot occur until the end of the exclusive contract approaches. Only at that point

can there be competition "for the market"; that is, competition to replace the prior holder of the exclusive contract.

107.    Before Fanatics' anticompetitive conduct, competition for Major League Licenses typically occurred regularly, because the agreements between the Leagues and Players Associations and the companies that produce and sell sports trading cards—to the extent they were even exclusive—had shorter terms and staggered expiration dates. Now, because of the unprecedented length and combination of Fanatics' exclusive-dealing arrangements, any competition "for the market" cannot take place for decades, placing consumers at the mercy of only one provider.

108.    The new, untested Fanatics was not given its long-term exclusives after proving it could perform through a short-term trial contract consistent with past industry practice. Nor were competitors given an opportunity to bid or otherwise compete for the licenses Fanatics acquired. Competitors like Panini only learned about Fanatics' exclusive agreements after they were consummated, through reading about them in the media.

109.    To induce the Leagues and Players Associations to deal with them, Fanatics gave them equity ownership interest in Fanatics. In acquiring all six U.S. Major Sports League licenses from existing Relevant Market licensors, Fanatics leveraged its relationships with leaders of the Players Associations and certain League personnel, the equity stakes that relevant Leagues and Players Associations were provided, and other considerations premised on the monopoly profits Fanatics expected to earn. The collective equity stake of the Leagues and Players Associations (plus NHL and MLS) is worth billions of dollars.

110.    Additionally, Defendant OneTeam played a critical role in the execution of the exclusive deals with the MLBPA and NFLPA. MLBPA and NFLPA created OneTeam as a joint

venture which "specializes in the collective licensing rights of athletes."[6] In other words, OneTeam is a joint venture that combines the intellectual property of the MLBPA and NFLPA— which the individual players associations had themselves acquired by combining the intellectual property of their respective members—and others. It then serves as a seller of that combined intellectual property.

111.    When Fanatics announced it exclusive trading card deals with the MLBPA and NFLPA, the Executive Directors of the MLBPA—Tony Clark—and the NFLPA—DeMaurice Smith—said that the deal "never would have happened" if their organizations had not "joined forces to create OneTeam."[7]

112.    Fanatics' exclusive deals gave it a long-term monopoly of unprecedented length and combination in the trading card industry. Once announced in August 2021, the entire industry knew that Fanatics would, for many years, have complete control of the marketplace for MLB, NFL, and NBA player trading cards along with the broader market for player trading cards for the Major U.S. Professional Sports Leagues. That reality, assured by a web of anticompetitive contracts, gave Fanatics unprecedented power to secure for itself a monopoly in the near term, too.

**B.    Fanatics Leverages its Long-Term Monopoly Gained by Exclusive Deals to Obtain a Short-Term Monopoly**

113.    Securing its exclusive deals of extreme length and in an extreme combination was critical to Fanatics' overall plan. In the first instance, these deals gave Fanatics a monopoly of the Relevant Markets for the long term. But then Fanatics leveraged that long-term monopoly to

---

[6] https://retail-merchandiser.com/news/oneteam-partners/

[7] https://www.wsj.com/sports/football/trading-cards-nfl-mlb-nba-one-team-11633520569

monopolize those same markets in the short term through coercive, unfair, and anticompetitive conduct.

114.    As intended by Fanatics, the practical, combined effect of Fanatics' exclusive deals was to facilitate Fanatics' subsequent anticompetitive attacks on Panini and other market participants and ensure that Fanatics could maintain the monopolistic fruits of its anticompetitive conduct for decades—and even beyond that, given the barriers to entry that Fanatics has erected and is erecting.

115.    Fanatics then undertook numerous actions, which were themselves facilitated by Fanatics' long-term, exclusive-dealing arrangements—with the purpose and dangerous probability of success of monopolizing those same markets in the short term—with the purpose and effect of reinforcing its long-term monopoly. These actions included acquisitions, and exclusionary deals with Panini's employees, suppliers, star professional basketball and football players, and with other industry participants.

### 1. Fanatics Bought Topps

116.    After announcing its exclusive deals in August 2021, on January 4, 2022, Fanatics announced that Topps agreed to sell itself to Fanatics for a price reported to be in the range of $500 million. Topps's primary business at the time was supplying MLB trading cards with an exclusive license with MLB that ran until 2025 and a semi-exclusive license with the MLB Players Association that ran until the end of 2022.

117.    By acquiring Topps, Fanatics also acquired an immediate, exclusive license with MLS and eliminated any marginal current competition, and any greater potential competition, that MLS cards might provide.

118.    Fanatics' acquisition of Topps solidified and increased Fanatics' market power, which in turn it leveraged as described herein to disadvantage competitors, such as Panini.

### 2. *Fanatics Acquired Control over GCP*

119.     Fanatics' anticompetitive conduct did not stop with its acquisition of Topps. In an effort to foreclose competition and solidify its dominance in the Relevant Markets, in March 2022 Fanatics acquired a controlling stake over GCP Packaging, LLC ("GCP"), a highly specialized manufacturer responsible for producing over ninety percent of Panini's trading cards.

120.     Fanatics' acquisition of control over GCP has given Fanatics control of Panini's lifeblood—the production of nearly all its trading cards. For example, when Panini recently wished to discuss business with GCP, it was informed that GCP would need to obtain direction and feedback directly or indirectly from Fanatics first.

121.     Fanatics' control over Panini's lifeblood was the purpose of its acquiring control of GCP. After acquiring this control, Fanatics' CEO, Michael Rubin, told Panini's CEO, Mark Warsop, that Fanatics could now turn off the GCP machines devoted to Panini whenever it wanted, and from time-to-time Fanatics has done just that.

122.     In November 2021, before Fanatics acquired control of GCP, GCP told Panini that it would have capacity to produce 297 million packs in 2022 and 336 million packs in 2023 for Panini. But when Fanatics acquired control over GCP, everything changed.

123.     In 2022, making all too real Rubin's threat to turn off the GCP machines devoted to Panini, GCP delivered only fifty-eight percent of Panini's requested production, totaling 181 million packs for the year, contrary to GCP's November 2021 confirmation of capacity for 297 million packs in 2022. In 2023, GCP delivered around sixty-one percent of Panini's requested production.

124.     Ultimately, in 2022, GCP's reduced manufacturing caused an output shortfall of over 100 million packs of Panini trading cards and delayed programs (or releases) into 2023, resulting in canceled orders and lost or reduced sales. Panini had no alternative source of

manufacturing supply during this time. Fanatics' purposeful disruption—indeed, appropriation—of this critical supply chain for high-quality trading cards has denied consumers the many benefits of having the opportunity to buy superior product from Panini when and how they prefer.

125.    This conduct of delaying releases last-minute continued in 2023, with GCP weekly delaying Panini's product releases with little to no notice. This pattern of intermeddling delays is new; before Fanatics acquired control, Panini experienced nothing on this scale or this systematic. These delays result in less weeks on the market for Panini and licensors and disrupts the normal cadence of releases scheduled, ultimately resulting in a decrease in Panini's revenue and profit margin and a reduction of consumer choice.

126.    At bottom, through acquiring control of GCP, Fanatics now controls the critical means of manufacturing Panini's trading cards and has been exercising that control to harm Panini, competition, and consumers.

### 3. Fanatics Raided Panini for Employees

127.    Employees skilled in the successful creation, design, and marketing of professional sports trading cards are another key input for competing in the Relevant Markets.

128.    As part of its anticompetitive conduct to monopolize the Relevant Markets, Fanatics launched a raid of Panini for such a key input: its employees.

129.    Fanatics has managed to use unlawful means to lure, as of October 2023, thirty-six employees to leave Panini and join Fanatics. Fanatics raided Panini's employee base to harm Panini and did so with a combination of threats and improper inducements.

130.    For example, Fanatics used the monopoly power and effective market control from its future exclusive deals to induce some employees to come to Fanatics by threatening them with not working in the industry ever again once Panini's licenses expired unless those

employees committed immediately to join Fanatics. That Fanatics, in a few years, would hold long-term exclusive licenses to all Major U.S. Professional Sports Leagues (and their players associations) provided credibility to these threats.

131.    At times, Fanatics went even further, telling Panini's employees that Fanatics would soon take over Panini's business before Panini's licenses expired and thus Panini—and with it these employees' jobs—would no longer exist. So, if these employees wished to continue in the industry, Fanatics' story went, they needed to join Fanatics immediately.

132.    By raiding these employees years before a legitimate need, Fanatics sought to harm Panini's current ability to perform under its existing licenses and to bolster Fanatics' monopoly power by trying to put Panini out of business, all to the detriment of consumers like Plaintiff and members of the Classes who heretofore have benefited from market competition and, in particular, Panini's striving to meet and exceed consumer expectations in the Relevant Markets.

### 4. Fanatics Paid Star, Rookie Players not to Deal with Panini

133.    Another key input to competing in the Relevant Markets is contracts with individual players for the right to use their original, handwritten autograph on their trading card.

134.    In April 2023, in a similar demonstration of exclusionary intent and to further remove Panini as its only competitor in the Relevant Markets, Fanatics began a targeted effort to execute exclusive deals with star, rookie players to deprive Panini of the ability to include those players' original, handwritten autographs with its trading cards during the remaining years of Panini's existing licenses. Fanatics is effectively paying these players to prevent them from dealing with Panini since Fanatics cannot effectively use these rights in the interim.

135.    Fanatics has signed several NFL and NBA rookie players to lucrative deals for their original, handwritten autographs that, importantly, include exclusivity provisions. In

essence, Fanatics offered these players large sums to keep their original, handwritten autographs off the most important trading cards for the critical, early years of their careers during which they otherwise are trying to enhance their reputations and when their cards generally are most desired by consumers. That, indeed, is why Fanatics had to pay so much.

136.    And as with Panini's employees, Fanatics also used threats to persuade these athletes to sign with Fanatics. For example, if the large sums weren't enough, Fanatics also threatened players that if they did not immediately sign with Fanatics, they would never get an autograph deal in the future when Fanatics' long-term, exclusive deals began.

137.    Panini's agreements with the NFL and NBA and their players associations do not foreclose players from individually signing exclusive deals for the use of their original, handwritten autographs. But Fanatics' doing so deprives consumers for years of the full range of trading cards that they would otherwise be able to enjoy from Panini and furthers Fanatics' anticompetitive conduct.

138.    According to industry reports, Panini holds exclusive licenses with the NBA and NFL until October 2025 and April 2026, respectively, to use those Leagues' marks, such as team uniforms, logos, and color combinations. [8] Therefore, Fanatics cannot sell star, rookie players' original, handwritten autographs on its own trading cards with NBA and NFL marks until October 2025 and April 2026, respectively. The most it can do is create what the trading card industry pejoratively call "pajama cards" that brush out all League marks, generally resulting in low-quality cards depicting players seemingly in pajamas. Another option is to offer cards showing players in street clothing. Either way, consumers do not desire these types of cards nearly as much as those with League marks like team uniforms and color combinations.

---

[8] https://sports.yahoo.com/article/caitlin-clark-leads-wnba-trading-171605059.html

139.    By signing these players to exclusives over the remaining terms of Panini's licenses with the NBA and NFL, Fanatics reduced consumer welfare by depriving Panini of the ability to provide consumers with superior products—trading cards with original, handwritten autographs—that they otherwise could buy. Rookie cards are especially sought out by consumers, but because of Fanatics' conduct these rookie cards simply won't exist for consumers to buy for the next two-to-three years during the remaining terms of Panini's licenses.

### 5.    *Fanatics Coerced Distributors and Big-Box Retailers*

140.    Fanatics' anticompetitive conduct includes Fanatics' use of its monopoly power and effective market control to threaten distributors, who supply trading cards to big-box retail stores, with cutting them off if they do not provide Fanatics with higher margins, likely pressuring them to compromise quality of service, to the detriment of consumers like Plaintiff and members of the Classes.

141.    Fanatics has renegotiated terms directly with those big-box retailers that require the retailers to carry a more limited line of trading card options—the ones belonging only to Fanatics (through Topps), further compromising consumer choice.

142.    In doing so, Fanatics intentionally signaled both the distributors to the big-box retailers and the big-box retailers themselves that, because of its total control over player trading cards for the Major U.S. Professional Sports Leagues, Fanatics will soon be the only way for them to receive necessary trading card product.

143.    Making clear Fanatics would follow through on its threats against distributors, it eliminated from its roster of United States distributors the largest distributor of sports-trading cards, GTS Distribution.

144.    Fanatics' actions relating to GTS, the other distributors to big-box retailers, and the big-box retailers themselves harm consumers like Plaintiff and members of the Classes by,

among other things, reducing consumer choice, reducing competition, and ultimately raising prices.

### 6. *Fanatics Coerced Local Trading Card Shops*

145.    After obtaining its exclusive deals and after acquiring Topps, Fanatics used the monopoly power and effective market control from those deals to impose terms on local trading card shops that are anticompetitive and harm competition and consumers like Plaintiff and members of the Classes.

146.    Fanatics sent contracts to local trading card shops requiring them to acknowledge that whenever Fanatics wished, it could unilaterally issue minimum prices available to consumers to pay for Fanatics trading cards. Although Fanatics labeled these unilaterally controlled, minimum price requirements as "suggestions," Fanatics made clear that if local trading card shops ignored these price floors, that would be grounds for Fanatics suspending their accounts.

147.    Because Fanatics will soon control the entire market for player trading cards for the Major U.S. Professional Sports Leagues—and with that control the ability to decide which local card shops (if any) receive NFL, NBA, and MLB player trading cards—local trading card shops must comply with minimum-price requirements as decreed by Fanatics.

148.    This ultimately results in higher prices for consumers like Plaintiff and members of the Classes, with lower output.

149.    Fanatics also reduced consumer choice by pressuring local trading card shops not to sell trading cards on business-to-business trading card websites by threatening to never again supply those shops with player trading cards for the Major U.S. Professional Sports Leagues if they do so.



**Figure 3.**[9]

### 7. *Other Anticompetitive Acts*

150.    ***Fanatics Coerced Case Breakers.*** Fanatics also has coerced a key participant in the trading card industry: "case breakers." Case breakers help bring new trading card product to market, "breaking"—or opening—new trading card cases and packets by livestreaming over the internet. Case breakers, by necessity, need cases of product to break. Fanatics has made clear to them that their ability to secure those cases will be thwarted unless they immediately migrate to Fanatics' new case-breaking platform—Fanatics Live—on terms so draconian as to run their case-breaking business into the ground. This serves two purposes for Fanatics that square with its anticompetitive plan. For one, it forces case breakers who would rather operate on other case-breaking platforms to migrate to Fanatics Live. For another, once those case-breakers have migrated, it slowly forces them out of business so that only Fanatics' case breakers, or Fanatics'

---

[9] https://cardlines.com/fanatics-place-new-limitations-on-hobby-shops/

preferred case breakers, will remain—all of whom will operate only on Fanatics' platform. This will result at a minimum in reduced consumer choice and reduced output of case-breaking services. Reduced output means higher prices.

151.    ***Fanatics Disparaged Panini to Third Parties.*** Also in or around April 2023, Fanatics began disseminating false and derogatory statements about Panini to three sets of third parties that are central to Panini's operations under its existing licenses: (1) players, player agents, and player representatives; (2) players associations; and (3) Panini's current and now-former employees. To harm Panini's business and exclude Panini as a competitor in the Relevant Markets, Fanatics informed these third parties that Panini is incapable of performing for them, will be out of business soon, and lacks the money to pay them. According to Panini, these statements of asserted facts are false. Panini is well capitalized with an experienced executive-management team. These statements have harmed Panini's business reputation and diminished its ability to compete in the Relevant Markets.

152.    ***Fanatics cut off Panini's Supply of Jerseys.*** One of many innovative elements that Panini offers to trading card consumers is the inclusion of a piece of a player's jersey integrated into that player's trading card. Critical to that offering is obtaining the jerseys themselves. For years, Panini obtained most of its supply of official player jerseys from Fanatics. In May 2023, Fanatics' CEO, Michael Rubin, approached Panini to threaten that Fanatics would no longer supply Panini with any jerseys for Panini to offer to consumers as elements of its trading cards. Panini has since been unable to submit new orders to buy jerseys from Fanatics through its official Panini account. The account representative at Fanatics who previously dealt with Panini has been unresponsive. While Panini received and paid for orders submitted before May 2023, Fanatics has cut off Panini's ability to place new orders to buy jerseys.

153.    ***Fanatics induces NFLPA to Attempt to Terminate its License Agreement with Panini.*** Fanatics knew Panini had an exclusive deal with the NFLPA. After all, its own exclusive deal was set to begin when Panini's expired—or at least that's what was publicly reported. The NFLPA agreement with Fanatics provides that if the NFLPA were to terminate its agreement with Panini early, then the effective date of Fanatics' deal with the NFLPA is automatically accelerated, making Fanatics' agreement immediately effective. Fanatics induced the NFLPA to find a way to claim it can terminate its agreement with Panini before its term expires. In August 2023, NFLPA attempted to terminate its agreement with Panini. Fanatics' goal is that the NFL would terminate its agreement with Panini early, too, thus allowing Fanatics to produce fully licensed NFL player trading cards for those seasons.

154.    ***Fanatics induced WWE to Attempt to Terminate its Contract.*** Within days of the NFLPA's attempt to terminate its contract with Panini and announcing Fanatics was its new exclusive partner, WWE did the same. It attempted to terminate its contract with Panini's parent company, Panini S.p.A., and it has been reported that WWE has also now partnered exclusively with Fanatics— purportedly effective immediately. Although WWE is not part of the Relevant Markets, Fanatics inducing WWE to try to terminate its exclusive deal with Panini S.p.A. is evidence of Fanatics' overall intent and reflects Fanatics seeking to leverage its market and monopoly power in the Relevant Markets to harm competition in another market.

## VI.    FANATICS' MARKET POWER AND MONOPOLY POWER

155.    Fanatics' anticompetitive conduct has completely altered the competitive landscape of the Relevant Markets.

156.    Through its anticompetitive conduct, Fanatics has specifically intended to monopolize and has monopolized the overall market for Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium), which includes the production and sale of

trading cards, and the individual submarkets for MLB player trading cards, NBA player trading

cards, and NFL player trading cards (both Mass Market and Premium).

157.    It has done so for the long term and at least attempted to do so, if it has not

already done so or at least come dangerously close to doing so, for the short term. And in doing

so, it has erected insurmountable barriers to new entry.

158.    Fanatics has monopolized the long term through its unprecedently long exclusive

agreements with the Leagues and Players Associations, which foreclose competitors' access to

the critical inputs for each of the three MLB player trading card, NBA player trading card, and

NFL player trading card markets (and markets for Mass Market and Premium cards) for an

extensively long period.

159.    Fanatics' unprecedently long agreements with respect to each League accomplish

an extreme combination of those long agreements by consolidating the Major U.S. Professional

Sports Leagues trading cards market into the hands of a single firm for the first time ever,

thereby covering the entire Major U.S. Professional Sports Leagues trading cards market (and

markets for Mass Market and Premium cards).

160.    The Major U.S. Professional Sports Leagues trading cards market will be

completely controlled by a single firm for decades, one whose dominance does not result from

superior products, business acumen, or even historic accident. Or put differently, Fanatics has

foreclosed—for decades—all competition for player trading cards for the ninety-two teams that

compose the NBA, NFL, and MLB.

161.    No firm has ever done this before, even for a few years. In the past, competition

among different firms to produce trading cards of players for Major U.S. Professional Sports

imposed price and quality discipline on the market. Neither Panini nor any other firm held exclusive licenses for trading cards of players for all Major U.S. Professional Sports Leagues.

162.     Fanatics, however, has created a new monopoly spanning all the Major U.S. Professional Sports Leagues and their Players Associations that no other entity in the trading card industry has ever held. Never has a single firm combined the licenses required to produce fully licensed trading cards of players for all Major U.S. Professional Sports Leagues. Fanatics doing so has erected a potential barrier to entry for decades. As a result, Fanatics can raise prices in the Major U.S. Professional Sports trading card market to supra-competitive levels or compromise choice or quality without constraint by competitors.

163.     Card collectors are already seeing price increase. For instance, in 2024, a collector posted online "Topps Chrome value boxes have appeared on [F]anatics, coming in at $39.99. What happened to the days of $25/$30? Last year, $35 was a stretch, and it just doesn't stop."[10] A sports trading cards podcast, Spitballin' Cards, released an episode in late 2024 where they discussed the price of trading cards. They noted that prices today are at an all-time high. Regarding Fanatics-owned Topps, the host mentioned that "Topps . . . prices are more expensive now than they've ever been."[11]

164.     The Relevant Markets are characterized by barriers to entry as discussed above. It requires considerable brand investment, financial wherewithal, and expertise to enter the market for Major U.S. Professional Sports Leagues trading cards or any of the other Relevant Markets. Only the Major U.S. Professional Sports Leagues offer the volume, financial stability, and

---

[10] https://www.reddit.com/r/baseballcards/comments/1dkgth9/fanatics_needs_to_calm_down_with_the_pric e/#:~:text=Topps%20Chrome%20value%20boxes%20have,222%20Go%20to%20comments%20Share

[11] https://www.youtube.com/watch?v=hQEnNb4JLvw

industry focus necessary to enable a firm engaged in the production and sale of such trading cards to be a significant competitor.

165.    If not enjoined, Fanatics' anticompetitive conduct will give Fanatics a complete, total, and long-lasting monopoly of the individual submarkets for MLB player trading cards, NBA player trading cards, and NFL player trading cards (both Mass Market and Premium) and the market for Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium). That long-term monopolistic outcome is not just probable absent an antitrust remedy; it is locked down and assured by contract.

## VII.  ANTITRUST INJURY

166.    By executing deals of unprecedented length and combination, Fanatics has destroyed competition for the Relevant Markets that would normally occur after each license agreement expires. It has thus created insurmountable barriers to entry for competition for the Relevant Markets.

167.    Fanatics is also obtaining its monopoly position in the Relevant Markets through anticompetitive acts. In this respect as well, Fanatics has not competed for the Relevant Markets. In this way, among others, Fanatics has deprived counterparties of the benefits of the competitive process to which they are entitled.

168.    Fanatics' anticompetitive conduct has already and will continue to in the future cause harm to the public, consumers, and competition by allowing Fanatics complete control to set and raise prices and to dictate choice and quality for the overall market for Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium) and the markets for MLB player trading cards, NBA player trading cards, and NFL player trading cards (both Mass Market and Premium), reduce incentives for the development of higher-quality cards, and reduce consumer choice.

169.    Higher pricing and diminished choice and product quality for consumers are resulting from Fanatics' anticompetitive conduct given that no other firm can compete for the production of trading cards for the Relevant Markets so no restraints on Fanatics raising prices exist. Fanatics has already proven this to be the case by raising the prices of Topps cards to unprecedent levels and by reserving for itself the right to raise the prices that local card shops must set for consumers.

170.    Panini's output of trading cards has been substantially reduced, which shows that Fanatics' first concern is not about customers, but rather its own motivation to monopolize the Relevant Markets and its own long-term profits.

171.    Product quality for trading cards in the Relevant Markets is another casualty because of Fanatics' anticompetitive conduct. Once consumers no longer had an option to buy League apparel other than Fanatics, League apparel product quality nosedived. The same will be true once consumers have no option other than Fanatics for trading cards for Major U.S. Professional Sports Leagues. Indeed, Fanatics—through Topps—already is producing and selling MLB trading cards of inferior quality and confronting consumers with massive quality-control issues.

172.    The consumer experience will also suffer through a reduction in consumer choice. Already Fanatics is leveraging its long-term monopoly power to fire a distributor, pressure other distributors to give it higher margins, force big-box retailers to feature its own product over others, and force case breakers onto its own platform. These actions limit the outlets at which cards may be bought and deprive consumers of the choice in where to buy their cards, from whom to buy their cards, and the mix of cards from which to choose.

173.    These harms to competition befall both Mass Market and Premium trading card consumers. For example, on the Mass Market side, one of the likely outcomes of Fanatics' anticompetitive conduct is a reduction in retail distribution channels. And on the Premium side, there is nothing to suggest that an unproven entity like Fanatics will be able to produce cards of high quality. Indeed, sports memorabilia collectors frequently complain about Fanatics quality issues for all of their products.

174.    Accordingly, Plaintiff and the Classes are injured by the conduct alleged herein which causes them to pay higher prices for Pro Sports Trading Cards and reduces their choices for the same.

## VIII.    CLASS ALLEGATIONS

175.    This Action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23. Plaintiff brings this class action on behalf of himself and all other similarly situated individuals. The Nationwide Class Plaintiff seeks to represent is defined as follows:

> **Nationwide Class.** All persons or entities in the United States, who, during the period beginning January 1, 2022 until such time as the anticompetitive conduct alleged herein ceases (the "Class Period"),  purchased from a non-Defendant distributor (*e.g.*, big-box or other retailer, local trading card shop, or online store) newly-issued, fully-licensed Major U.S. Professional Sports Leagues trading cards produced by Fanatics.

176.    In the alternative and in addition to the Nationwide Class, Plaintiff seeks to represent the following State Repealer Class:

> **State Repealer Class.** All persons or entities in the United States that purchased from a non-Defendant distributor (*e.g.*, big-box or other retailer, local trading card shop, or online store), in one of the *Illinois Brick* Repealer States (defined below) during the Class Period, newly-issued, fully-licensed Major U.S. Professional Sports Leagues trading cards produced by Fanatics.

177.    The "*Illinois Brick* Repealer States," for purposes of this Complaint, include

Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida,

Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota,

Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,

New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina,

South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming.

178.    Excluded from the Classes are: Defendants and Defendants' subsidiaries,

affiliates, officers and directors, and any entity in which Defendants have a controlling interest;

Plaintiff's counsel; and all judges assigned to hear any aspect of this litigation; as well as their

immediate family members.

179.    Plaintiff reserves the right to modify or amend the definition of the proposed

Classes before the Court determines whether certification is appropriate.

180.    **Numerosity.** Both Classes are so numerous that joinder would be impracticable.

There are likely millions of trading card buyers across the United States.

181.    **Commonality.** There are questions of law and fact common to the Classes, which

predominate over any questions affecting only individual members of the Classes. These

common questions of law and fact include, without limitation:

a.   Whether Defendants violated the antitrust laws;

b.   Whether Defendants engaged in anticompetitive conduct;

c.   Whether Plaintiff was harmed;

d.   Whether Plaintiff is entitled to declaratory relief and injunctive relief to

    end Defendant's conduct; and

e.   Whether Plaintiff and members of the Classes are entitled to damages and

    other relief.

182.    **Typicality.** Plaintiff's claims are typical of those of other members of the Classes because Plaintiff, like every other member of the Classes, was harmed by way of the anticompetitive conduct alleged herein. Plaintiff, like all other members of the Classes, was injured by Defendants' uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other members of the Classes, such that there are no defenses unique to Plaintiff. The claims of Plaintiff and those of the other members of the Classes arise from the same operative facts and are based on the same legal theories.

183.    **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of members of the Classes in that he has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Classes. The damages and infringement of rights Plaintiff suffered are typical of other members of the Classes, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Classes. Plaintiff has retained counsel experienced in antitrust class action litigation, and Plaintiff intends to prosecute this action vigorously.

184.    **Superiority of Class Action.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual members of the Classes, and certification as a class action will preserve judicial resources by allowing the Classes' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Classes will remain unaware of the claims they may possess.

185.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of members of the Classes demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

186.    **Predominance.** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

187.    This proposed class action does not present any unique management difficulties.

## IX.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Monopolization in Violation of Section 2 of the Sherman Act**
**(Against Fanatics)**
**(On behalf of Nationwide Class for Injunctive Relief)**

188.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

189.    The relevant product market is the market for newly issued, fully-licensed Major U.S. Professional Sports Leagues trading cards, or alternatively the MLB trading card market, the NFL trading card market, and the NBA trading card market. The relevant geographic market is the United States.

190.    Fanatics' anticompetitive conduct has caused Fanatics to acquire and maintain monopolies of the overall market for Major U.S. Professional Sports Leagues trading cards, and each of the three MLB player, NBA player, and NFL player trading card markets (for both the Mass Market and Premium markets), each of which constitutes a substantial part of interstate commerce.

191.     Fanatics has the power to control prices in and/or to exclude competition from the Relevant Markets, resulting in monopoly power in each of the markets.

192.     These monopolies and their maintenance are not due to superior products, business acumen, or historic accident, and instead result from Fanatics' anticompetitive conduct.

193.     Fanatics' anticompetitive conduct unreasonably restrain competition and create insurmountable barriers to entry. There are no procompetitive justifications to redeem them.

194.     Fanatics' anticompetitive conduct affects a substantial portion of interstate commerce.

195.     Plaintiff and members of the Classes have been injured in their business or property by Fanatic's antitrust violation. That injury consists of paying higher prices for trading cards than would have been paid in the absence of the antitrust violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Fanatics' conduct unlawful.

196.     Plaintiff and members of the classes continue to pay higher prices today for trading cards than they would have paid in the absence of Fanatics' antitrust violation and are threatened with future injury to their business and property by reason of Fanatics' continuing violation of Section 2 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

**SECOND CAUSE OF ACTION**
**Attempted Monopolization in Violation of Section 2 of the Sherman Act**
**(Against Fanatics)**
**(On behalf of Nationwide Class for Injunctive Relief)**

197.     Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

198.    The relevant product market is the market for newly issued, fully-licensed Major U.S. Professional Sports Leagues trading cards, or alternatively the MLB trading card market, the NFL trading card market, and the NBA trading card market. The relevant geographic market is the United States.

199.    Fanatics, through its anticompetitive conduct and the constituent acts of that conduct, willfully has attempted, continues to attempt, and specifically intends to monopolize the market for Major U.S. Professional Sports Leagues trading cards and each of the three MLB player, NBA player, and NFL player trading card markets—for both the Mass Market and Premium card markets. Fanatics has a dangerous probability of success in monopolizing each of these markets, each of which constitutes a substantial part of interstate commerce. This probability is not due to superior products, business acumen, or historic accident, and instead results from its anticompetitive conduct and the constituent acts of that conduct, none of which constitute competition on the merits.

200.    Fanatics' anticompetitive conduct unreasonably restrain competition and create insurmountable barriers to entry. There are no procompetitive justifications to redeem them.

201.    Fanatics' anticompetitive conduct affects a substantial portion of interstate commerce.

202.    Plaintiff and members of the Classes have been injured in their business or property by Fanatic's antitrust violation. That injury consists of paying higher prices for trading cards than would have been paid in the absence of the antitrust violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Fanatics' conduct unlawful.

203.    Plaintiff and members of the classes continue to pay higher prices today for trading cards than they would have paid in the absence of Fanatics' antitrust violation and are threatened with future injury to their business and property by reason of Fanatics' continuing violation of Section 2 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

### THIRD CAUSE OF ACTION
**Violation of Section 1 of the Sherman Act**
**(Against Fanatics, MLB and MLBP)**
**(On behalf of Nationwide Class for Injunctive Relief)**

204.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

205.    Fanatics entered into long-term exclusive contracts with the MLB and the entity responsible for licensing the names, marks, and logos of each of the MLB's teams, the MLBP.

206.    Fanatics' long-term exclusive agreement with the MLB and MLBP unreasonably restrains trade and foreclose competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for MLB player trading cards.

207.    Defendants cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

208.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violations. That injury consists of paying higher prices for trading cards than would have been paid in the absence of the antitrust violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

209.    Plaintiff and members of the classes continue to pay higher prices today for trading cards than they would have paid in the absence of Defendants' antitrust violation and are

threatened with future injury to their business and property by reason of Defendants' continuing

violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton

Antitrust Act, 15 U.S.C. §26.

### FOURTH CAUSE OF ACTION
**Violation of Section 1 of the Sherman Act**
**(Against Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI)**
**(On behalf of Nationwide Class for Injunctive Relief)**

210.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if

fully set forth herein.

211.    Fanatics entered into long-term exclusive contracts with the MLBPA and the

entity responsible for licensing the names, marks, and logos of each of the MLBPA's members,

the MLBPI. Fanatics also entered into long-term exclusive contracts with the NFLPA and the

entity responsible for licensing the names, marks, and logos of each of the NFLPA's members,

the NFLPI.

212.    MLBPA and NFLPA created OneTeam as a joint venture which "specializes in

the collective licensing rights of athletes.

213.    When Fanatics announced it exclusive trading card deals with the MLBPA and

NFLPA, the Executive Directors of the MLBPA—Tony Clark—and the NFLPA—DeMaurice

Smith—said that the deal "never would have happened" if their organizations had not "joined

forces to create OneTeam."

214.    Fanatics' long-term exclusive agreements with the MLBPA, the MLBPI, the

NFLPA, and the NFLPI unreasonably restrain trade and foreclose competition in the Relevant

Market and in the submarkets for Mass Market and Premium cards for MLB and NFL player

trading cards.

215.    Defendants cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

216.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violations. That injury consists of paying higher prices for trading cards than would have been paid in the absence of the antitrust violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

217.    Plaintiff and members of the classes continue to pay higher prices today for trading cards than they would have paid in the absence of Defendants' antitrust violation and are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

**FIFTH CAUSE OF ACTION**
**Violation of Section 1 of the Sherman Act**
**(Against Fanatics, NFL and NFLP)**
**(On behalf of Nationwide Class for Injunctive Relief)**

218.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

219.    Fanatics entered into long-term exclusive contracts with the NFL and the entity responsible for licensing the names, marks, and logos of each of the NFL's teams, the NFLP.

220.    Fanatics' long-term exclusive agreement with the NFL and NFLP unreasonably restrains trade and foreclose competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for NFL player trading cards.

221.    Defendants cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

222.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violations. That injury consists of paying higher prices for trading cards than would have been paid in the absence of the antitrust violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

223.    Plaintiff and members of the classes continue to pay higher prices today for trading cards than they would have paid in the absence of Defendants' antitrust violation and are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

### SIXTH CAUSE OF ACTION
**Violation of Section 1 of the Sherman Act**
**(Against Fanatics, NBA and NBAP)**
**(On behalf of Nationwide Class for Injunctive Relief)**

224.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

225.    Fanatics entered into long-term exclusive contracts with the NBA and the entity responsible for licensing the names, marks, and logos of each of the NBA's teams, the NBAP.

226.    Fanatics' long-term exclusive agreement with the NBA and NBAP unreasonably restrains trade and foreclose competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for NBA player trading cards.

227.    Defendants cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

228.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violations. That injury consists of paying

higher prices for trading cards than would have been paid in the absence of the antitrust

violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust

laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

229.    Plaintiff and members of the classes continue to pay higher prices today for

trading cards than they would have paid in the absence of Defendants' antitrust violation and are

threatened with future injury to their business and property by reason of Defendants' continuing

violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton

Antitrust Act, 15 U.S.C. §26.

**SEVENTH CAUSE OF ACTION**
**Violation of Section 1 of the Sherman Act**
**(Against Fanatics and NBAPA)**
**(On behalf of Nationwide Class for Injunctive Relief)**

230.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if

fully set forth herein.

231.    Fanatics entered into long-term exclusive contracts with the NBAPA.

232.    Fanatics' long-term exclusive agreement with the NBAPA unreasonably restrains

trade and foreclose competition in the Relevant Market and in the submarkets for Mass Market

and Premium cards for NBA player trading cards.

233.    Defendants cannot show any cognizable pro-competitive benefits that outweigh

the harm to competition and consumers.

234.    As a result of the long-term exclusive agreement, consumers have suffered injury

and damages that flow from Defendants' antitrust violations. That injury consists of paying

higher prices for trading cards than would have been paid in the absence of the antitrust

violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust

laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

235.    Plaintiff and members of the classes continue to pay higher prices today for trading cards than they would have paid in the absence of Defendants' antitrust violation and are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## EIGHTH CAUSE OF ACTION
### Monopolization under State Law
### (Against Fanatics)
### (On behalf of State Repealer Class for Damages)

236.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein

237.    The relevant product market is the market for newly issued Major U.S. Professional Sports Leagues trading cards, or alternatively the MLB trading card market, the NFL trading card market, and the NBA trading card market. The relevant geographic market is the United States.

238.    Fanatics' anticompetitive conduct has caused Fanatics to acquire and maintain monopolies of the overall market for Major U.S. Professional Sports Leagues trading cards, and each of the three MLB player, NBA player, and NFL player trading card markets (for both the Mass Market and Premium markets), each of which constitutes a substantial part of interstate commerce.

239.    Fanatics has the power to control prices in and/or to exclude competition from the Relevant Markets, resulting in monopoly power in each of the markets.

240.    These monopolies and their maintenance are not due to superior products, business acumen, or historic accident, and instead result from Fanatics' anticompetitive conduct.

241.    Fanatics' anticompetitive conduct unreasonably restrain competition and create insurmountable barriers to entry. There are no procompetitive justifications to redeem them.

242.    By reason of the foregoing, Fanatics has violated, and Plaintiff and members of the State Repealer Class are entitled to relief under:

a.    Arizona, Ariz. Rev. Stat. § 44-1401, et seq.

b.    California, Cal. Bus. & Prof. Code § 16700, et seq.

c.    Colorado, Colo. Rev. Stat. §§ 6-4-101, et seq.

d.    Connecticut, Conn. Gen. Stat. § 35-24, et seq.

e.    D.C. Code § 28-4501, et seq.

f.    Delaware Del. Code Ann. tit. 6, § 2101, et. seq.

g.    Hawaii, Hawaii Rev. Stat. § 480-1, et seq.

h.    Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, et seq.

i.    Iowa, Iowa Code § 553.1, et seq.

j.    Kansas, Kan. Stat. Ann. § 50-101, et seq.

k.    Maine, Maine Rev. Stat. tit. 10, § 1101, et seq.

l.    Maryland, Md. Code, Comm. Law § 11-201, et seq.

m.    Michigan, MCL § 445.773, et seq.

n.    Minnesota, Minn. Stat. § 325D.49, et seq.

o.    Mississippi, Miss. Code Ann. § 75-21-1, et seq.

p.    Nebraska, Neb. Rev. Stat. § 59-801, et seq.

q.    Nevada, Nev. Rev. Stat. § 598A.010, et seq.

r.    New Hampshire, N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, et seq.

s.    New Jersey, N.J. Stat. Ann. § 56:9-11, et seq.

t.   New Mexico, N.M. Stat. Ann. § 57-1-1, et seq.

u.   New York, N.Y. Gen. Bus. Law § 340, et seq.

v.   North Carolina, N.C. Gen. Stat. § 75-1, et seq.

w.   North Dakota, N.D. Cen. Code § 51-08.1-01, et seq.

x.   Oregon, Or. Rev. Stat. § 646.705, et seq.

y.   P.R. Laws Ann. tit. 10 §§ 258, et seq.

z.   Rhode Island, R.I. Sat. § 6-36-1, et seq.

aa.  South Carolina, S.C. Code Ann. § 39-3-10, et seq.

bb.  South Dakota, S.D. Cod. Laws § 37-1-3.1, et seq.

cc.  Tennessee, Tenn. Code Ann. § 47-25-101, et seq.

dd.  Utah, Utah Code. Ann. § 76-10-3101, et seq.

ee.  Vermont, 9 V.S.A. § 2453a(a)

ff.  West Virginia, W.V. Code § 47-18-1, et seq.

gg.  Wisconsin, Wisc. Stat. § 133.01, et seq.

hh.  Wyoming, Wyo. Stat. Ann. § 40-4-101, et seq.

**NINTH CAUSE OF ACTION**
**Unreasonable Restraint of Trade under State Law**
**(Against Fanatics, MLB and MBLP)**
**(On behalf of State Repealer Class for Damages)**

243.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

244.    Fanatics entered into long-term exclusive contracts with the MLB and the entity responsible for licensing the names, marks, and logos of each of the MLB's teams, the MLBP.

245.    Fanatics' long-term exclusive agreement with the MLB and MLBP unreasonably restrains trade and foreclose competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for MLB player trading cards.

246.    Defendants cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

247.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violations. That injury consists of paying higher prices for trading cards than would have been paid in the absence of the antitrust violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

248.    By reason of the foregoing, Defendants have violated, and Plaintiff and members of the State Repealer Class are entitled to relief under:

      a.  Arizona, Ariz. Rev. Stat. § 44-1401, et seq.

      b.  California, Cal. Bus. & Prof. Code § 16700, et seq.

      c.  Colorado, Colo. Rev. Stat. §§ 6-4-101, et seq.

      d.  Connecticut, Conn. Gen. Stat. § 35-24, et seq.

      e.  D.C. Code § 28-4501, et seq.

      f.  Delaware Del. Code Ann. tit. 6, § 2101, et. seq.

      g.  Hawaii, Hawaii Rev. Stat. § 480-1, et seq.

      h.  Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, et seq.

      i.  Iowa, Iowa Code § 553.1, et seq.

      j.  Kansas, Kan. Stat. Ann. § 50-101, et seq.

      k.  Maine, Maine Rev. Stat. tit. 10, § 1101, et seq.

l.   Maryland, Md. Code, Comm. Law § 11-201, et seq.

m.  Michigan, MCL § 445.773, et seq.

n.   Minnesota, Minn. Stat. § 325D.49, et seq.

o.   Mississippi, Miss. Code Ann. § 75-21-1, et seq.

p.   Nebraska, Neb. Rev. Stat. § 59-801, et seq.

q.   Nevada, Nev. Rev. Stat. § 598A.010, et seq.

r.   New Hampshire, N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, et seq.

s.   New Jersey, N.J. Stat. Ann. § 56:9-11, et seq.

t.   New Mexico, N.M. Stat. Ann. § 57-1-1, et seq.

u.   New York, N.Y. Gen. Bus. Law § 340, et seq.

v.   North Carolina, N.C. Gen. Stat. § 75-1, et seq.

w.  North Dakota, N.D. Cen. Code § 51-08.1-01, et seq.

x.   Oregon, Or. Rev. Stat. § 646.705, et seq.

y.   P.R. Laws Ann. tit. 10 §§ 258, et seq.

z.   Rhode Island, R.I. Sat. § 6-36-1, et seq.

aa.  South Carolina, S.C. Code Ann. § 39-3-10, et seq.

bb.  South Dakota, S.D. Cod. Laws § 37-1-3.1, et seq.

cc.  Tennessee, Tenn. Code Ann. § 47-25-101, et seq.

dd.  Utah, Utah Code. Ann. § 76-10-3101, et seq.

ee.  Vermont, 9 V.S.A. § 2453a(a)

ff.   West Virginia, W.V. Code § 47-18-1, et seq.

gg.  Wisconsin, Wisc. Stat. § 133.01, et seq.

hh.  Wyoming, Wyo. Stat. Ann. § 40-4-101, et seq.

## TENTH CAUSE OF ACTION
### Unreasonable Restraint of Trade under State Law
**(Against Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI)**
**(On behalf of State Repealer Class for Damages)**

249.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

250.    Fanatics entered into long-term exclusive contracts with the MLBPA and the entity responsible for licensing the names, marks, and logos of each of the MLBPA's members, the MLBPI. Fanatics also entered into long-term exclusive contracts with the NFLPA and the entity responsible for licensing the names, marks, and logos of each of the NFLPA's members, the NFLPI.

251.    MLBPA and NFLPA created OneTeam as a joint venture which "specializes in the collective licensing rights of athletes.

252.    When Fanatics announced it exclusive trading card deals with the MLBPA and NFLPA, the Executive Directors of the MLBPA—Tony Clark—and the NFLPA—DeMaurice Smith—said that the deal "never would have happened" if their organizations had not "joined forces to create OneTeam."

253.    Fanatics' long-term exclusive agreements with the MLBPA, the MLBPI, the NFLPA, and the NFLPI unreasonably restrain trade and foreclose competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for MLB and NFL player trading cards.

254.    Defendants cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

255.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violations. That injury consists of paying

higher prices for trading cards than would have been paid in the absence of the antitrust violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

256.    By reason of the foregoing, Defendants have violated, and Plaintiff and members of the State Repealer Class are entitled to relief under:

      a.  Arizona, Ariz. Rev. Stat. § 44-1401, et seq.

      b.  California, Cal. Bus. & Prof. Code § 16700, et seq.

      c.  Colorado, Colo. Rev. Stat. §§ 6-4-101, et seq.

      d.  Connecticut, Conn. Gen. Stat. § 35-24, et seq.

      e.  D.C. Code § 28-4501, et seq.

      f.  Delaware Del. Code Ann. tit. 6, § 2101, et. seq.

      g.  Hawaii, Hawaii Rev. Stat. § 480-1, et seq.

      h.  Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, et seq.

      i.  Iowa, Iowa Code § 553.1, et seq.

      j.  Kansas, Kan. Stat. Ann. § 50-101, et seq.

      k.  Maine, Maine Rev. Stat. tit. 10, § 1101, et seq.

      l.  Maryland, Md. Code, Comm. Law § 11-201, et seq.

      m.  Michigan, MCL § 445.773, et seq.

      n.  Minnesota, Minn. Stat. § 325D.49, et seq.

      o.  Mississippi, Miss. Code Ann. § 75-21-1, et seq.

      p.  Nebraska, Neb. Rev. Stat. § 59-801, et seq.

      q.  Nevada, Nev. Rev. Stat. § 598A.010, et seq.

      r.  New Hampshire, N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, et seq.

s.  New Jersey, N.J. Stat. Ann. § 56:9-11, et seq.

t.  New Mexico, N.M. Stat. Ann. § 57-1-1, et seq.

u.  New York, N.Y. Gen. Bus. Law § 340, et seq.

v.  North Carolina, N.C. Gen. Stat. § 75-1, et seq.

w.  North Dakota, N.D. Cen. Code § 51-08.1-01, et seq.

x.  Oregon, Or. Rev. Stat. § 646.705, et seq.

y.  P.R. Laws Ann. tit. 10 §§ 258, et seq.

z.  Rhode Island, R.I. Sat. § 6-36-1, et seq.

aa.  South Carolina, S.C. Code Ann. § 39-3-10, et seq.

bb.  South Dakota, S.D. Cod. Laws § 37-1-3.1, et seq.

cc.  Tennessee, Tenn. Code Ann. § 47-25-101, et seq.

dd.  Utah, Utah Code. Ann. § 76-10-3101, et seq.

ee.  Vermont, 9 V.S.A. § 2453a(a)

ff.  West Virginia, W.V. Code § 47-18-1, et seq.

gg.  Wisconsin, Wisc. Stat. § 133.01, et seq.

hh.  Wyoming, Wyo. Stat. Ann. § 40-4-101, et seq.

## ELEVENTH CAUSE OF ACTION
### Unreasonable Restraint of Trade under State Law
### (Against Fanatics, NFL and NFLP)
### (On behalf of State Repealer Class for Damages)

257.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

258.    Fanatics entered into long-term exclusive contracts with the NFL and the entity responsible for licensing the names, marks, and logos of each of the NFL's teams, the NFLP.

259.    Fanatics' long-term exclusive agreement with the NFL and NFLP unreasonably restrains trade and foreclose competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for NFL player trading cards.

260.    Defendants cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

261.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violations. That injury consists of paying higher prices for trading cards than would have been paid in the absence of the antitrust violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

262.    By reason of the foregoing, Defendants have violated, and Plaintiff and members of the State Repealer Class are entitled to relief under:

      a.  Arizona, Ariz. Rev. Stat. § 44-1401, et seq.

      b.  California, Cal. Bus. & Prof. Code § 16700, et seq.

      c.  Colorado, Colo. Rev. Stat. §§ 6-4-101, et seq.

      d.  Connecticut, Conn. Gen. Stat. § 35-24, et seq.

      e.  D.C. Code § 28-4501, et seq.

      f.  Delaware Del. Code Ann. tit. 6, § 2101, et. seq.

      g.  Hawaii, Hawaii Rev. Stat. § 480-1, et seq.

      h.  Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, et seq.

      i.  Iowa, Iowa Code § 553.1, et seq.

      j.  Kansas, Kan. Stat. Ann. § 50-101, et seq.

      k.  Maine, Maine Rev. Stat. tit. 10, § 1101, et seq.

l.  Maryland, Md. Code, Comm. Law § 11-201, et seq.

m.  Michigan, MCL § 445.773, et seq.

n.  Minnesota, Minn. Stat. § 325D.49, et seq.

o.  Mississippi, Miss. Code Ann. § 75-21-1, et seq.

p.  Nebraska, Neb. Rev. Stat. § 59-801, et seq.

q.  Nevada, Nev. Rev. Stat. § 598A.010, et seq.

r.  New Hampshire, N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, et seq.

s.  New Jersey, N.J. Stat. Ann. § 56:9-11, et seq.

t.  New Mexico, N.M. Stat. Ann. § 57-1-1, et seq.

u.  New York, N.Y. Gen. Bus. Law § 340, et seq.

v.  North Carolina, N.C. Gen. Stat. § 75-1, et seq.

w.  North Dakota, N.D. Cen. Code § 51-08.1-01, et seq.

x.  Oregon, Or. Rev. Stat. § 646.705, et seq.

y.  P.R. Laws Ann. tit. 10 §§ 258, et seq.

z.  Rhode Island, R.I. Sat. § 6-36-1, et seq.

aa.  South Carolina, S.C. Code Ann. § 39-3-10, et seq.

bb.  South Dakota, S.D. Cod. Laws § 37-1-3.1, et seq.

cc.  Tennessee, Tenn. Code Ann. § 47-25-101, et seq.

dd.  Utah, Utah Code. Ann. § 76-10-3101, et seq.

ee.  Vermont, 9 V.S.A. § 2453a(a)

ff.  West Virginia, W.V. Code § 47-18-1, et seq.

gg.  Wisconsin, Wisc. Stat. § 133.01, et seq.

hh.  Wyoming, Wyo. Stat. Ann. § 40-4-101, et seq.

## TWELFTH CAUSE OF ACTION
### Unreasonable Restraint of Trade under State Law
### (Against Fanatics, NBA and NBAP)
### (On behalf of State Repealer Class for Damages)

263.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

264.    Fanatics entered into long-term exclusive contracts with the NBA and the entity responsible for licensing the names, marks, and logos of each of the NBA's teams, the NBAP.

265.    Fanatics' long-term exclusive agreement with the NBA and NBAP unreasonably restrains trade and foreclose competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for NBA player trading cards.

266.    Defendants cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

267.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violations. That injury consists of paying higher prices for trading cards than would have been paid in the absence of the antitrust violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

268.    By reason of the foregoing, Defendants have violated, and Plaintiff and members of the State Repealer Class are entitled to relief under:

      a.    Arizona, Ariz. Rev. Stat. § 44-1401, et seq.

      b.    California, Cal. Bus. & Prof. Code § 16700, et seq.

      c.    Colorado, Colo. Rev. Stat. §§ 6-4-101, et seq.

      d.    Connecticut, Conn. Gen. Stat. § 35-24, et seq.

      e.    D.C. Code § 28-4501, et seq.

f.  Delaware Del. Code Ann. tit. 6, § 2101, et. seq.

g.  Hawaii, Hawaii Rev. Stat. § 480-1, et seq.

h.  Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, et seq.

i.  Iowa, Iowa Code § 553.1, et seq.

j.  Kansas, Kan. Stat. Ann. § 50-101, et seq.

k.  Maine, Maine Rev. Stat. tit. 10, § 1101, et seq.

l.  Maryland, Md. Code, Comm. Law § 11-201, et seq.

m.  Michigan, MCL § 445.773, et seq.

n.  Minnesota, Minn. Stat. § 325D.49, et seq.

o.  Mississippi, Miss. Code Ann. § 75-21-1, et seq.

p.  Nebraska, Neb. Rev. Stat. § 59-801, et seq.

q.  Nevada, Nev. Rev. Stat. § 598A.010, et seq.

r.  New Hampshire, N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, et seq.

s.  New Jersey, N.J. Stat. Ann. § 56:9-11, et seq.

t.  New Mexico, N.M. Stat. Ann. § 57-1-1, et seq.

u.  New York, N.Y. Gen. Bus. Law § 340, et seq.

v.  North Carolina, N.C. Gen. Stat. § 75-1, et seq.

w.  North Dakota, N.D. Cen. Code § 51-08.1-01, et seq.

x.  Oregon, Or. Rev. Stat. § 646.705, et seq.

y.  P.R. Laws Ann. tit. 10 §§ 258, et seq.

z.  Rhode Island, R.I. Sat. § 6-36-1, et seq.

aa. South Carolina, S.C. Code Ann. § 39-3-10, et seq.

bb. South Dakota, S.D. Cod. Laws § 37-1-3.1, et seq.

cc. Tennessee, Tenn. Code Ann. § 47-25-101, et seq.

dd. Utah, Utah Code. Ann. § 76-10-3101, et seq.

ee. Vermont, 9 V.S.A. § 2453a(a)

ff. West Virginia, W.V. Code § 47-18-1, et seq.

gg. Wisconsin, Wisc. Stat. § 133.01, et seq.

hh. Wyoming, Wyo. Stat. Ann. § 40-4-101, et seq.

### THIRTEENTH CAUSE OF ACTION
**Unreasonable Restraint of Trade under State Law**
**(Against Fanatics and NBPA)**
**(On behalf of State Repealer Class for Damages)**

269.   Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

270.   Fanatics entered into long-term exclusive contracts with the NBPA.

271.   Fanatics' long-term exclusive agreement with the NBAPA unreasonably restrains trade and foreclose competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for NBA player trading cards.

272.   Defendants cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

273.   As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violations. That injury consists of paying higher prices for trading cards than would have been paid in the absence of the antitrust violations. Plaintiff and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

274.   By reason of the foregoing, Defendants have violated, and Plaintiff and members of the State Repealer Class are entitled to relief under:

a.   Arizona, Ariz. Rev. Stat. § 44-1401, et seq.

b.   California, Cal. Bus. & Prof. Code § 16700, et seq.

c.   Colorado, Colo. Rev. Stat. §§ 6-4-101, et seq.

d.   Connecticut, Conn. Gen. Stat. § 35-24, et seq.

e.   D.C. Code § 28-4501, et seq.

f.   Delaware Del. Code Ann. tit. 6, § 2101, et. seq.

g.   Hawaii, Hawaii Rev. Stat. § 480-1, et seq.

h.   Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, et seq.

i.   Iowa, Iowa Code § 553.1, et seq.

j.   Kansas, Kan. Stat. Ann. § 50-101, et seq.

k.   Maine, Maine Rev. Stat. tit. 10, § 1101, et seq.

l.   Maryland, Md. Code, Comm. Law § 11-201, et seq.

m.   Michigan, MCL § 445.773, et seq.

n.   Minnesota, Minn. Stat. § 325D.49, et seq.

o.   Mississippi, Miss. Code Ann. § 75-21-1, et seq.

p.   Nebraska, Neb. Rev. Stat. § 59-801, et seq.

q.   Nevada, Nev. Rev. Stat. § 598A.010, et seq.

r.   New Hampshire, N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, et seq.

s.   New Jersey, N.J. Stat. Ann. § 56:9-11, et seq.

t.   New Mexico, N.M. Stat. Ann. § 57-1-1, et seq.

u.   New York, N.Y. Gen. Bus. Law § 340, et seq.

v.   North Carolina, N.C. Gen. Stat. § 75-1, et seq.

w.   North Dakota, N.D. Cen. Code § 51-08.1-01, et seq.

x.   Oregon, Or. Rev. Stat. § 646.705, et seq.

y.   P.R. Laws Ann. tit. 10 §§ 258, et seq.

z.   Rhode Island, R.I. Sat. § 6-36-1, et seq.

aa. South Carolina, S.C. Code Ann. § 39-3-10, et seq.

bb. South Dakota, S.D. Cod. Laws § 37-1-3.1, et seq.

cc. Tennessee, Tenn. Code Ann. § 47-25-101, et seq.

dd. Utah, Utah Code. Ann. § 76-10-3101, et seq.

ee. Vermont, 9 V.S.A. § 2453a(a)

ff.  West Virginia, W.V. Code § 47-18-1, et seq.

gg. Wisconsin, Wisc. Stat. § 133.01, et seq.

hh. Wyoming, Wyo. Stat. Ann. § 40-4-101, et seq.

<u>**FOURTEENTH CAUSE OF ACTION**</u>
**Unfair and Deceptive Trade Practices**
**(Against All Defendants)**
**(On behalf of State Repealer Class for Damages)**

275.   Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

276.   By reason of the foregoing, Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the following state laws:

a.   Arkansas, Ark. Code §§ 4-88-101, et seq.

b.   California, California Bus & Prof. Code §§ 17200, et seq.

c.   Florida, Fla. Stat. § 501.201, et seq.

d.   Massachusetts, Mass. Gen. Laws, chapter 93A § 1, et seq.

e.   Missouri, Mo. Rev. Stat. § 407.020.

f.   Montana, Mont. Code, §§ 30-14-101, et seq.

g.   Virginia, Va. Code Ann. § 59.1-196, et seq.

## FIFTEENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
#### (Against Fanatics)
#### (On behalf of State Repealer Class for Restitution)

277.    Plaintiff realleges and repeats the allegations contained in paragraphs 1-187 as if fully set forth herein.

278.    Plaintiff asserts the following cause of action in the alternative.

279.    Plaintiff and members of State Repealer Class paid higher prices for Fanatics' trading cards content than what would have otherwise occurred in a market free of Fanatics' unlawful conduct.

280.    Plaintiff and members of State Repealer Class conferred a benefit upon Fanatics with their money. Specifically, they paid for trading cards. In doing so, they paid supracompetitive prices.

281.    Fanatics knew that Plaintiff and members of State Repealer Class conferred a benefit which Fanatics accepted. Fanatics profited heavily from these transactions.

282.    Under principles of equity and good conscience, Fanatics should not be permitted to retain the money made through these unconscionable acts.

283.    Plaintiff and members of State Repealer Class have no adequate remedy at law.

284.    As a direct and proximate result of Fanatics' conduct, Plaintiff and members of State Repealer Class have suffered injury (and will continue to suffer injury), including in the form of higher prices for trading cards.

285.    Fanatics should be compelled to disgorge profits from this unlawful scheme into a common fund or constructive trust, for the benefit of Plaintiff and members of State Repealer Class.

## X.   DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Classes, respectfully ask this Court for a judgment that:

A.   Certifies the Classes pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) and directs that reasonable notice of this Action, as provided by Federal Rule of Civil Procedure 23(c)(2) be given to the Class, and appoints Plaintiff as representative of the Class;

B.   Appoints Plaintiff's counsel as class counsel;

C.   Enters judgment against Defendants, and in favor of Plaintiff and the Classes, holding Defendants liable for the antitrust violations as alleged herein;

D.   Grants permanent injunctive relief enjoining Defendants from continuing to engage in the anticompetitive conduct described above;

E.   Awards Plaintiff and the Classes actual, treble, and exemplary damages as permitted plus interest in accordance with the law;

F.   Awards such equitable relief as is necessary to correct for the anticompetitive market effects as caused by Defendants' unlawful conduct, including disgorgement, restitution, and the creative of a constructive trust;

G.   Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees; and

H.   Directs such further relief as it may deem just and proper.

## XI.   JURY TRIAL DEMAND

286.   Plaintiff and members of the Classes demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

DATED: July 14, 2025

Respectfully submitted,

*/s/ Gregory S. Asciolla*

Gregory S. Asciolla
Alexander E. Barnett
Jonathan S. Crevier
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
abarnett@dicellolevitt.com
jcrevier@dicellolevitt.com

*Counsel for Plaintiff and members of the Classes*