**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PHILLIP JONES; SAAD AMER; SEAN AULD; KYLENE COMEAU; DANIEL ENRIQUEZ; CHIP FURR; GLEN GAY; MITCHELL GOLDBERGER; STAVEN HODGE; BRUCE HONNOLD; JOSEPH KELLY; ALEXANDROS KOLAZAS; TIMOTHY MCCANN JR.; RYAN MEUSE; AARON MURPHY; EDGAR NAVA; JOHN SCHOLL; and RICHARD CRAIG SMITH on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; FANATICS HOLDINGS, INC.; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL PLAYERS ASSOCIATION; and ONETEAM PARTNERS LLC,

*Defendants*.

Case No. 1:25-cv-05776-LTS-VF

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION OF CLAIMS OF PLAINTIFFS SAAD AMER, SEAN AULD, DANIEL ENRIQUEZ, CHIP FURR, GLEN GAY, MITCHELL GOLDBERGER, STAVEN HODGE, ALEXANDROS KOLAZAS, TIMOTHY MCCANN, RYAN MEUSE, AARON MURPHY, AND EDGAR NAVA**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....... 1

II. FACTUAL BACKGROUND ....... 2

A. Plaintiffs' Claims ....... 2

B. Arbitration Plaintiffs' Agreement to the TOU ....... 3

1. Fanatics.com ....... 3

2. MLBShop.com ....... 10

III. LEGAL STANDARD ....... 13

IV. ARGUMENT ....... 14

A. Arbitration Plaintiffs' Assent to the TOU Is Valid and Binding ....... 15

B. The Parties Delegated Arbitrability Questions—Including the Scope of the Arbitration Agreement—to the Arbitrator ....... 18

C. Even If the Court Reaches Arbitrability, Arbitration Plaintiffs' Claims Fall Within the Scope of the Arbitration Provision ....... 20

D. Plaintiffs' Claims Against MLBPI/A, MLB, NBPA, and NBA Must Be Compelled To Arbitration ....... 22

E. Plaintiffs' Claims Must Be Stayed ....... 24

V. CONCLUSION ....... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES


*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................14

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
2017 WL 7309893 (S.D.N.Y. Nov. 20, 2017)....................17

*Blash v. BCS Placements, LLC*,
2020 WL 2832777 (S.D.N.Y. May 31, 2020)....................19

*Branch of Citibank, N.A. v. De Nevares*,
74 F.4th 8 (2d Cir. 2023)....................2

*Byrne v. Charter Comm'cns, Inc.*,
581 F. Supp. 3d 409 (D. Conn. 2022)....................24

*Contec Corp. v. Remote Sol., Co.*,
398 F.3d 205 (2d Cir. 2005)....................20

*Davitashvili v. Grubhub Inc.*,
131 F.4th 109 (2d Cir. 2025)....................21

*Douzinas v. Am. Bureau of Shipping, Inc.*,
888 A.2d 1146 (Del. Ch. 2006)....................23, 24

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023)....................15, 16, 18

*Foran v. NFL*,
2019 WL 2408030 (S.D.N.Y. June 7, 2019)....................18, 20

*GPS Int'l Techs., Inc. v. Verizon Commc'ns, Inc.*,
2025 WL 2776095 (S.D.N.Y. Sept. 30, 2025)....................21

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019)....................14, 18, 20

*In re Titanium Dioxide Antitrust Litig.*,
962 F. Supp. 2d 840 (D. Md. 2013)....................23

*Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*,
67 F.4th 107 (2d Cir. 2023)....................21

*Maldonado v. NFL*,
2023 WL 4580417 (S.D.N.Y. July 18, 2023) ........................................................ *passim*

*Marsh & McLennan Agency LLC v. Williams*,
2023 WL 4534984 (S.D.N.Y. July 13, 2023) ........................................................2

*Mavashev v. Kaldykulov*,
2024 WL 1345802 (E.D.N.Y. Mar. 30, 2024) ........................................................19

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)........................................................15, 16, 17

*Pacelli v. Augustus Intel., Inc.*,
459 F. Supp. 3d 597 (S.D.N.Y. 2020)........................................................14

*Ramasamy v. Essar Glob. Ltd.*,
825 F. Supp. 2d 466 (S.D.N.Y. 2011)........................................................22

*Reid v. Tandym Grp., LLC*,
697 F. Supp. 3d 62 (S.D.N.Y. 2023)........................................................24

*Smith v. Spizzirri*,
601 U.S. 472 (2024)........................................................2, 24

*Wells Fargo Advisors, LLC v. Sappington*,
884 F.3d 392 (2d Cir. 2018)........................................................19

*Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*,
2006 WL 2473665 (Del. Ch. Aug. 22, 2006) ........................................................22, 23

*Xiaohong v. Dingledine*,
2025 WL 1604001 (S.D.N.Y. June 6, 2025) ........................................................24

**STATUTES**

9 U.S.C.
§ 2........................................................13, 14
§ 3........................................................24

## I. INTRODUCTION

Plaintiffs Saad Amer, Sean Auld, Daniel Enriquez, Chip Furr, Glen Gay, Mitchell Goldberger, Staven Hodge, Alexandros Kolazas, Timothy McCann, Ryan Meuse, Aaron Murphy, and Edgar Nava—along with six others—brought this putative class action against Fanatics for alleged damages related to their purchases of "newly issued, fully licensed" MLB and NBA trading cards "from an entity other than Defendants." Am. Consolidated Class Action Compl., ECF No. 149 ("AC") ¶¶ 1, 27-28, 30-34, 37-41. While all eighteen Plaintiffs purport to be indirect purchasers, the twelve Plaintiffs listed above ("Arbitration Plaintiffs") also created accounts on, and directly purchased trading cards from, Fanatics' websites. When they did so, they affirmatively agreed to be bound by the applicable Terms of Use ("TOU"), which require arbitration of "any and all disputes, claims and causes of action" that are "connected with the Properties," *i.e.*, Fanatics' websites. *See, e.g.*, Decl. of Tina Kang in Support of Mot. to Compel Arbitration ("Kang Decl.") Ex. 1. Any question about whether Plaintiffs' antitrust claims are "connected with" Fanatics' websites is delegated to the arbitrator, but even if the Court reaches that question, the claims are "connected with" those websites because Plaintiffs allege harm to competition in a purported market for *all* newly issued, fully licensed MLB, NBA, and NFL trading cards—including MLB and NBA cards sold on Fanatics' websites.

Another court in this District has enforced the same arbitration language at issue here, based on the same and similar notices provided to the Arbitration Plaintiffs when they made purchases and created accounts. In *Maldonado v. NFL*, Judge Carter held that the account creation and place order pages on Fanatics.com and NFLShop.com were "reasonably conspicuous" to users and granted Fanatics' motion to compel arbitration. 2023 WL 4580417, at *3 (S.D.N.Y. July 18, 2023). The Court should apply the same law, to the same facts, to reach the same result here.

There is no question that the Arbitration Plaintiffs accepted the TOU and arbitration provision, and that the parties delegated all questions of arbitrability to the arbitrator. The claims of Plaintiffs Amer, Auld, Enriquez, Furr, Gay, Goldberger, Hodge, Kolazas, McCann, Meuse, Murphy, and Nava are therefore subject to binding arbitration and must be stayed. *See Smith v. Spizzirri*, 601 U.S. 472, 474, 476 (2024).[1]

## II. FACTUAL BACKGROUND

### A. Plaintiffs' Claims

Plaintiffs purport to bring a class action on behalf of consumers who purchased MLB and NBA trading cards produced by Fanatics and sold by an entity other than Defendants, beginning January 1, 2022. AC ¶¶ 1, 27-28, 30-34, 37-41. Although Plaintiffs seek damages for indirect purchases, they allege "harm [to] competition in the market for Pro Sports Trading Cards"—a market that includes *all* newly issued, fully licensed MLB, NBA, and NFL trading cards in the U.S., whether sold on Fanatics' websites, other websites, brick-and-mortar retail stores, or elsewhere. *Id.* ¶¶ 76-77, 108, 121; *see also id.* ¶ 88 (alleging sales at "Walmart, Target, pharmacy chains, … local trading card shops (or hobby shops), online retailers, and through case breaking"). Plaintiffs claim that Fanatics and the other Defendants engaged in an "anticompetitive scheme" that "reduced output and competition, and thereby artificially inflated prices, in the market for MLB and NBA trading cards." *Id.* ¶ 19. They further allege that they "face a significant threat of future injury with respect to their purchases of Pro Sports Trading Cards, including NFL trading

[1] Defendants have concurrently moved to dismiss Plaintiffs' claims on several grounds, including lack of Article III standing. The Court should first address whether Plaintiffs have Article III standing to assert each claim and, only if they do, address the Motion to Compel Arbitration of that claim. *See Branch of Citibank, N.A. v. De Nevares*, 74 F.4th 8, 21-22 (2d Cir. 2023) (reversing order on petition to compel arbitration and remanding with instructions to dismiss for lack of jurisdiction in light of plaintiff's failure to establish Article III standing); *see also Marsh & McLennan Agency LLC v. Williams*, 2023 WL 4534984, at *1 (S.D.N.Y. July 13, 2023).

cards." *Id.* Plaintiffs bring claims for violation of Sherman Act Sections 1 and 2, Clayton Act Sections 3 and 7, and various state antitrust and consumer protection laws. *Id.* ¶¶ 216-378.

**B. Arbitration Plaintiffs' Agreement to the TOU**

To create accounts and make trading card purchases on the relevant Fanatics websites, Plaintiffs Amer, Auld, Enriquez, Furr, Gay, Goldberger, Hodge, Kolazas, McCann, Meuse, Murphy, and Nava had to affirmatively agree to the TOUs, including the arbitration provisions therein.[2] The following table summarizes the Arbitration Plaintiffs' interactions with Fanatics:

| Plaintiff | Fanatics.com Purchase | Fanatics.com Account Creation | MLBShop.com Purchase | MLBShop.com Account Creation |
|---|---|---|---|---|
| Saad Amer | Yes | Yes | | |
| Sean Auld | | Yes | | |
| Daniel Enriquez | | Yes | | Yes |
| Chip Furr | Yes | Yes | | |
| Glen Gay | | Yes | | |
| Mitchell Goldberger | | Yes | | |
| Staven Hodge | | Yes | | |
| Alexandros Kolazas | Yes | | | Yes |
| Timothy McCann | | Yes | | |
| Ryan Meuse | | Yes | | |
| Aaron Murphy | | Yes | Yes | Yes |
| Edgar Nava | Yes | Yes | | Yes |

**1. Fanatics.com**

Since at least January 1, 2017, the TOU on Fanatics.com have contained a provision by which users agree to submit claims to binding individual arbitration. *See* Kang Decl. ¶¶ 6-9 & Exs. 1-3. The current TOU on Fanatics.com, which were last updated on February 29, 2024,

[2] Plaintiffs' account creations and purchases detailed in this Motion are based on the names and alleged places of residence in the AC. Defendants reserve all rights to compel arbitration based on Plaintiffs' website interactions under other names or accounts, and to seek discovery of the email addresses associated with any Fanatics accounts or purchases Plaintiffs have used or made.

provide in relevant part that:

> As a condition of using the Properties, you and we agree that any and all disputes, claims and causes of action (collectively, "Claims") arising out of or connected with the Properties (except for small claims court Claims, if applicable) shall be resolved exclusively by binding arbitration under the rules of the American Arbitration Association ("AAA"), including the Supplementary Procedures for Consumer-Related Disputes, for full and final settlement of such Claim applying the Federal Arbitration Act and other federal arbitration laws. YOU UNDERSTAND AND AGREE THAT YOU ARE WAIVING YOUR RIGHT TO SUE OR GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS UNDER THIS CONTRACT. YOU AND WE ALSO AGREE THAT (A) ANY CLAIMS WILL BE RESOLVED INDIVIDUALLY NOT AS A PLAINTIFF OR CLASS REPRESENTATIVE, MEMBER OF OTHERWISE ON BEHALF OF OTHERS IN ANY PURPOSED CLASS, COLLECTIVE, OR REPRESENTATIVE PROCEEDING AND NOT THROUGH ANY CLASS ACTION, (B) IF A CLAIM PROCEEDS IN COURT ANYWAY, WE BOTH WAIVE ANY RIGHT TO A JURY TRIAL; AND (C) EITHER YOU OR WE MAY SEEK A COURT INJUNCTION REGARDING INTELLECTUAL PROPERTY INFRINGEMENT. ARBITRATION DOES NOT INVOLVE A JUDGE OR JURY. Although court review of an arbitration award may be limited, an arbitrator is empowered to award the same damages and relief as a court, including injunctive relief or statutory damages. Notwithstanding the foregoing, either party may seek temporary or emergency equitable relief to enforce its rights in any court of competent jurisdiction.

*Id.* Ex. 1. Prior versions, including the August 11, 2021 version and the January 9, 2017 version of the TOU on Fanatics.com, had materially identical arbitration provisions. *Id.* Exs. 2-3. Since at least November 6, 2017, the TOU webpage on the Fanatics.com mobile site would have been identical to the TOU webpage on the Fanatics.com desktop site. *Id.* ¶ 9. And since at least June 27, 2019, the TOU governing purchases on the Fanatics mobile app would have been identical to the TOU on the Fanatics.com mobile site. *Id.*

#### a. Fanatics.com and Fanatics Mobile App Purchases

Fanatics' records reflect that Plaintiffs Amer, Furr, Kolazas, and Nava purchased trading cards from Fanatics. Specifically:

- Plaintiff Amer purchased a 2024 Topps Holiday Baseball Factory Sealed Mega Box via PayPal on October 23, 2024, using the Fanatics.com mobile site; a 2025 Topps

Holiday Baseball Factory Sealed Mega Box via PayPal on February 24, 2025, using the Fanatics.com mobile site; a 2024 Bowman Baseball Factory Sealed Mega Box via PayPal on May 6, 2025, using the Fanatics.com desktop site; and a 2025 Topps Basketball Factory Sealed Fanatics Exclusive Value Box via PayPal on November 2, 2025, using the Fanatics mobile app.[3]

- Plaintiff Furr purchased a 2025 Topps Basketball Factory Sealed Value Box via Affirm on October 9, 2025, using the Fanatics.com mobile site.
- Plaintiff Kolazas purchased a 2025 Topps Allen & Ginter Baseball Factory Sealed Value Box and a 2025 Topps Chrome Updates Baseball Factory Sealed Value Box via Apple Pay on December 4, 2025, using the Fanatics.com mobile site.
- Plaintiff Nava purchased a 2025 Topps Baseball Series 1 Factory Sealed Fanatics Exclusive Value Box via credit card on February 5, 2025, using the Fanatics.com mobile site; a 2025 Topps Heritage Baseball Factory Sealed Mega Box via credit card on April 14, 2025, using the Fanatics.com mobile site; and a 2025 Topps Holiday Baseball Factory Sealed Mega Box via credit card on October 10, 2025, using the Fanatics.com mobile site.

*Id.* ¶ 10.

To complete any of these purchases, customers had to enter their payment information and then click a "Place Order," "Apple Pay," or "affirm" button to complete the transaction.[4] *Id.* ¶¶ 12-

---

[3] Plaintiff Amer made a number of additional purchases on Fanatics-owned or -operated websites, including additional trading card and apparel purchases.

[4] There are two alternate paths a user can follow to check out with PayPal and Apple Pay. A user can click the "Checkout" button, complete the checkout process on the Fanatics page, and later select PayPal or Apple Pay as the payment type to complete the purchase. Alternatively, a user can click the PayPal or Apple Pay button on the first page of the checkout flow, bypassing several

13 & Exs. 4-7. Directly above the button was a notice informing customers that, "By placing an order, you agree to our Terms of Use, FanCash Policy, & Privacy Policy." The statement appeared in black text against a white background, and the words "Terms of Use," "FanCash Policy," and "Privacy Policy" were dark blue, underlined, and hyperlinked so that a customer could click "Terms of Use" and view the full text of the agreement. The current "Place Order" pages on the Fanatics.com desktop site are depicted in the screenshots below for different payment methods. These "Place Order" pages on the Fanatics.com mobile site and the Fanatics mobile app are materially identical. *Id.* ¶¶ 13-14. Further, the "Place Order" pages on the desktop site, mobile site, and mobile app would have been materially similar to the screenshots below throughout 2024 and 2025, when Plaintiffs Amer, Furr, Kolazas, and Nava completed their purchases. *Id.*

**Credit Card**




**PayPal**




---

steps of the checkout process on the Fanatics' page. *See id.* ¶ 12 & Exs. 5, 6. Regardless of which path a user takes, she would see the same notice of the TOU.

**Apple Pay**




**Affirm**




**b. Fanatics.com Account Creations**

Fanatics' records reflect that eleven Plaintiffs[5] created Fanatics.com accounts:

- Plaintiff Amer on February 1, 2022;
- Plaintiff Auld on February 6, 2024;
- Plaintiff Enriquez on May 2, 2021;
- Plaintiff Furr on June 7, 2021;
- Plaintiff Gay on March 28, 2023;
- Plaintiff Goldberger on January 25, 2020;

[5] Plaintiff Kolazas is the only Arbitration Plaintiff who did not appear to create a Fanatics.com account, but Fanatics' records reflect that Plaintiff Kolazas purchased trading cards on the Fanatics.com mobile site and created an MLBShop.com account, as explained herein.

- Plaintiff Hodge on March 29, 2022;
- Plaintiff McCann on December 8, 2021;
- Plaintiff Meuse on November 21, 2018;
- Plaintiff Murphy on March 2, 2024; and
- Plaintiff Nava on November 30, 2020.

*Id.* ¶ 15. When Plaintiffs created their Fanatics.com accounts, they expressly agreed to the TOU, including the arbitration provision therein.

Since at least February 8, 2017 and until at least May 1, 2025, to create an account on the Fanatics.com desktop or mobile site, customers had to provide their name and email address, create a password, and click the "Create An Account" button. *Id.* ¶ 22. Directly above or below the "Create An Account" button was a notice informing customers that, "By signing up, you agree to our Terms of Use & Privacy Policy" or "By signing up, you agree to our Terms of Use, FanCash Policy, & Privacy Policy." *Id.* The statement appeared in dark gray text against a white background, while the words "Terms of Use," "FanCash Policy," and "Privacy Policy" appeared in underlined and hyperlinked text so that a customer could click "Terms of Use," "FanCash Policy," or "Privacy Policy" and view the full text of the respective agreements. *Id.* ¶¶ 17-22 & Exs. 9-13. Since at least June 27, 2019, the account creation page on the Fanatics mobile app was materially identical to the account creation page on the Fanatics.com mobile site. *Id.* ¶ 22.

The March 2024, August 2022, May 2022, December 2020, and July 2018 versions of the "Create An Account" page on the Fanatics.com desktop site are depicted in the screenshots below. *Id.* Exs. 9-13. These pages were materially identical when Amer, Auld, Enriquez, Furr, Gay, Goldberger, Hodge, McCann, Meuse, Murphy, and Nava created their Fanatics accounts.

**<u>March 2024</u>**




**<u>August 2022</u>**




**<u>May 2022</u>**




**<u>December 2020</u>**



**<u>July 2018</u>**




### 2. MLBShop.com

Since at least January 1, 2020, the TOU on MLBShop.com have contained a provision by which users agree to submit claims to binding individual arbitration. *Id.* ¶ 23 & Ex. 14.[6] The current TOU on MLBShop.com, which were last updated on January 1, 2020, provide in relevant part that:

> Except where prohibited by law, as a condition of using the MLB Shop Website, you and we agree that any and all disputes, claims and causes of action (collectively, "Claims") arising out of or connected with the MLB Shop Website (except for small claims court Claims, if applicable) shall be resolved exclusively by binding arbitration under the rules of the American Arbitration Association ("AAA"), including the Supplementary Procedures for Consumer-Related Disputes, for full and final settlement of such Claim, applying the Federal Arbitration Act and other federal arbitration laws. You and we also agree that (a) any Claims will be resolved individually and not through any class action; (b) if a Claim proceeds in court anyway, we both waive any right to a jury trial; and (c) either you or we may seek a court injunction regarding intellectual property infringement. Arbitration does not involve a judge or jury. **YOU UNDERSTAND**

[6] MLB Shop is the official online store of Major League Baseball and is operated by Fanatics. The MLB Shop TOU explain that MLBShop.com is "operated by Fanatics Retail Group North, Inc. ('Fanatics')," and define "we," "us," and "our" to include Fanatics. *Id.* Ex. 14.

> **AND AGREE THAT YOU ARE WAIVING YOUR RIGHT TO SUE OR GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS UNDER THESE SHOP TERMS. YOU AND WE ALSO AGREE THAT (I) ANY CLAIMS WILL BE RESOLVED INDIVIDUALLY AND NOT AS A PLAINTIFF OR CLASS REPRESENTATIVE, MEMBER OF OTHERWISE ON BEHALF OF OTHERS IN ANY PURPORTED CLASS, COLLECTIVE, OR REPRESENTATIVE PROCEEDING AND NOT THROUGH ANY CLASS ACTION; (II) IF A CLAIM PROCEEDS IN COURT ANYWAY, WE BOTH WAIVE ANY RIGHT TO A JURY TRIAL; AND (III) EITHER YOU OR WE MAY SEEK A COURT INJUNCTION REGARDING INTELLECTUAL PROPERTY INFRINGEMENT.** Although court review of an arbitration award may be limited, an arbitrator is empowered to award the same damages and relief as a court, including injunctive relief or statutory damages. Notwithstanding the foregoing, either party may seek temporary or emergency equitable relief to enforce its rights in any court of competent jurisdiction. …

*Id.* Ex. 14.

**a. MLBShop.com Purchases**

Fanatics' records reflect that Plaintiff Murphy purchased trading cards from MLBShop.com. Specifically, Plaintiff Murphy purchased a 2024 Topps Updates Baseball Factory Sealed Fanatics Exclusive Value Box on MLBShop.com via PayPal on July 20, 2024. *Id.* ¶ 24. To complete a purchase using PayPal on MLBShop.com currently and when Plaintiff Murphy made a purchase on July 20, 2024, the customer had to click a "Place Order" button. Directly above the "Place Order" button was a notice informing customers that, "By placing an order, you agree to our Terms of Use & Privacy Policy." *Id.* ¶ 26 & Ex. 15. The statement appeared in black text against a white background, with the words "Terms of Use" and "Privacy Policy" appearing in dark blue, underlined, and hyperlinked text so that a customer could click "Terms of Use" and view the full text of the agreement. *Id.* The "Place Order" page on the MLBShop.com mobile site was materially identical to the "Place Order" page on the MLBShop.com desktop site. *See id.* ¶ 25 & Ex. 15. Whether the customer selected the PayPal payment option on the first or subsequent page of the checkout flow (*see supra* note 4), the customer would have seen the notice depicted below. *Id.* ¶ 26.




**b. MLBShop.com Account Creations**

Fanatics' records reflect that four Plaintiffs created accounts on MLBShop.com:

- Plaintiff Enriquez on May 1, 2021;
- Plaintiff Kolazas on August 27, 2024;
- Plaintiff Murphy on May 4, 2024; and
- Plaintiff Nava on August 13, 2023.

*Id.* ¶ 27. When Plaintiffs created their accounts, they expressly agreed to the TOU, including the arbitration provision therein.

Since at least July 2018, to create an account on MLBShop.com, a customer had to provide their name and email address, create a password, and click the "Create An Account" button. *Id.* ¶ 33 & Ex. 16-19. Directly above or below the "Create An Account" button was a notice informing customers that, "By signing up, you agree to our Terms of Use & Privacy Policy." *Id.* ¶ 33. The statement appeared in dark gray text against a white background, while the words "Terms of Use" and "Privacy Policy" were underlined and hyperlinked so that a customer could click "Terms of Use" or "Privacy Policy" and view the full text of the respective agreements. *Id.* & Ex. 16-19. The account creation page on the MLBShop.com mobile website was materially the same as the account creation page on the MLBShop.com desktop website since at least May 1, 2021 (the earliest date on which any Plaintiff created an account on MLBShop.com). *Id.*

The January 2026, December 2023, November 2022, and July 2018 versions of the "Create An Account" page on the MLBShop.com desktop site are depicted in the screenshots below. *Id.* & Exs. 16-19.

**January 2026**




**December 2023**




**November 2022**




**July 2018**




## III. LEGAL STANDARD

The Arbitration Plaintiffs' claims against Fanatics are governed by the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 2; Kang Decl. Exs. 1-3, 14 (TOUs providing for application of the

FAA). Under the FAA, an agreement to arbitrate, like the one in the TOU, "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This reflects Congress's intent to enforce agreements to arbitrate, and affirms the principle that federal law strongly favors arbitration. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (reaffirming the "liberal federal policy favoring arbitration," and explaining that "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms" (citations omitted)).

Pursuant to the FAA's strong policy favoring arbitration, the district court's role in ruling on a motion to compel arbitration is, at most, limited to determining: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *See Pacelli v. Augustus Intel., Inc.*, 459 F. Supp. 3d 597, 605-06 (S.D.N.Y. 2020). But where (as here) the parties delegate to the arbitrator the power to decide gateway arbitrability issues—such as the scope and enforceability of the arbitration agreement—the district court's inquiry is even more limited. *Id.* at 606-07. Specifically, "if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court *may not decide* the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) (emphasis added). To determine whether there is a valid delegation, the court undertakes a limited inquiry into whether the parties "clearly and unmistakably" delegated the power to decide arbitrability to the arbitrator. *See, e.g.*, *Pacelli*, 459 F. Supp. 3d at 608; *Maldonado*, 2023 WL 4580417, at *5.

## IV. ARGUMENT

The FAA requires the Court to enforce the arbitration provisions at issue here because the parties (1) entered into valid agreements to arbitrate that (2) clearly and unmistakably delegated the power to decide arbitrability issues to the arbitrator. In 2023, a court in this District examined

substantially the same website user flow and TOU and correctly concluded that the TOU are valid and enforceable, and that the parties clearly and unmistakably delegated questions of arbitrability to the arbitrator. *Maldonado*, 2023 WL 4580417, at *3, *5. The Court should reach the same conclusion here.

### A. Arbitration Plaintiffs' Assent to the TOU Is Valid and Binding

To determine whether online terms of use are sufficient to form an agreement, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put [the offeree] on inquiry notice of such terms." *Id.* at *2 (citation omitted). Courts consider the totality of the circumstances, asking whether "the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (citation omitted); *see also Maldonado*, 2023 WL 4580417, at *2 (courts consider factors such as "whether the screen is cluttered; the text and hyperlinks to the TOU are positioned directly below the relevant assent button; and the hyperlinks are contrasted with the background" (citation omitted)). No single factor is dispositive. *See Edmundson v. Klarna, Inc.*, 85 F.4th 695, 707 (2d Cir. 2023).

Applying these principles, the Second Circuit has found a binding arbitration agreement where a plaintiff receives a notice of hyperlinked terms of use near a button to create an account or complete a purchase, like the Arbitration Plaintiffs here. For instance, in *Edmundson*, the Second Circuit held that the plaintiff "unambiguously manifested assent to Klarna's terms when … she selected 'Confirm and continue' to finalize her GameStop purchase," where the hyperlinked terms and the statement "I agree to the payment terms" were located directly above the "Confirm and continue" button. 85 F.4th at 707-08. The screen analyzed in that case is depicted below:




*Id.* at 711 (Addendum C) (internal citation omitted).

Similarly, in *Meyer*, the Second Circuit held that "the design of the screen and language used render the notice provided reasonable" for reasons including: the "Screen is uncluttered"; "[t]he text, including the hyperlinks … appears directly below the buttons for registration"; "notice of the Terms of Service is provided simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply"; and "[a]lthough the sentence is in a small font, the dark print contrasts with the bright white background, and the hyperlinks are in blue and underlined." 868 F.3d at 78-82. The screen analyzed in that case is depicted below:




*Id.* (Addendum B) (internal citation omitted); *see also Bernardino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 7309893, at *10-11 (S.D.N.Y. Nov. 20, 2017) (enforcing arbitration provision in online "checkout-wrap" agreement where terms of use were made available via hyperlink during online checkout process and consumer manifested assent by submitting an online order).

Here, Plaintiffs Amer, Auld, Enriquez, Furr, Gay, Goldberger, Hodge, Kolazas, McCann, Meuse, Murphy, and Nava each had reasonable notice of, and manifested assent to, the TOU when they made purchases and created accounts on the relevant websites. Each time they clicked an action button—whether "Create an account," "Place Order," or a digital wallet or buy-now-pay-later icon—there was a notice immediately above or below the button informing them that, by taking the relevant action, they were agreeing to the TOU. In each instance, the notice appeared in black or dark gray text against a white background, while the words "Terms of Use" were underlined and hyperlinked so that a customer could click "Terms of Use" and view the full text of the TOU. Thus, the TOU were "presented in a clear and conspicuous way," the notice was

"spatially coupled with the mechanism for manifesting assent," and users were "clearly warned … that taking a specific action would constitute assent to certain terms." *Edmundson*, 85 F.4th at 704. Indeed, the notices on Fanatics' websites described above are *more* conspicuous than those the Second Circuit endorsed in *Edmundson* and *Meyer*: among other factors, the notices are closer to the action buttons, and the notice language is clear regarding the import of clicking the button. *See supra* Section II.B.

### B. The Parties Delegated Arbitrability Questions—Including the Scope of the Arbitration Agreement—to the Arbitrator

Because Plaintiffs agreed to be bound by the TOU, the Court must send their claims to arbitration. To the extent the Arbitration Plaintiffs intend to challenge whether their claims fall within the scope of the arbitration provision—*i.e.*, whether their indirect purchaser claims are "connected with" Fanatics.com or MLBShop.com—the parties "clearly and unmistakably" delegated such "arbitrability" issues to an arbitrator, not the Court. *See Henry Schein*, 586 U.S. at 68-69, 71-72 (where there is "clear and unmistakable evidence" that the "contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract," "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless"). This means the Court cannot decide any issues the Arbitration Plaintiffs may raise regarding the scope or enforceability of the arbitration provision, or any other arbitrability question.

An arbitration agreement evidences a clear and unmistakable intent to delegate issues of arbitrability to the arbitrator where (1) there is "broad language expressing an intention to arbitrate all aspects of all disputes," and (2) the "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability." *Foran v. NFL*, 2019 WL 2408030, at *2 (S.D.N.Y. June 7, 2019) (citations omitted). The TOU here contain both features.

*First,* the arbitration provisions contain broad language providing that "any and all disputes, claims and causes of action … arising out of or connected with the Properties [*i.e.*, Fanatics.com]," or "arising out of or connected with the MLB Shop Website," "shall be resolved exclusively by binding arbitration." Kang Decl. Exs. 1, 14. Multiple courts—including a court in this District—have held that the same and similar language evidences an intent to submit questions of arbitrability to the arbitrator. *Maldonado*, 2023 WL 4580417, at *5 (same language established intent to delegate arbitrability; "both TOU are a part of Defendants' Websites and Properties, and thus disputes about the TOU are subject to arbitration"); *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 (2d Cir. 2018) ("any controversy or dispute" evidenced parties' intent to delegate arbitrability to arbitrator); *Mavashev v. Kaldykulov*, 2024 WL 1345802, at *15 (E.D.N.Y. Mar. 30, 2024) (delegation was evidenced by language stating "[a]ny claim, dispute, or controversy of whatever nature arising out of or relating to [the] Agreement[s]" will be submitted to arbitration); *Blash v. BCS Placements, LLC*, 2020 WL 2832777, at *4 (S.D.N.Y. May 31, 2020) ("all claims, disputes and other matters in question arising out of, or relating to, this letter agreement or the performance thereof" supported delegation).

*Second,* the arbitration provisions provide that any arbitration is to be conducted "under the rules of the American Arbitration Association ('AAA') including the Supplementary Procedures for Consumer-Related Disputes." Kang Decl. Exs. 1, 14. Rule 7 of the current AAA Consumer Arbitration Rules and Mediation Procedures provides that "[t]he arbitrator shall have the power to rule on their own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA, Consumer Arbitration Rules, R-7(a) (effective May 1, 2025), https://www.adr.org/media/yawntdvs/2025_consumer_arbitration_rules.pdf. When parties "explicitly

incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (citations omitted); *see also Foran*, 2019 WL 2408030, at *2 ("[T]he incorporation of the AAA rules necessitates that an arbitrator, as opposed to this Court, decide arbitrability.").

Either of the above features standing alone constitutes clear and unmistakable evidence that the parties intended for an arbitrator to decide arbitrability issues. The presence of both leaves no doubt. *See Foran*, 2019 WL 2408030, at *2-3 (finding arbitrability reserved for the arbitrator for the same "two primary reasons" discussed above).

### C. Even If the Court Reaches Arbitrability, Arbitration Plaintiffs' Claims Fall Within the Scope of the Arbitration Provision

Because there is a binding agreement to arbitrate and the parties clearly and unmistakably delegated the issue of arbitrability, the Court's analysis must end there. *Henry Schein*, 586 U.S. at 65; *Foran*, 2019 WL 2408030, at *2. If, however, the Court determines that arbitrability was not clearly and unmistakably delegated and undertakes further analysis, the Court should still enforce the parties' arbitration agreements because the arbitration provisions plainly encompass the Arbitration Plaintiffs' claims.

The Fanatics.com and MLBShop.com arbitration agreements broadly apply to "any and all disputes, claims and causes of action (collectively, 'Claims')" that are "connected with the Properties," *i.e.*, Fanatics.com, or with "the MLB Shop Website." Kang Decl. Exs. 1, 14. While the Arbitration Plaintiffs purport to be indirect purchasers, they also directly contracted with Fanatics when they created accounts and purchased trading cards on Fanatics.com and MLBShop.com. They cannot avoid that direct contractual relationship—and the arbitration

agreements that govern it—by selectively seeking damages for trading cards sold by an entity other than Defendants.

Plaintiffs' antitrust claims are plainly "connected with" Fanatics.com and MLBShop.com. Plaintiffs allege "harm [to] competition in the market for Pro Sports Trading Cards"—a market that includes *all* newly issued, fully licensed NFL, NBA, and MLB trading cards, including MLB and NBA trading cards sold on Fanatics.com and MLBShop.com. AC ¶¶ 76-77, 108, 121. This *marketwide* harm encompasses sales on Fanatics' websites. Further, Plaintiffs allege that sales of affected products occur "through both online stores and brick-and-mortar retail stores," *id.* ¶ 108, including at "Walmart, Target, pharmacy chains, … local trading card shops (or hobby shops), online retailers, and through case breaking." *Id.* ¶ 88. In other words, even if Plaintiffs do not seek damages for direct purchases, those purchases are still part of the alleged market, were supposedly impacted by the "anticompetitive scheme," and are thus "connected with" Plaintiffs' claims. *See GPS Int'l Techs., Inc. v. Verizon Commc'ns, Inc.*, 2025 WL 2776095, at *7 (S.D.N.Y. Sept. 30, 2025) ("If the court determines that the allegations underlying the claims touch matters covered by the parties' contracts, then those claims must be arbitrated, whatever the legal labels attached to them."). And if there were any ambiguity about the scope of the arbitration clause (which there is not), the "presumption of arbitrability" would apply and weigh in favor of arbitration. *See Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113–16 (2d Cir. 2023).[7]

[7] Defendants expect Plaintiffs to argue that their indirect purchaser claims are not arbitrable under the Second Circuit's decision in *Davitashvili v. Grubhub Inc.*, 131 F.4th 109 (2d Cir. 2025). That is incorrect. Among other reasons, the alleged antitrust violation in *GrubHub* did not involve supracompetitive pricing *on* Grubhub's (or any defendant's) platform; it involved "no-price competition clauses" impacting only *off*-platform prices. *Id.* at 113. Here, Plaintiffs' antitrust claims allege *marketwide* price impacts, *including* on Fanatics' websites.

### D. Plaintiffs' Claims Against MLBPI/A, MLB, NBPA, and NBA Must Be Compelled To Arbitration

As explained above, Arbitration Plaintiffs' claims are governed by the TOUs located on Fanatics.com and MLBShop.com and are subject to the arbitration agreements therein. Under the doctrine of equitable estoppel, which allows non-signatory defendants to enforce arbitration agreements and class waivers, Plaintiffs' claims against the Major League Baseball Players Association and MLB Players, Inc. (collectively, "MLBPI/A"); Major League Baseball and Major League Baseball Properties, Inc. (collectively, "MLB"); the National Basketball Players Association ("NBPA"); and National Basketball Association and NBA Properties, Inc. (collectively, "NBA") must be compelled to arbitration as well. *See Maldonado*, 2023 WL 4580417, at *4 (holding that non-signatories NFL, NFLP, and other NFL-related defendants may invoke the arbitration agreement governing use of Fanatics.com and NFLShop.com).

Pursuant to the choice-of-law provisions in the TOUs, Delaware law governs the arbitration agreements between the Arbitration Plaintiffs and Fanatics and its affiliates. *See* Kang Decl. Exs. 1, 14; *Ramasamy v. Essar Glob. Ltd.*, 825 F. Supp. 2d 466, 469 (S.D.N.Y. 2011) (applying choice-of-law provision to determine application of equitable estoppel); *Maldonado*, 2023 WL 4580417, at *4 (same, applying Delaware law). Under Delaware law, equitable estoppel applies where, as in this case, the plaintiff "raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, 2006 WL 2473665, *5 (Del. Ch. Aug. 22, 2006) (citation omitted).

Because Plaintiffs (signatories) allege several bilateral conspiracies to violate antitrust and consumer protection laws between Fanatics (also a signatory) and each non-signatory (MLBPI/A, MLB, NBPA, and NBA) to violate antitrust and consumer protection laws, their claims of

"substantially interdependent and concerted misconduct" (while disputed) allow MLBPI/A, MLB, NBA, and NBPA to invoke equitable estoppel. *Id.*; see *also Maldonado*, 2023 WL 4580417, at *4 (compelling arbitration between a signatory and non-signatory where plaintiffs alleged antitrust claims that were "based on the same facts, are inherently inseparable, [and] fall within the scope of the arbitration clauses at issue" (quoting *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 851 (D. Md. 2013))); *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1147, 1153 (Del. Ch. 2006) (applying equitable estoppel where claims stemmed from the "same pattern of behavior" and "all involve[d] the same course of improper conduct," and noting that plaintiffs "may not press claims that involve identical factual contentions in two separate forums simply by sweeping [non-signatories] into their complaint").

While MLBPI/A, MLB, NBPA, and NBA certainly dispute Plaintiffs' allegations, Plaintiffs allege coordinated conduct between Fanatics and MLBPI/A, between Fanatics and MLB, between Fanatics and NBPA, and between Fanatics and NBA that is inseparable from the conduct they allege was undertaken by Fanatics. *See, e.g.*, AC ¶¶ 245-250 (Fifth Cause of Action pleaded against "Fanatics, MLB, and MLBP"); *id.* ¶¶ 251-258 (Sixth Cause of Action pleaded against "Fanatics, MLBPA, MLBPI, [and others]"); *id.* ¶¶ 265-270 (Eighth Cause of Action pleaded against "Fanatics, NBA, and NBAP"); *id.* (passim) (references to "Fanatics and its co-conspirators"). Plaintiffs' claims rely on shared facts; therefore, their claims against MLB, MLBPI/A, NBA, and NBPA fall within the scope of the relevant arbitration agreements. *See Maldonado*, 2023 WL 4580417, at *4. "[T]o refuse to compel arbitration for claims against" MLBPI/A, MLB, NBPA, and NBA "would render the arbitration between the signatories

meaningless and thwart the state and federal policy in favor of arbitration." *Douzinas*, 888 A.2d at 1153.[8]

Accordingly, the Court should enforce the TOUs as to MLB, MLBPI/A, NBA, and NBPA and compel the Arbitration Plaintiffs' claims against MLBPI/A, MLB, NBPA, and NBA to arbitration and strike the class allegations.

### E. Plaintiffs' Claims Must Be Stayed

Under the FAA, the Court is required to stay the claims of Plaintiffs Amer, Auld, Enriquez, Furr, Gay, Goldberger, Hodge, Kolazas, McCann, Meuse, Murphy, and Nava. *See* 9 U.S.C. § 3; *Smith*, 601 U.S. at 476 (the "plain statutory text [of the FAA] requires a court to stay the proceeding" (citation omitted)). And, if any of these Arbitration Plaintiffs intend to press their claims in arbitration, then for efficiency reasons and to avoid conflicting decisions the Court should stay the entire case pending resolution of those arbitrations. *See Xiaohong v. Dingledine*, 2025 WL 1604001, at *5 (S.D.N.Y. June 6, 2025) (discretionary stay of "the balance of the proceedings pending arbitration" is "particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims" (citation omitted)); *Byrne v. Charter Comm'cns,*

---

[8] Equitable estoppel would also apply under New York law, which requires that (i) the issues that MLBPI/A, MLB, NBPA, and NBA seek to arbitrate must be "intertwined with the agreement that [Plaintiffs have] signed," and (ii) the alleged relationships among the defendants warrants preventing Plaintiffs "from denying an obligation to arbitrate a similar dispute with the non-signatory." *See Reid v. Tandym Grp., LLC*, 697 F. Supp. 3d 62, 75 (S.D.N.Y. 2023) (citation omitted). MLBPI/A, MLB, NBPA, and NBA satisfy both requirements here: ***first***, they seek to arbitrate claims that are encompassed by Plaintiffs' arbitration provision with Fanatics (*i.e.*, antitrust claims relating to trading cards produced by Fanatics that contain league intellectual property); ***second***, Plaintiffs allege separate conspiracies between Fanatics and MLBPI/A, MLB, NBPA, and NBA based on the same set of facts and circumstances. MLBPI/A, MLB, NBPA, and NBA should not be forced to litigate Plaintiffs' claims in federal court while Plaintiffs simultaneously pursue the same conspiracy claims against Fanatics in arbitration.

*Inc.*, 581 F. Supp. 3d 409, 423-24 (D. Conn. 2022) (staying one plaintiff's claims where another plaintiff's claims were subject to arbitration).

## V. CONCLUSION

Defendants request that the Court grant their Motion to Compel Arbitration of the claims of Plaintiffs Amer, Auld, Enriquez, Furr, Gay, Goldberger, Hodge, Kolazas, McCann, Meuse, Murphy, and Nava.

Dated: January 29, 2026

Respectfully submitted,

**LATHAM & WATKINS LLP**

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
lawrence.buterman@lw.com

Amanda P. Reeves (*pro hac vice*)
David L. Johnson (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
amanda.reeves@lw.com
david.johnson@lw.com

Christopher S. Yates (*pro hac vice*)
Alicia R. Jovais (*pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
chris.yates@lw.com
alicia.jovais@lw.com

*Counsel for Defendants Fanatics, Inc.; Fanatics, LLC; Fanatics Collectibles Intermediate Holdco, Inc.; Fanatics SPV, LLC; and Fanatics Holdings, Inc.*

**WEIL, GOTSHAL & MANGES LLP**

*/s/ Yehudah L. Buchweitz**
Yehudah L. Buchweitz
Joseph R. Rausch
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
yehudah.buchweitz@weil.com
joseph.rausch@weil.com

Meagan K. Bellshaw
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7140
megan.bellshaw@weil.com

*Counsel for Major League Baseball Players Association and MLB Players, Inc.*

**KEKER, VAN NEST & PETERS LLP**

*/s/ Cody S. Harris**
Cody S. Harris
Adam Lauridsen
Anjali Srinivasan
Taylor L. Reeves
633 Battery Street
San Francisco, CA 84111
(415) 391-5400
charris@keker.com
alauridsen@keker.com
asrinivasan@keker.com
treeves@keker.com

*Counsel for Major League Baseball and Major League Baseball Properties, Inc.*

**SULLIVAN & CROMWELL LLP**

*/s/ Richard C. Pepperman II**
Richard C. Pepperman II
Benjamin R. Walker

Sheeva L. Nesva
125 Broad Street
New York, New York 10004
(212) 558-4000
peppermanr@sullcrom.com
walkerb@sullcrom.com
nesvas@sullcrom.com

*Counsel for Defendants National Basketball Association and NBA Properties, Inc.*

**ARNOLD & PORTER KAYE SCHOLER LLP**

*/s/ C. Scott Lent**
C. Scott Lent
250 W. 55th Street
New York, New York 10019
(212) 836-8220
scott.lent@arnoldporter.com

*Counsel for National Basketball Players Association*

* Fanatics uses electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

**CERTIFICATION OF WORD COUNT COMPLIANCE**

I, Lawrence E. Buterman, hereby certify that the Memorandum of Law in Support of Motion to Compel Arbitration complies with the word-count limitations set forth in Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and Section A.2h. of Chief Judge Swain's Individual Practices. According to the word processing software used to prepare this document, the memorandum contains 6,244 words, excluding the parts of the document exempted by Section A.2h.

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman