**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PHILLIP JONES; SAAD AMER; SEAN AULD; KYLENE COMEAU; DANIEL ENRIQUEZ; CHIP FURR; GLEN GAY; MITCHELL GOLDBERGER; STAVEN HODGE; BRUCE HONNOLD; JOSEPH KELLY; ALEXANDROS KOLAZAS; TIMOTHY MCCANN JR.; RYAN MEUSE; AARON MURPHY; EDGAR NAVA; JOHN SCHOLL; and RICHARD CRAIG SMITH on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>    v.<br><br>FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; FANATICS HOLDINGS, INC.; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS, INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL ASSOCIATION PLAYERS ASSOCIATION; and ONETEAM PARTNERS LLC,<br><br>      Defendants. | Case No. 1:25-cv-05776-LTS-VF<br><br>**<u>ORAL ARGUMENT REQUESTED</u>** |

**FANATICS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AMENDED CONSOLIDATED CLASS ACTION COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................................................1

SUMMARY OF RELEVANT ALLEGATIONS........................................................................3

ARGUMENT .................................................................................................................................7

I.     PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE ACTUAL OR IMPENDING
       ANTICOMPETITIVE EFFECTS (CLAIMS ONE, TWO, AND FIVE TO NINE) ...........7

       A.     Plaintiffs Fail To Plead Anticompetitive Effects for MLB and NBA Cards ...........8

              1.     No Direct Evidence.....................................................................................9

              2.     No Indirect Evidence .................................................................................12

       B.     Plaintiffs Fail To Plead Impending Consumer Harm for NFL Cards That
              Fanatics Does Not Yet Produce and Distribute .......................................................14

II.    PLAINTIFFS LACK ARTICLE III STANDING TO PURSUE THEIR NFL
       CLAIM (CLAIM SEVEN) .................................................................................................16

III.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A VIOLATION OF SECTION 7
       OF THE CLAYTON ACT (CLAIMS THREE AND FOUR)..........................................17

       A.     Plaintiffs Fail To Allege That Fanatics' Investment in GCP Had a
              Reasonable Probability of Anticompetitive Effect for Consumers (Claim
              Three).......................................................................................................................17

       B.     Plaintiffs Fail To Allege That Fanatics' Acquisition of Topps Increased
              Concentration in Any Alleged Market (Claim Four)...............................................18

IV.    PLAINTIFFS' STATE-LAW CLAIMS FAIL FOR THE SAME AND
       ADDITIONAL REASONS (CLAIMS TEN THROUGH THIRTEEN)..........................20

       A.     Plaintiffs' Conclusory Recitation of State Statutes Is Insufficient ........................20

       B.     The State-Law Claims Fail for the Same Reasons the Federal Claims Fail ..........21

              1.     State Antitrust Claims (Claims Ten and Eleven)......................................21

              2.     State Consumer Protection Claims (Claim Twelve).................................22

       C.     Plaintiffs Fail To Satisfy Essential Elements of Various State Statutes ................23

              1.     No Indirect Purchaser, Private, or Class Action Permitted.......................23

2. No Plausible Allegations Related to Intrastate Commerce........................24

3. No Particularized Allegations of Reliance, Fraud, or Specific Conduct....................................................................................................25

4. Failure to Provide Notice.........................................................................26

CONCLUSION....................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1-800 Contacts, Inc. v. F.T.C.*,
   1 F.4th 102 (2d Cir. 2021) (per curiam)..................................................................................10

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   607 F. Supp. 2d 500 (S.D.N.Y. 2009).....................................................................................10

*Arcesium, LLC v. Advent Software, Inc.*,
   2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) ....................................................................10, 12

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994).......................................................................................................14

*Barker v. Nestle Purina PetCare Co.*,
   601 F. Supp. 3d 464 (E.D. Mo. 2022)......................................................................................25

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979).....................................................................................................12

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ...................................................................................................9

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*,
   651 F.2d 122 (2d Cir. 1981)......................................................................................................13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)..................................................................................................................19

*Brunswick Corp. v. Riegel Textile Corp.*,
   752 F.2d 261 (7th Cir. 1984) ..............................................................................................13, 15

*Camaisa v. Pharm. Rsch. Assocs., Inc.*,
   2022 WL 843653 (D. Del. Mar. 22, 2022) ...............................................................................19

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006)..................................................................................................................16

*Daisy Outdoor Advert. Co. v. Abbott*,
   322 S.C. 489 (1996)..................................................................................................................25

*Davric Maine Corp. v. Rancourt*,
   216 F.3d 143 (1st Cir. 2000).....................................................................................................22

*Demartini v. Microsoft Corp.*,
 662 F. Supp. 3d 1055 (N.D. Cal. 2023) ......................................................................19

*E & L Consulting Ltd. v. Doman Indus. Ltd.*,
 472 F.3d 23 (2d Cir. 2006)..........................................................................................13

*Edwards v. N. Am. Power & Gas, LLC*,
 120 F. Supp. 3d 132 (D. Conn. 2015) .........................................................................16

*Esquibel v. Colgate-Palmolive Co.*,
 2025 WL 1785865 (S.D.N.Y. June 27, 2025) (Swain, J.) ...........................................16

*Est. of Pilgrim v. Gen. Motors LLC*,
 344 F.R.D. 381 (E.D. Mich. 2023) ..............................................................................23

*Fravel v. Ford Motor Co.*,
 973 F. Supp. 2d 651 (W.D. Va. 2013) ..........................................................................25

*Freeman Indus., LLC v. Eastman Chem. Co.*,
 172 S.W.3d 512 (Tenn. 2005)......................................................................................25

*Fruehauf Corp. v. F. T. C.*,
 603 F.2d 345 (2d Cir. 1979).........................................................................................17

*FTC v. Microsoft Corp.*,
 681 F. Supp. 3d 1069 (N.D. Cal. 2023) .......................................................................18

*Fucile v. Visa U.S.A., Inc.*,
 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) ......................................................22

*Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.*,
 789 F. Supp. 760 (D. Miss. 1992)................................................................................22

*Giordano v. Saks Inc.*,
 654 F. Supp. 3d 174 (E.D.N.Y. 2023) ............................................................................8

*Graham v. UMG Recordings, Inc.*,
 2025 WL 2879607 (S.D.N.Y. Oct. 9, 2025)............................................................10, 11

*Harris v. TD Ameritrade Inc.*,
 338 F. Supp. 3d 170 (S.D.N.Y. 2018), *aff'd*, 837 F. App'x 841 (2d Cir. 2021).........2

*HQuotient, Inc. v. Knight Trading Grp., Inc.*,
 2005 WL 323750 (S.D.N.Y. Feb. 9, 2005)...................................................................25

*Illinois Tool Works Inc. v. J-B Weld Co., LLC*,
 419 F. Supp. 3d 382 (D. Conn. 2019)..........................................................................10

*In re Aggrenox Antitrust Litig.*,
94 F. Supp. 3d 224 (D. Conn. 2015)..............................................................20, 22, 23

*In re Aluminum Warehousing Antitrust Litig.*,
2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir.
2016) ........................................................................................................................22

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016)....................................................................................20

*In re Aluminum Warehousing Antitrust Litig.*,
95 F. Supp. 3d 419 (S.D.N.Y. 2015)........................................................................24

*In re Amitiza Antitrust Litig.*,
2024 WL 4250224 (D. Mass. Aug. 21, 2024) .........................................................23

*In re AMR Corp.*,
2023 WL 2563897 (2d Cir. Mar. 20, 2023)..................................................17, 18, 19

*In re Androgel Antitrust Litig. (No. II)*,
687 F. Supp. 2d 1371 (N.D. Ga. 2010).....................................................................22

*In re Bystolic Antitrust Litig.*,
583 F. Supp. 3d 455 (S.D.N.Y. 2022)..................................................................20, 22

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012).................................................................14, 15

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 510 (N.D. Ill. 2019) .......................................................................24

*In re Effexor Antitrust Litig.*,
357 F. Supp. 3d 363 (D.N.J. 2018) ..........................................................................26

*In re Elec. Books Antitrust Litig.*,
2014 WL 2535112 (S.D.N.Y. June 5, 2014) ............................................................22

*In re Graphic Processing Units (GPU) Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...................................................................25

*In re Interior Molded Doors Antitrust Litig.*,
2019 WL 4478734 (E.D. Va. Sept. 18, 2019)..........................................................22

*In re Keurig Green Mtn. Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019).......................................................................24

*In re Magnesium Oxide Antitrust Litig.*,
2011 WL 5008090 (D.N.J. Oct. 20, 2011).................................................................24

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008)......................................................................................14

*In re Packaged Ice Antitrust Litig.*,
    779 F. Supp. 2d 642 (E.D. Mich. 2011)...............................................................25

*In re Pork Antitrust Litig.*,
    495 F. Supp. 3d 753 (D. Minn. 2020)...................................................................24

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    2019 WL 4796528 (W.D. Mo. Aug. 21, 2019)......................................................22

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    355 F. Supp. 3d 145 (E.D.N.Y. 2018) ..................................................................25

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    64 F. Supp. 3d 665 (E.D. Pa. 2014) .....................................................................23

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*
    2017 WL 4642285 (E.D. Pa. Oct. 17, 2017).........................................................22

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
    150 F. Supp. 3d 593 (D.S.C. 2015).......................................................................23

*Indep. Cnty. v. Pfizer, Inc.*,
    534 F. Supp. 2d 882 (E.D. Ark. 2008) ..................................................................23

*Intel Corp. v. Fortress Inv. Grp.*,
    511 F. Supp. 3d 1006 (N.D. Cal. 2021), *aff'd*, 2022 WL 16756365 (9th Cir.
    Nov. 8, 2022) ........................................................................................................11

*Johannessohn v. Polaris Indus., Inc.*,
    450 F. Supp. 3d 931 (D. Minn. 2020), *aff'd*, 9 F.4th 981 (8th Cir. 2021)..............25

*K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995).....................................................................................8

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) ................................................................................13

*Linzer Prods. Corp. v. Sekar*,
    499 F. Supp. 2d 540 (S.D.N.Y. 2007).....................................................................8

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..............................................................................................16

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016)....................................................................................9

*Mass. Laborers' Health & Welfare Fund v. Boehringer Ingelheim Pharms.*,
  783 F. Supp. 3d 417 (D. Mass. 2025) ...................................................................23

*Miami Prods. & Chem. Co. v. Olin Corp.*,
  546 F. Supp. 3d 223 (W.D.N.Y. 2021) .................................................................24

*Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*,
  795 F.3d 1124 (9th Cir. 2015) .............................................................................21

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)................................................................................................8

*Olstad v. Microsoft Corp.*,
  700 N.W.2d 139 (Wis. 2005)................................................................................25

*Panini America, Inc. v. Fanatics, Inc.*,
  No. 23-cv-09714 (S.D.N.Y.)..................................................................................2

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117, 124 (2d Cir. 2007).............................................................17, 19, 20

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
  661 F. Supp. 2d 218 (E.D.N.Y. 2009) ..................................................................22

*Sabol v. PayPal Holdings, Inc.*,
  2024 WL 3924686 (N.D. Cal. Aug. 23, 2024) .....................................................12

*Sell It Soc., LLC v. Acumen Brands, Inc.*,
  2015 WL 1345927 (S.D.N.Y. Mar. 20, 2015).............................................10, 11, 15

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
  2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ......................................................23

*Staley v. Gilead Scis., Inc.*,
  446 F. Supp. 3d 578 (N.D. Cal. 2020) ..................................................................23

*Tele Atlas N.V. v. NAVTEQ Corp.*,
  397 F. Supp. 2d 1184 (N.D. Cal. 2005) ..................................................................8

*TMT Mgmt. Grp., LLC v. U.S. Bank Nat'l Ass'n*,
  940 N.W.2d 239 (Minn. Ct. App. 2020)................................................................22

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998)......................................................................12, 13, 15

*Toretto v. Donnelley Fin. Sols., Inc.*,
  583 F. Supp. 3d 570 (S.D.N.Y. 2022)...................................................................25

*Tristar Prods., Inc. v. Telebrands Corp., Whele LLC*,
  2025 WL 1111513 (N.D. Fla. Apr. 14, 2025)................................................................14

*United States v. AT&T, Inc.*,
  916 F.3d 1029 (D.C. Cir. 2019)...................................................................................17

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001).........................................................................................8

*United States v. Waste Mgmt. Inc.*,
  743 F.2d 976 (2d Cir. 1984).........................................................................................19

*USI Ins. Servs., LLC v. Morris*,
  2024 WL 1436316 (D. Colo. Feb. 21, 2024)................................................................21

*Waxman v. Cliffs Nat'l Resources*,
  222 F. Supp. 3d 281 (S.D.N.Y. 2016)...........................................................................16

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)...........................................................................................8

## STATUTES

6 Del. C.
  § 2108 (September 30, 2024).........................................................................................23

15 U.S.C.
  § 1..............................................................................................................................5, 8
  § 2.........................................................................................................................5, 8, 12
  § 14..........................................................................................................................5, 8
  § 18.................................................................................................... *passim*
  § 26.............................................................................................................................14

6 R.I. Gen. Laws Ann.
  § 6-36-2(b) .................................................................................................................21
  § 6-36-21 ....................................................................................................................26

Ariz. Rev. Stat. Ann.
  § 44-1415A .................................................................................................................26

Ariz. Rev. Stat.
  § 44-1412 ....................................................................................................................21

Colo. Rev. Stat. Ann.
  § 6-4-115 (June 7, 2023)..............................................................................................23
  § 6-4-116 ....................................................................................................................26

Conn. Gen. Stat. Ann.
§ 35-44b ..........................................................................................................................21

D.C. Code
§ 28-4502 ........................................................................................................................24
§ 28-4515 ........................................................................................................................21

Del. Code Ann. 6
§ 2113...............................................................................................................................21

Haw. Rev. Stat. Ann.
§ 480-13.3(a)....................................................................................................................26
§ 480-13.3(a)(1) ..............................................................................................................26
§ 480-13.3(a)(2)(C)..........................................................................................................26

Haw. Rev. Stat.
§ 480-3 .............................................................................................................................21

Ill. Comp. Stat.
§ 10/7(2)....................................................................................................................23, 24
§ 10/11 .............................................................................................................................21

Iowa Code
§ 553.2..............................................................................................................................21
§ 553(4) ............................................................................................................................25

Kan. Stat. Ann.
§ 50-163 ...........................................................................................................................21

Md. Code Ann., Com. Law
§ 11-202 ...........................................................................................................................21

Mich. Comp. Laws
§ 445.772..........................................................................................................................25
§ 445.784(2) .....................................................................................................................21

N.H. Rev. Stat. Ann.
§ 356:14 ...........................................................................................................................21

N.J. Stat. Ann.
§ 56:9-12 (August 5, 2022).............................................................................................23
§ 56:9-18 ..........................................................................................................................21

N.M. Stat. Ann.
§ 57-1-15..........................................................................................................................21

N.Y. Gen. Bus. Law
§ 340(5).............................................................................................................................26

Neb. Rev. Stat. Ann.
  § 59-829 ............................................................................................................21

Nev. Rev. Stat. Ann.
  § 598A.050...........................................................................................................21
  § 598A.210(3) ......................................................................................................26

Or. Rev. Stat.
  § 646.715(2).........................................................................................................21

S.D. Codified Laws
  § 37-1-22 .............................................................................................................21

Tenn. Code Ann.
  § 47-25-106(c) .....................................................................................................24

Utah Code Ann.
  § 76-10-3109(9) ...................................................................................................26
  § 76-10-3118, *formerly* § 76-10-926 ...............................................................21
  § 76-16-511 .........................................................................................................23

W. Va. Code
  § 47-18-16............................................................................................................21

## RULES

Or. R. Civ. P. 32(H) ...............................................................................................26

## OTHER AUTHORITIES

*The Athletic* Collectibles Staff, *2025-26 Topps Basketball Hobby Box Battle:
  What We Pulled and Who Came Away the Winner*, N.Y. Times: *The Athletic*
  (Oct. 28, 2025), https://www.nytimes.com/athletic/6755353/2025/10/28/
  topps-basketball-cards-hobby-box-nba-collectors/...................................................10

**INTRODUCTION**

Despite amending their Complaint multiple times, Plaintiffs' case still rests on speculative and implausible theories of consumer harm and should be dismissed. Plaintiffs sued Fanatics in July 2025 for charging higher prices for newly issued, fully licensed NFL, NBA, and MLB trading cards produced by Fanatics and sold by third-party retailers. That theory was false as to NFL and NBA cards: when Plaintiffs filed their lawsuit, Fanatics did not produce and distribute newly issued, fully licensed NFL and NBA cards—its competitor, Panini, did. As to NFL cards, Fanatics *still* does not produce and distribute those cards because Panini's exclusive license with the NFL runs until April 2026. Am. Consolidated Class Action Compl., ECF No. 149 ("AC") ¶ 153. Now, after multiple amendments—including following service of Fanatics' Rule 11 motion highlighting Plaintiffs' false allegations about NFL and NBA cards—Plaintiffs have withdrawn their allegations about paying higher prices for NFL cards. But they have substituted them with speculative and baseless allegations about "a significant threat of future injury" for "future purchases" of NFL cards, and they now seek only injunctive relief for those cards. *Id.* ¶¶ 1-2, 19, 26. As to MLB and NBA cards, which Fanatics has produced since January 2022 (through Topps' MLB license) and October 2025 (when Fanatics' NBA license took effect), *id.* ¶¶ 131, 153, Plaintiffs' allegations of consumer harm remain conclusory and implausible: they are based on anonymous Reddit posts, a stray remark on a podcast, and an article from *The Athletic* that overwhelmingly *praises* Fanatics' NBA cards.

Because there are no plausible allegations of higher prices for MLB and NBA cards—nor of "future injury" from "future purchases" of NFL cards—Plaintiffs' Sherman Act claims (Counts One, Two, and Five to Nine) should be dismissed for failure to plead actual or impending anticompetitive effects. Similarly, Claim Seven should be dismissed for lack of Article III

standing because it relates solely to NFL trading cards and rests entirely on speculation about the future prices and quality of those cards.

Plaintiffs' Clayton Act claims should be dismissed for similar reasons. Plaintiffs' claim related to Fanatics' acquisition of Topps (Claim Four) fails because Fanatics had zero market share in any collectibles market prior to acquiring Topps and merely stepped into Topps' existing MLB licenses—there was no increase in concentration, and Plaintiffs do not plausibly allege any resulting consumer harm. Plaintiffs' claim related to Fanatics' investment in printing company GCP (Claim Three) also fails because Plaintiffs do not plausibly allege that Fanatics' investment has a reasonable probability of anticompetitive effect on consumers. Even accepting Plaintiffs' assertions about Panini's production "shortfalls" after the investment, there are no allegations that GCP reduced its *overall* supply of trading cards and therefore no plausible allegations of consumer injury flowing from the investment.

Finally, Plaintiffs' tag-along state-law claims (Claims Ten, Eleven, Twelve, and Thirteen) fail for the same reasons as their federal claims, as well as for independent reasons.

Above all, the AC attempts to piggyback on the allegations in *Panini America, Inc. v. Fanatics, Inc.*, No. 23-cv-09714 (S.D.N.Y.) ("*Panini* Action"), to try to create a consumer claim that might survive dismissal. That does not work. Whatever harm Panini—an allegedly excluded *competitor*—pled, these *consumer* Plaintiffs fail to plausibly allege that Fanatics caused them to pay higher prices, receive lower quality, or face reduced output for newly issued, fully licensed NFL, NBA, or MLB trading cards. The AC should be dismissed.[1]

---

[1] Fanatics has concurrently filed a Motion to Compel Arbitration of the claims of 12 Plaintiffs; this Court should first "rule on [Fanatics'] motion to compel arbitration before proceeding to [Fanatics'] merits-based motion to dismiss." *Harris v. TD Ameritrade Inc.*, 338 F. Supp. 3d 170, 181 (S.D.N.Y. 2018), *aff'd*, 837 F. App'x 841 (2d Cir. 2021).

**SUMMARY OF RELEVANT ALLEGATIONS**

Plaintiffs' factual allegations rehash those in the *Panini* Action, so Fanatics only briefly summarizes them.  However, the *Panini* Action is different in a critical respect: it involved a *competitor's* claim of market exclusion, whereas Plaintiffs are *consumers* who allege they currently paid higher prices for MLB and NBA cards and speculate that they might pay higher prices for NFL cards (sometime in the future when Fanatics starts manufacturing and selling those cards).  That is an important difference for pleading anticompetitive effects and standing.

***Sports IP Licensing.***  For decades, companies have competed for the IP licenses needed to make and sell fully licensed sports trading cards.  AC ¶ 106.  Players associations control IP rights to athletes' identifying information, while sports leagues control IP rights to team logos, color combinations, and the like.  *Id.* ¶¶ 68-69.  To make and sell sports trading cards with both players' likenesses and team and league marks, companies must acquire licenses to both sets of rights.  *Id.* ¶¶ 71-72.  The leagues and players associations decide whether, to whom, and on what terms to license their IP.  *Id.* ¶¶ 75, 97.  Many of these licenses historically have been exclusive.  *Id.* ¶ 4.

***Incumbent Panini.***  Panini has been a dominant player in global collectibles, including trading cards, for decades.  *Id.* ¶¶ 138, 153.  Panini achieved its leading position in the U.S. through, among other things, multi-year exclusive licenses with IP owners.  *Id.* ¶ 153 n.17.  Today, Panini still holds multi-year licenses with many sports leagues, including the NFL (through March 2026) and NFLPA (through February 2026), and until recently Panini held multi-year licenses with the NBA and NBPA (both through September 2025).  *Id.* ¶¶ 113, 153 n.17. Panini's exclusive agreements have had durations up to ten years.  *Id.* ¶¶ 111, 153.

***New Entrant Fanatics.***  Fanatics is a digital sports platform that manufactures and sells licensed sports merchandise and collectibles.  Fanatics recognized that the sports trading card industry had become stagnant and sought to bring innovation.  *See id.* ¶ 127.  Specifically, Fanatics

3

competed for the rights that would allow it to make and sell fully licensed baseball, basketball, and football trading cards after Panini's and Topps' existing licenses expired. *See id.* ¶ 113. Fanatics succeeded. In 2021 and 2022, Fanatics entered into separate licensing agreements with the NBA, NFL, MLB, and their respective players associations. *Id.* ¶¶ 5, 113. These exclusive agreements have terms between ten and twenty years. *Id.* ¶ 116.

To deliver on its promise to innovate and to meet the licensors' expectations, Fanatics began building out its trading card operations. In January 2022, Fanatics announced it had acquired Topps and assumed Topps' existing exclusive licenses with the MLB (and non-exclusive license with the MLBPA) and Major League Soccer. *Id.* ¶¶ 7, 114, 131. In March 2022, Fanatics invested in GC Packaging LLC ("GCP"), a trading card manufacturer. *Id.* ¶¶ 8, 135. And in 2023, Fanatics sought to hire "specialized" and "skilled" employees to facilitate the "creation, design, and marketing" of Fanatics' trading cards. *Id.* ¶¶ 86, 143-44. To "enhance" its trading card offerings and create new categories of trading cards, Fanatics also entered into exclusive autograph agreements with "star, rookie players" in the NBA and NFL to use their autographs on its cards. *Id.* ¶¶ 75, 149.

***The Indirect Purchaser Plaintiffs.*** Plaintiffs are consumers who (1) claim to have paid "inflated prices" for newly issued, fully licensed MLB and NBA cards "produced by Fanatics" and sold to consumers by third-party retailers (*e.g.*, hobby shops, big-box stores), and (2) speculate that they may pay "inflate[d] … prices" for "future purchases" of NFL cards that Fanatics will begin producing in April 2026. *Id.* ¶¶ 1-2, 19, 26, 184, 193. Plaintiffs also claim to have suffered "reduced output, diminished product quality, and restricted consumer choice" for MLB, NBA, and NFL trading cards. *Id.* ¶ 184. Plaintiffs seek to represent: (1) an injunctive relief class of "persons or entities in the United States, who [since January 1, 2022] … purchased, not for resale, an

unopened pack, box, or case of newly issued, fully licensed Pro Sports Trading Cards," and (2) a damages class of "persons or entities in the *Illinois Brick* Repealer States … who [since January 1, 2022] purchased, not for resale, an unopened pack, box, or case of newly issued, fully licensed MLB or NBA trading cards produced by Fanatics." *Id.* ¶¶ 202-03.

*Plaintiffs' Antitrust Claims.*    Plaintiffs claim that Fanatics participated in an "anticompetitive scheme" related to MLB, NBA, and NFL trading cards. *Id.* ¶¶ 2, 184. According to Plaintiffs, Fanatics obtained "long-term exclusive licenses" with the MLB, NBA, and NFL and their respective players associations "by promising [the licensors] an equity stake in [Fanatics'] future monopoly profits." *Id.* ¶ 6. This "scheme" also supposedly included: acquiring Topps; investing in card printer GCP; "poaching" Panini employees; disparaging Panini; and preventing Panini from acquiring jerseys for use in trading cards. *Id.* ¶¶ 131-147, 167-68, 191.

Plaintiffs assert two claims against Fanatics for violation of Sherman Act Section 2, (Claims One, Two), *id.* ¶¶ 216-231; two claims against Fanatics for violation of Clayton Act Section 7, *id.* ¶¶ 232-244 (Claims Three, Four); five claims against Fanatics and different combinations of leagues and players associations for violation of Sherman Act Section 1 and Clayton Act Section 3 (Claims Five to Nine), *id.* ¶¶ 245-276; one claim against Fanatics for violation of 33 state monopolization statutes (Claim Ten), *id.* ¶¶ 277-320; two claims against all Defendants, except for the NFL and NFLPA Defendants, for violation of 40 state unreasonable restraint of trade and unfair trade practices statutes (Claim Eleven and Twelve), *id.* ¶¶ 321-369; and one claim against Fanatics for unjust enrichment (Claim Thirteen), *id.* ¶¶ 370-378.

*The Alleged Market.*    Plaintiffs allege a market "limited to newly issued, fully licensed" "NBA trading cards, NFL trading cards, and MLB trading cards." *Id.* ¶¶ 76-77. Plaintiffs claim this purported market "is further divided … into markets for Mass Market trading cards and for

5

Premium trading cards," *id.* ¶ 87, as well as "submarkets" for each of NFL, NBA, and MLB cards, *id.* ¶ 96, for a total of "eight markets." *id.* ¶ 102.

*Plaintiffs' Theory of Anticompetitive Effects: MLB and NBA Cards.* Plaintiffs allege consumers "have paid, and will continue to pay, higher prices for MLB and NBA" trading cards produced by Fanatics. *Id.* ¶ 193; *see also id.* ¶¶ 2, 19, 184, 186, 283. Plaintiffs claim they overpaid as indirect purchasers because Fanatics "either (a) sells to distributors, who in turn supply retailers, or (b) sells directly to retailers, which then sell to end consumers," and "any increase in the wholesale prices or imposition of minimum retail prices is directly passed down the chain to class members." *Id.* ¶ 197. Plaintiffs' theory of higher prices and lower quality for MLB cards is based on: (1) an anonymous Reddit post claiming a "Topps Chrome value box[]" increased from "$25/$30" at some unidentified time to "$39.99" in 2024, *id.* ¶¶ 180, 186; (2) a podcast "mention[ing] that 'Topps … prices are more expensive now than they've ever been,'" *id.* ¶ 180; (3) an anonymous Reddit post claiming Topps once provided "28% fewer cards for an increasingly higher price," *id.* ¶ 186; and (4) claims that "[c]onsumers have reported widespread quality-control issues with Fanatics-owned Topps products," such as "Premium releases including less sought after cards," *id.* ¶ 188. Plaintiffs' theory of higher prices and lower quality for NBA cards is based on: (1) an anonymous Reddit post claiming Topps' "retail prices got spiked," and (2) an article in *The Athletic* noting that a pack of NBA cards had "dinged up corners." *Id.* ¶¶ 182, 186.

*Plaintiffs' Theory of Anticompetitive Effects: NFL Cards.* Plaintiffs withdrew their claim of having paid higher prices for NFL cards made by Fanatics—as they had to, since Fanatics will not make and distribute those cards until April 2026. *Compare, e.g.*, Corrected Am. Consolidated Class Action Compl., ECF No. 141 ¶ 191 (alleging Plaintiffs "paid … higher prices for Pro Sports Trading Cards," including NFL cards), *with* AC ¶ 193 (alleging Plaintiffs "paid … higher prices

for MLB and NBA Pro Sports Trading Cards"). Plaintiffs now vaguely claim that consumers "face a real and immediate threat of paying higher prices for NFL trading cards when Fanatics gains monopoly power in the NFL trading cards submarket in 2026." AC ¶ 193. They also allege "reduced consumer choices for … NFL trading cards" made by Panini. *Id.* ¶¶ 223, 230, 257, 263.

## ARGUMENT

The Court should dismiss the AC for four reasons. *First*, Plaintiffs fail to plausibly allege actual or impending anticompetitive effects resulting from Fanatics' alleged conduct, requiring dismissal of their Sherman Act claims (Claims One, Two, and Five to Nine). *Second*, Plaintiffs lack Article III standing to assert a claim related solely to NFL cards that Fanatics does not produce and distribute (Claim Seven). *Third*, Plaintiffs fail to plausibly allege that Fanatics' acquisition of Topps resulted in undue market concentration or that Fanatics' investment in GCP had a reasonable probability of anticompetitive effect for consumers (Claims Three and Four). *Fourth*, Plaintiffs' kitchen-sink state-law claims fail for the same reasons as their federal claims and on independent grounds (Claims Ten through Thirteen).

## I. PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE ACTUAL OR IMPENDING ANTICOMPETITIVE EFFECTS (CLAIMS ONE, TWO, AND FIVE TO NINE)

Plaintiffs fail to state Sherman Act claims because their allegations of anticompetitive effects are implausible. As to MLB and NBA cards, Plaintiffs claim to have paid higher prices and experienced lower quality and reduced output, but their conclusory allegations—mostly in the form of Reddit posts—fail to support that claim. As to NFL cards, Plaintiffs admit they could not have paid inflated prices or experienced lower quality for NFL cards produced *by Fanatics*, since Fanatics will not produce and distribute those cards until April 2026. Plaintiffs' speculative and unsupported claims that consumers might pay higher prices for "future purchases" of NFL cards,

7

or that Fanatics somehow caused "reduced consumer choices" for the NFL cards produced *by Panini*, fall far short of alleging actual or impending consumer harm.

### A.    Plaintiffs Fail To Plead Anticompetitive Effects for MLB and NBA Cards

To state a claim for violation of Section 1 or Section 2 of the Sherman Act, Plaintiffs must plausibly allege anticompetitive effects resulting from the challenged conduct.  *See K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127-28 (2d Cir. 1995) (Section 1 plaintiff must show that challenged conduct "has had an actual adverse effect on competition as a whole in the relevant market" or "that defendants possess sufficient market power to cause an adverse effect on competition"); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (for a Section 2 claim, defendant's "act must have an anticompetitive effect"); *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 207 (E.D.N.Y. 2023) ("An antitrust plaintiff must allege … an adverse effect on competition market-wide.").[2]

"A plaintiff may demonstrate adverse effect on competition either 'directly or indirectly.'" *Giordano,* 654 F. Supp. 3d at 208.  <u>Direct</u> evidence requires plausible allegations of "reduced output, increased prices, or decreased quality in the relevant market," while <u>indirect</u> evidence requires plausible allegations of "market power plus some evidence that the challenged restraint harms competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018).  Although "'direct' and

---

[2] In their Sherman Act Section 1 claims (Claims Five to Nine), Plaintiffs also cite Section 3 of the Clayton Act.  That statute reaches only arrangements dealing with "goods, wares, merchandise, machinery, supplies or other commodities."  15 U.S.C. § 14.  Here, Plaintiffs' claims concern exclusive agreements for IP rights, not tangible goods. *See Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 556 (S.D.N.Y. 2007) ("[C]ontracts that explicitly grant a license to exploit the intellectual property contained in a commodity have been viewed as primarily concerned with intangible rights, and are therefore not covered by the [Clayton] Act."); *Tele Atlas N.V. v. NAVTEQ Corp.*, 397 F. Supp. 2d 1184, 1192 (N.D. Cal. 2005) ("A license is not the sale of a tangible good" under Section 3).  But even if Clayton Act Section 3 applies, Plaintiffs still fail to plead the requisite anticompetitive effects. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) (explaining "[t]he rule of reason governs" claims under "Section 3 of the Clayton Act").

'indirect' proof [are] alternative ways of satisfying the adverse-effect requirement, there is really only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016).  Speculation about future anticompetitive effects is insufficient: the "cases have always required, as a practical matter, some evidence that the challenged action has *already* had an adverse effect on competition." *Id.*; *see also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) ("[A] complaint's allegation of a practice that may or may not injure competition is insufficient to 'state a claim to relief that is plausible on its face.'").

Plaintiffs fail to plead either direct or indirect evidence of anticompetitive effects for MLB and NBA trading cards.

### 1.    No Direct Evidence

For MLB cards, Plaintiffs purport to plead <u>direct</u> evidence of anticompetitive effects by claiming that Fanatics "has raised the prices of Topps-branded MLB cards to unprecedented levels" and that "collectors are already seeing price increases" and lower quality.  AC ¶¶ 180, 186. Plaintiffs rely on: (1) an anonymous Reddit post claiming a "Topps Chrome value box[]" increased from "$25/$30" at some unidentified time to "$39.99" in 2024, *id.* ¶¶ 180, 186; (2) a podcast "mention[ing] that 'Topps … prices are more expensive now than they've ever been," *id.* ¶ 180; (3) another anonymous Reddit post claiming Topps once provided "28% fewer cards for an increasingly higher price," *id.* ¶ 186; and (4) vague claims that "[c]onsumers have reported widespread quality-control issues with Fanatics-owned Topps products," such as "Premium releases including less sought after cards," *id.* ¶ 188.

For NBA cards—which Fanatics began producing only three months ago—Plaintiffs' purported direct evidence consists of: (1) an anonymous Reddit post claiming Topps' "retail prices got spiked," and (2) an article in *The Athletic* noting that a pack of NBA cards had cards with

9

"dinged up corners." *Id.* ¶ 182. *The Athletic* article overwhelmingly *praises* Fanatics' NBA cards, including on improved price and quality: "card design is pretty clean"; the cards cost "less than" the "current average hobby box price"; the authors would "buy this again" given the cards were at "a reasonable price point"; and the initial release was a "really strong first showing" and a "welcome change" from the "previous license-holder," *i.e.*, Panini.[3]

These online comments fall far short of plausibly alleging higher prices or reduced quality for MLB and NBA cards. *See Sell It Soc., LLC v. Acumen Brands, Inc.*, 2015 WL 1345927, at *4 (S.D.N.Y. Mar. 20, 2015) (dismissing Sherman Act claims where "Plaintiff provide[d] no factual support (allegations) for [its] speculative conclusion" that defendant's conduct "may likely lead[] to increased prices and reduced innovation and consumer choice"). Plaintiffs do not even attempt to plead how much prices supposedly increased, over what period, or why increased costs, inflation, and other factors did not cause any alleged increases. Moreover, inferring anything about *market-wide* prices or quality changes from a handful of online comments is improperly speculative. *See 1-800 Contacts, Inc. v. F.T.C.*, 1 F.4th 102, 118 & n.11 (2d Cir. 2021) (per curiam) (noting that "showing that a price for certain [products] dropped is not direct evidence of the effect on the market as a whole").[4]  And, "[e]ven assuming, *arguendo*, that [Fanatics' alleged] conduct"

---

[3] *The Athletic* Collectibles Staff, *2025-26 Topps Basketball Hobby Box Battle: What We Pulled and Who Came Away the Winner*, N.Y. Times: *The Athletic* (Oct. 28, 2025), https://www.nytimes.com/athletic/6755353/2025/10/28/topps-basketball-cards-hobby-box-nba-collectors/ (incorporated in AC ¶ 182 n.23). Because Plaintiffs incorporate *The Athletic* article by reference, the Court may consider its contents—and those contents, not Plaintiffs' unsupported conclusions, control. *See Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446, at *5 (S.D.N.Y. Mar. 31, 2021); *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 607 F. Supp. 2d 500, 502 (S.D.N.Y. 2009) (where "a conclusory allegation … conflicts with a statement made in a document attached to the complaint, the document controls and the allegation is not accepted as true").

[4] Courts routinely reject conclusory allegations based on online commentary. *See Illinois Tool Works Inc. v. J-B Weld Co., LLC*, 419 F. Supp. 3d 382, 399 (D. Conn. 2019) (declining to consider "internet reviews" to assess product quality because "online reviews are 'bimodal' and reflect extreme positions"); *Graham v. UMG Recordings, Inc.*, 2025 WL 2879607, at *14 (S.D.N.Y.

10

could "result in price increases," Plaintiffs' claims would still fail because the AC "does not allege … that any increased prices would be 'above competitive levels,'" as required. *Sell It Soc.*, 2015 WL 1345927, at \*4; *see also Intel Corp. v. Fortress Inv. Grp.*, 511 F. Supp. 3d 1006, 1027 (N.D. Cal. 2021) (allegation that consumers "paid supracompetitive prices" is "conclusory"), *aff'd*, 2022 WL 16756365, at \*2-3 (9th Cir. Nov. 8, 2022).  Nor do Plaintiffs plead any facts suggesting that the third-party retailers from which they purchased trading cards raised prices because of *Fanatics'* alleged conduct—as opposed to the myriad reasons hundreds of independent sellers might adjust their retail prices.  *See* AC ¶¶ 195-99 (making conclusory allegations of pass-through).

Plaintiffs also fail to plausibly allege reduced output of MLB and NBA cards.  *See* AC ¶¶ 180-199.  Plaintiffs claim Fanatics' investment in GCP "resulted in significant supply disruptions and delayed product releases for *Panini's* trading cards," *id.* ¶ 187 (emphasis added), but they do not allege any reduction in trading card supply *overall*, and thus fail to plead consumer harm.  *See infra* Section III.A.  Nor do Plaintiffs allege that Fanatics actually "cut off" supply of MLB or NBA cards from any distributor or retailer.  *See* AC ¶ 189.  As for Plaintiffs' claim that Fanatics "limited the availability" of "competing products" by "coercing case breakers" to use the Fanatics Live platform, *id.* ¶ 190, those allegations are irrelevant to the *unopened* cards that comprise the alleged markets.  *Compare id.* ¶ 203 (damages class limited to purchasers of "*unopened* pack, box, or case …), *with id.* ¶ 166 (breakers "*open*[] … new trading card cases and packets by livestreaming over the internet") (emphases added).  Further, Plaintiffs' claims about reduced output from Fanatics' "exclusive autograph deals with star rookie players" (*e.g., id.* ¶¶ 153-54, 190) depend on the unsupported conclusion that consumers would not buy cards

---

Oct. 9, 2025) ("small sample of users' possible experience, communicated through Tweets and other anonymized commentary" failed to plausibly support defamation claim).

11

bearing valuable autographs but not league marks (*i.e.*, "pajama cards") in place of cards bearing league marks but not valuable autographs. Finally, Plaintiffs engage in pure speculation by claiming Fanatics' alleged "poaching of Panini employees" somehow "reduc[es] the likelihood that Plaintiffs … will benefit from new product features, creative designs, or improved consumer experiences." *Id.* ¶ 191.

In sum, Plaintiffs wrongly assume that purported harm to *Panini* is harm to *consumers*. Panini's claims concern alleged lost profits, while Plaintiffs' claims concern alleged overcharges to retailers that were supposedly passed on to consumers. Those are "fundamentally different theories of harm." *Sabol v. PayPal Holdings, Inc.*, 2024 WL 3924686, at *4 (N.D. Cal. Aug. 23, 2024); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979) (while "a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price"). The Court in *Panini* made no findings as to what might happen to consumer prices or quality in the future, and Plaintiffs fail to plausibly allege any such effect. *See Arcesium*, 2021 WL 1225446, at *7 (dismissing antitrust claims where plaintiff alleged "only that these [competitive] impacts *could* happen" (emphasis added)).

### 2.    No Indirect Evidence

To the extent Plaintiffs attempt to offer <u>indirect</u> evidence of anticompetitive effects for MLB and NBA cards, they fare no better. Indirect evidence requires a showing of high market share "plus some other ground for believing that the challenged behavior could harm competition in the market." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998); *see also id.* at 98 (similar for Section 2). Plaintiffs make no allegations about market shares, other than a stray statement that "by April 2026 Fanatics will control 100% of the Relevant Markets." AC ¶ 113.

12

Even accepting Plaintiffs' "Relevant Markets" for purposes of this Motion, this supposed future market share says nothing about plausible anticompetitive effects for MLB and NBA trading cards.

At best, according to Plaintiffs, Fanatics presently has some unalleged share between 33% and 66% of a supposed "newly issued, fully licensed" NFL, NBA, and MLB trading cards market (Fanatics' NBA license took effect in October 2025, but Panini is still selling NBA cards during a sell-off period and thus still has share of any NBA cards market).[5]  These market shares are insufficient to plead anticompetitive effects indirectly: it is well settled that a "market share below 50% is rarely evidence of monopoly power," and even a share between 50% and 70% will only "occasionally show monopoly power."  *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981); *see also Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) ("[T]he Supreme Court has never found a party with less than 75% market share to have monopoly power.").

In any event, even if Plaintiffs plausibly alleged a high market share, they ignore the "marketplace reality" that harm to consumers does not follow from substituting one exclusive licensee (Panini) for another (Fanatics or Topps).  *See Tops Mkts.*, 142 F.3d at 98-99 (court "cannot be blinded by market share figures" and must consider "marketplace realities").  Antitrust law is "indifferen[t]" to who "exploits" exclusive rights.  *Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 266-67 (7th Cir. 1984); *see also E & L Consulting Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29-30 (2d Cir. 2006) (exclusive distributorship "provides no monopolistic benefit to [the manufacturer] that it does not already enjoy").  Thus, even if "the replaced monopolist is harmed,

---

[5] Fanatics' share of any properly defined market is far lower, considering competition from, *e.g.*: games and entertainment trading cards; sports trading cards other than MLB, NBA, and NFL cards, such as NHL and MLS; baseball, basketball, and football trading cards beyond MLB, NBA, and NFL (such as college and minor league baseball); unlicensed sports trading cards; and the entirety of trading cards sold on the secondary market.

the level of competition in the market remains the same," and there is no plausible anticompetitive effect. *See Tristar Prods., Inc. v. Telebrands Corp., Whele LLC*, 2025 WL 1111513, at \*16 (N.D. Fla. Apr. 14, 2025) (dismissing antitrust claims). When Fanatics took over the MLB license from Topps in 2022, and when Fanatics replaced Panini as the exclusive NBA licensee in 2025, this "reshuffling of competitors" did not harm consumers because "from the consumers' point of view nothing about the market has changed": the "[licenses] remained exclusive" and "[o]nly the provider changed." *Balaklaw v. Lovell*, 14 F.3d 793, 798-799 (2d Cir. 1994).

**B.     Plaintiffs Fail To Plead Impending Consumer Harm for NFL Cards That Fanatics Does Not Yet Produce and Distribute**

Following service of Fanatics' Rule 11 motion, Plaintiffs withdrew their false allegations regarding inflated prices and lower quality for NFL cards that Fanatics does not yet produce. But they persist in speculating about *future* prices and quality of NFL cards and make a baseless demand for injunctive relief. To plead entitlement to such relief, Plaintiffs "must demonstrate a significant threat of injury from an impending violation." *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 209 (S.D.N.Y. 2012); *see also* 15 U.S.C. § 26. The "requirement of 'threatened injury,' … dovetails with Article III's requirement that in order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 14 (1st Cir. 2008). Plaintiffs fail to meet this standard.

Plaintiffs claim there is "a significant threat of future injury to purchasers of … newly issued, fully licensed NFL trading cards," AC ¶¶ 2, 19, because "due to consumer preferences and cross-elasticity of demand, consumers who have paid higher prices for MLB and NBA Pro Sports Trading Cards face a real and immediate threat of paying higher prices for NFL trading cards … in 2026," *id.* ¶ 193. This allegation is nothing but a mix of jargon and wild speculation: it is equally

14

plausible that, when Fanatics begins making and distributing newly issued, fully licensed NFL cards in April 2026, quality will increase and prices will be fair and reasonable—just as *Plaintiffs' own source* indicates happened with NBA cards. *See supra* n.3. Plaintiffs' speculation to the contrary is insufficient. *See Sell It Soc.*, 2015 WL 1345927, at *4 (dismissing Sherman Act claims based on "speculative conclusion" that conduct "may likely lead to increased prices and reduced innovation and consumer choice"); *In re DDAVP*, 903 F. Supp. 2d at 210 (dismissing injunctive relief claim because "Plaintiffs' claim of future injury [was] wholly speculative").

To the extent Plaintiffs allege that NFL cards produced *by Panini* were somehow impacted by *Fanatics'* alleged conduct, that claim fails too. *See* AC ¶¶ 223, 230, 257, 263-64 (alleging consumers have experienced "reduced consumer choices for … NFL trading cards"). Whatever problems may exist with Panini's NFL cards, Plaintiffs should take those up with Panini. Plaintiffs' allegations about Fanatics supposedly reducing output—*i.e.*, the supposed "shortfall" of Panini cards, *id.* ¶ 187, "coercing" case breakers, *id.* ¶ 190, rookie autograph deals, *id.* ¶¶ 153-54, 190, and "poaching" Panini employees, *id.* ¶ 191—fail for the same reasons those allegations do not work as to MLB and NBA cards. *Supra* Section I.A1.[6]

---

[6] To the extent Plaintiffs try to rely on market share to plead future harm for NFL cards, that fails too. As explained above, in a combined market for "newly issued, fully licensed" MLB, NBA, and NFL trading cards, Fanatics has at best an unalleged share of between 33% and 66%. Even if Fanatics has 100% of a gerrymandered "submarket" for NFL trading cards only, that still would be insufficient. Fanatics will, in April 2026, merely succeed its predecessor and competitor Panini as the exclusive NFL licensee. "From the standpoint of antitrust law, concerned as it is with consumer welfare, it is a matter of indifference whether [one entity or another] exploits a monopoly." *Brunswick Corp.*, 752 F.2d at 266-67 (affirming dismissal of antitrust claims because "merely shift[ing] a lawful monopoly into different hands . . . has no antitrust significance"). This means there is no "ground for believing that the challenged behavior"—*i.e.*, Fanatics taking over the NFL license from Panini—"could harm competition." *See Tops Mkts.*, 142 F.3d at 97 (requiring high market share *plus* other evidence of competitive harm).

## II.    PLAINTIFFS LACK ARTICLE III STANDING TO PURSUE THEIR NFL CLAIM (CLAIM SEVEN)

Plaintiffs also lack Article III standing to pursue their injunctive relief claim related to newly issued, fully licensed NFL cards.  Article III standing requires Plaintiffs to allege facts demonstrating that: (1) they have suffered an "injury in fact" that is "(a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical'"; (2) the injury is "fairly traceable to the challenged action of [Fanatics]"; and (3) it is "'likely', as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation modified).  To constitute "an injury-in-fact, harms, including economic harms, must be imminent or actual, not merely possible." *Waxman v. Cliffs Nat'l Resources*, 222 F. Supp. 3d 281, 287–88 (S.D.N.Y. 2016).  "Even an 'objectively reasonable likelihood' of harm is insufficient"; instead, harm "must at least be 'certainly impending.'" *Id.* at 287.  Plaintiffs "must demonstrate standing for each claim [they] seek to press" and cannot rely on standing for one count to suffice for all counts.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *see also Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 138 (D. Conn. 2015).

Plaintiffs fail to allege "certainly impending" harm for Claim Seven, which relates exclusively to NFL trading cards.  *See Waxman*, 222 F. Supp. 3d at 287.  As explained above, Plaintiffs' alleged harm related to NFL cards rests on their speculation about a "threat" of "future injury" "in 2026."  AC ¶¶ 2, 19, 193.  That claim is entirely hypothetical—not "imminent," "actual," and "certainly impending," as required.  *See Esquibel v. Colgate-Palmolive Co.*, 2025 WL 1785865, at *5 (S.D.N.Y. June 27, 2025) (Swain, J.) (dismissing plaintiffs' injunctive relief claims for lack of standing); *see supra* Section I.B.

16

### III.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A VIOLATION OF SECTION 7 OF THE CLAYTON ACT (CLAIMS THREE AND FOUR)

In Claims Three and Four, Plaintiffs challenge two different acquisitions by Fanatics: its acquisition of Topps and its investment in printer GCP.  *See* AC ¶¶ 232-244.  To state Clayton Act claims based on these acquisitions, Plaintiffs must allege facts showing that the transactions "substantially … lessen[ed] competition" in a relevant market.  15 U.S.C. § 18; *In re AMR Corp.*, 2023 WL 2563897, at *2 (2d Cir. Mar. 20, 2023).  There must be a "'reasonable probability' of a substantial impairment of competition"; a "mere possibility will not suffice."  *Fruehauf Corp. v. F. T. C.*, 603 F.2d 345, 351 (2d Cir. 1979).  The Section 7 analysis varies depending on whether the transaction at issue is horizontal or vertical in nature—*i.e.*, whether the transaction combines competitors, or is instead between entities at different levels of the supply chain.  *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019).  Here, as to GCP (Count Three), Plaintiffs do not sufficiently allege that this vertical transaction had an anticompetitive effect on consumers.  As to Topps (Count Four), Plaintiffs' failure to allege increased concentration in any market requires dismissal, whether the transaction is deemed horizontal or vertical.

### A.    Plaintiffs Fail To Allege That Fanatics' Investment in GCP Had a Reasonable Probability of Anticompetitive Effect for Consumers (Claim Three)

Plaintiffs concede that GCP is a "specialized manufacturer" of trading cards, not a competitor of Fanatics.  AC ¶ 135.  This means that Fanatics' investment in GCP is a means of "expanding vertically" to "increas[e] its efficiency," and this type of "[v]ertical expansion by [an alleged] monopolist, without more," is not unlawful.  *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007) (firm's "vertical expansion into another level of the same product market will ordinarily be for the purpose of increasing its efficiency").  Plaintiffs' burden to plead that Fanatics' investment in GCP violates the Clayton Act is thus a heavy one: considering the efficiencies of vertical expansion, Plaintiffs must plausibly allege a "reasonable *probability* of

17

anticompetitive effect," *i.e.*, that Fanatics' investment in GCP results in the ability and incentive to harm competition, and that "competition would probably be substantially lessened." *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1090 (N.D. Cal. 2023).

Plaintiffs fail to plausibly allege a "reasonable probability" of consumer harm resulting from Fanatics' GCP investment. Plaintiffs theorize that "[c]onsumers … have suffered losses reflecting the anticompetitive effect of Fanatics' acquisition of control over GCP" in the form "reduced access to Pro Sports Trading Cards" and "reduced and delayed Pro Sports Trading Cards releases." AC ¶ 235. But their factual allegations do not support this theory: Plaintiffs allege only an "output shortfall" of *Panini* trading cards and "delay [of] *Panini's* product releases"—not a reduction in *overall* trading card supply available to consumers or a delay in *overall* trading card releases. *Id.* ¶¶ 139-41. There is no "reasonable probability" of consumer harm if, for example, GCP simply shifted production from one type of trading cards to another but did not reduce *market-wide* output. Whatever GCP-related harm was alleged in the *Panini* Action, Plaintiffs fail to plausibly allege any market-wide output reduction or delay that might harm consumers.

### B. Plaintiffs Fail To Allege That Fanatics' Acquisition of Topps Increased Concentration in Any Alleged Market (Claim Four)

Plaintiffs' scant allegations regarding Fanatics' acquisition of Topps fail to plead a Clayton Act violation. *See id.* ¶¶ 7, 114, 131-34. Section 7 requires Plaintiffs to plausibly allege that the Topps acquisition "will lead to undue concentration in the market." *In re AMR Corp.*, 2023 WL 2563897, at *2. But Plaintiffs cannot plead that Fanatics' acquisition of Topps increased concentration in any alleged market—because it did not. When Fanatics acquired Topps in 2022, Fanatics was not producing any newly issued, fully licensed trading cards at all; Panini's own long-term exclusive licenses barred Fanatics from doing so (and still bar Fanatics from doing so, for NFL cards). *See* AC ¶¶ 113, 153. Because Fanatics had zero share of any alleged trading cards

18

market when it acquired Topps, that transaction could not as a matter of law increase concentration in any such market by any amount—and certainly not by an "undue" amount. *In re AMR Corp.*, 2023 WL 2563897, at \*2; *see also United States v. Waste Mgmt. Inc.*, 743 F.2d 976, 983-84 (2d Cir. 1984) (no Section 7 violation despite large post-merger share because of absence of anticompetitive effects); *Camaisa v. Pharm. Rsch. Assocs., Inc.*, 2022 WL 843653, at \*7 (D. Del. Mar. 22, 2022) (dismissing Section 7 claim for failure to plausibly allege anticompetitive effects where plaintiff did not allege change in market shares).

Further, Plaintiffs' bare allegation that the Topps acquisition "eliminated one of [Fanatics'] major competitors" (AC ¶ 7) is insufficient to plead a "reasonable probability" of anticompetitive effects. *See Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1062-63 (N.D. Cal. 2023) (dismissing Section 7 claims because "Plaintiffs' general allegation that the merger may cause 'higher prices, less innovation, less creativity, less consumer choice, decreased output, and other potential anticompetitive effects' … is insufficient"). It is equally plausible that Fanatics' acquisition of Topps will benefit consumers via better quality, more variety, and lower prices. *See id.* at 1064 ("equality of possibility is insufficient" to plead a Section 7 claim).

Finally, Plaintiffs' Clayton Act claim fails because any alleged consumer injury would not "flow[] from" the Topps acquisition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Port Dock*, 507 F.3d at 123 (no Section 7 violation where alleged injury was not caused by the acquisition itself). Plaintiffs' core complaint is about Fanatics' *future* licenses with the MLB, NFL, and NBA. AC ¶¶ 115-121, 128-29, 194, 218-19. Fanatics did not acquire any of those future licenses by acquiring Topps; the MLB licenses that Topps held at the time of the acquisition would have expired before Fanatics' own MLB licenses took effect in 2026. *Id.* ¶¶ 114, 131, 133. In other words, the Topps acquisition merely gave Fanatics access to Topps' expiring

19

agreements—licenses Plaintiffs do not allege were unlawful.  This means Plaintiffs fail to allege any "substantial[] … lessen[ing] [of] competition" that flows from the Topps acquisition at all. *See Port Dock*, 507 F.3d at 120 n.3, 123.

## IV.     PLAINTIFFS' STATE-LAW CLAIMS FAIL FOR THE SAME AND ADDITIONAL REASONS (CLAIMS TEN THROUGH THIRTEEN)

In their four state-law claims (Claims Ten through Thirteen), Plaintiffs assert 73 state antitrust and consumer protection claims under the laws of 38 states, the District of Columbia, and Puerto Rico.  AC ¶¶ 286-318, 328-60, 363-69.  These claims fail: (1) a cursory recitation of state statutes is insufficient; (2) the state-law claims are derivative of Plaintiffs' deficient federal antitrust claims; and (3) Plaintiffs fail to satisfy the elements of many of their state-law claims.

### A.     Plaintiffs' Conclusory Recitation of State Statutes Is Insufficient

Plaintiffs' conclusory recitation of dozens of state statutes fails.  Plaintiffs repeat the same generic paragraphs 33 times in Claim Ten (*e.g.*, *id.* ¶ 286) and 33 times in Claim Eleven (*e.g.*, *id.* ¶ 328).  Their allegations in Claims Twelve and Thirteen are just labels and conclusions about "unconscionable" and "fraudulent" conduct—none of which is pled with specificity.  *Id.* ¶¶ 363-69, 375.  And Claim Thirteen's plea of "no adequate remedy at law" is a bare legal conclusion. *Id.* ¶ 376.  Courts routinely dismiss similar state-law claims.  *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (affirming dismissal of state consumer protection and antitrust claims where plaintiffs "list[ed] a couple dozen state statutes in alphabetical order by state" and "fail[ed] to explain adequately how the defendants' conduct violated any of the … statutes"); *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 498 (S.D.N.Y. 2022) (plaintiff "cannot simply enumerate a long list of state-law claims" and "rely on the defendants and the court to sort out whether or how those laws can act as surrogates for antitrust law"); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015) ("The indirect purchasers … have listed

claims under very many state laws, but they have not truly pleaded claims under those laws sufficient to show their entitlement to recovery under them[.]").  This Court should do the same.

### B.    The State-Law Claims Fail for the Same Reasons the Federal Claims Fail

### 1.    State Antitrust Claims (Claims Ten and Eleven)

Plaintiffs' state antitrust claims are derivative of their federal claims, "realleg[ing] and repeat[ing]" the same allegations.  AC ¶¶ 277, 321.  Plaintiffs brought antitrust claims under the laws of 31 states, the District of Columbia, and Puerto Rico.  All states except Wyoming interpret their antitrust laws in harmony with federal law, and neither Wyoming statutes nor case law indicate Wyoming would deviate from federal precedent.  Plaintiffs' state antitrust claims thus fail for the same reasons as their federal claims.

The legislatures of 19 states—Arizona, Connecticut, Delaware, Hawaii, Illinois, Iowa, Kansas, Maryland, Michigan, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, Oregon, Rhode Island, South Dakota, Utah, and West Virginia—and the District of Columbia have adopted a harmonization statute providing that their state's antitrust law should be interpreted in accordance with federal antitrust law.[7]  State courts in 11 states—California, Colorado, Maine, Minnesota, Mississippi, New York, North Carolina, North Dakota, Tennessee, Vermont, and Wisconsin—and Puerto Rico have adopted a harmonization doctrine, likewise directing that their state antitrust law should be interpreted in accordance with federal antitrust law.[8]  Consistent with

---

[7] Ariz. Rev. Stat. § 44-1412; Conn. Gen. Stat. Ann. § 35-44b; D.C. Code § 28-4515; Del. Code Ann. 6 § 2113; Haw. Rev. Stat. § 480-3; 740 Ill. Comp. Stat § 10/11; Iowa Code § 553.2; Kan. Stat. Ann. § 50-163; Md. Code Ann., Com. Law § 11-202; Mich. Comp. Laws § 445.784(2); Neb. Rev. Stat. Ann. § 59-829; Nev. Rev. Stat. Ann. § 598A.050; N.H. Rev. Stat. Ann. § 356:14; N.J. Stat. Ann. § 56:9-18; N.M. Stat. Ann. § 57-1-15; Or. Rev. Stat. § 646.715(2); 6 R.I. Gen. Laws Ann. § 6-36-2(b); S.D. Codified Laws § 37-1-22; Utah Code Ann. § 76-10-3118, *formerly* § 76-10-926; W. Va. Code § 47-18-16.

[8] *See Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015) (California); *USI Ins. Servs., LLC v. Morris*, 2024 WL 1436316, at *6 (D. Colo.

these harmonization provisions, when federal antitrust claims are dismissed, the "claims under the antitrust laws of various states—based on the same factual allegations—fail too." *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d at 497; *see also In re Androgel Antitrust Litig. (No. II)*, 687 F. Supp. 2d 1371, 1382 (N.D. Ga. 2010). Wyoming is the only remaining state, and neither its antitrust statute nor case law suggests that Wyoming would not also follow federal antitrust law.

### 2. State Consumer Protection Claims (Claim Twelve)

Plaintiffs invoke the consumer protection laws of seven states—Arkansas, Florida, Massachusetts, Missouri, Montana, South Carolina, and Virginia—by "realleg[ing] and repeat[ing]" the same factual allegations as their federal antitrust claims. AC ¶ 361. Courts dismiss state consumer protection claims, including claims under the laws Plaintiffs invoke, when they are based solely on deficient federal antitrust claims. *See In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d at 498 ("The fundamental deficiency with these claims is that they rely on the existence of anticompetitive conduct," and plaintiffs "have not provided a basis on which these claims survive when federal antitrust claims based on the same factual foundation fail."); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *1 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2017 WL 4642285, at *1 n.1, *13-14 (E.D. Pa. Oct. 17, 2017).

---

Feb. 21, 2024) (Colorado); *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) (Maine); *TMT Mgmt. Grp., LLC v. U.S. Bank Nat'l Ass'n*, 940 N.W.2d 239, 246 (Minn. Ct. App. 2020) (Minnesota); *Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 780 (D. Miss. 1992) (Mississippi); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 233-34 (E.D.N.Y. 2009) (New York); *In re Pre-Filled Propane Tank Antitrust Litig.*, 2019 WL 4796528, at *14 (W.D. Mo. Aug. 21, 2019) (North Carolina); *In re Elec. Books Antitrust Litig.*, 2014 WL 2535112, at *15, *18 (S.D.N.Y. June 5, 2014) (North Dakota, Wisconsin); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d at 252 (Puerto Rico); *In re Interior Molded Doors Antitrust Litig.*, 2019 WL 4478734, at *16 (E.D. Va. Sept. 18, 2019) (Tennessee); *Fucile v. Visa U.S.A., Inc.*, 2004 WL 3030037, at *2-4 (Vt. Super. Ct. Dec. 27, 2004) (Vermont).

### C.    Plaintiffs Fail To Satisfy Essential Elements of Various State Statutes

### 1.    No Indirect Purchaser, Private, or Class Action Permitted

Plaintiffs' antitrust claims under **Colorado**, **Delaware**, and **New Jersey** laws fail because the alleged class period, beginning January 1, 2022, is before the effective date of the *Illinois Brick* repealer laws in each state.  Colo. Rev. Stat. Ann. § 6-4-115 (June 7, 2023); 6 Del. C. § 2108 (September 30, 2024); N.J. Stat. Ann. § 56:9-12 (August 5, 2022).  Damages claims arising before the enactment of a repealer statute must be dismissed.  *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d at 251-53; *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, 2018 WL 7197233, at *24 (S.D.N.Y. Dec. 26, 2018).  **Puerto Rico** and **Wyoming** do not have *Illinois Brick* repealer laws, so Plaintiffs cannot bring antitrust claims under those states' antitrust laws.  *In re Amitiza Antitrust Litig.,* 2024 WL 4250224 (D. Mass. Aug. 21, 2024) (Wyoming); *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 626-28 (N.D. Cal. 2020) (Puerto Rico).  And **Utah's** *Illinois Brick* repealer law applies only to individuals who are citizens or residents of Utah—which no named Plaintiff is.  Utah Code Ann. § 76-16-511.

Further, the consumer protection laws of **Arkansas** and **Missouri** bar indirect purchaser claims.  *See Indep. Cnty. v. Pfizer, Inc.*, 534 F. Supp. 2d 882, 888-89 (E.D. Ark. 2008) (Arkansas); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 701-02 (E.D. Pa. 2014) (Missouri).  Plaintiffs' consumer protection claims under **Arkansas**, **Montana**, and **South Carolina** laws also fail because those laws prohibit class actions.  *Mass. Laborers' Health & Welfare Fund v. Boehringer Ingelheim Pharms.*, 783 F. Supp. 3d 417, 446 (D. Mass. 2025) (Arkansas); *Est. of Pilgrim v. Gen. Motors LLC*, 344 F.R.D. 381, 405-06 (E.D. Mich. 2023) (Montana); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 150 F. Supp. 3d 593, 634-35 (D.S.C. 2015) (South Carolina).  Similarly, the **Illinois** antitrust law prohibits indirect purchasers from bringing class actions, reserving that right for the Attorney General, 740 Ill.

Comp. Stat. § 10/7(2), and the **Tennessee** antitrust statute prohibits class actions altogether, Tenn. Code Ann. § 47-25-106(c).

### 2.    No Plausible Allegations Related to Intrastate Commerce

The antitrust laws of 21 jurisdictions require indirect purchaser plaintiffs to allege certain connections to intrastate commerce; Plaintiffs fail those requirements.

The antitrust statutes of the **District of Columbia** and **Mississippi** only apply when anticompetitive conduct, not just its effects, occurs in that jurisdiction. *See* § 28-4502 (District of Columbia); *In re Keurig Green Mtn. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 267 (S.D.N.Y. 2019) (Mississippi).  Plaintiffs fail to allege specific facts of anticompetitive conduct in any jurisdiction; "[v]ague, conclusory statements of intrastate transactions" are insufficient.  *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 779 (D. Minn. 2020).

Plaintiffs' antitrust claims under the laws of **Arizona**, **Connecticut**, the **District of Columbia**, **Hawaii**, **Iowa**, **Kansas**, **Maine**, **Maryland**, **Michigan**, **Minnesota**, **Mississippi**, **Nebraska**, **Nevada**, **New Mexico**, **New York**, **North Carolina**, **North Dakota**, **Oregon**, **Rhode Island**, **South Dakota**, **Tennessee**, **West Virginia**, and **Wisconsin** fail because Plaintiffs do not adequately allege a substantial *effect* on intrastate commerce.  The AC contains only conclusory allegations for each state, without describing any specific effect in any jurisdiction.  *See Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 243-44 (W.D.N.Y. 2021) (dismissing state antitrust claims where plaintiffs had "not adequately alleged intrastate effects" or sales in Arizona, Connecticut, the District of Columbia, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, or West Virginia); *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 457 n.37 (S.D.N.Y. 2015) (Rhode Island); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 549 (N.D. Ill. 2019) (North Carolina); *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *8 n.10 (D.N.J. Oct. 20,

24

2011) (Hawaii, Kansas, and Nevada); *HQuotient, Inc. v. Knight Trading Grp., Inc.*, 2005 WL 323750, at *4 (S.D.N.Y. Feb. 9, 2005) (New York); *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522-24 (Tenn. 2005) (Tennessee); *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wis. 2005) (Wisconsin). The Iowa statue is materially identical to the Massachusetts statute. *Compare* Iowa Code § 553(4), *with* Mich. Comp. Laws § 445.772.

Plaintiffs' consumer protection claims under **Florida** and **Missouri** laws fail because they do not allege sufficient connections to these states. *See Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 606 (S.D.N.Y. 2022) (Florida consumer protection claims require specific allegations that "at least some improper acts occurred in Florida"); *Barker v. Nestle Purina PetCare Co.*, 601 F. Supp. 3d 464, 469 (E.D. Mo. 2022) (Missouri consumer protection claims require specific allegations of in-state conduct; dismissing claims because "every part of the challenged transaction[s] took place" outside Missouri).

### 3. No Particularized Allegations of Reliance, Fraud, or Specific Conduct

Plaintiffs' claims under **Arkansas**, **Florida**, and **Virginia** consumer protection laws fail because Plaintiffs do not allege reliance or fraud with particularity. *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 153, 158 (E.D.N.Y. 2018) (Arkansas); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 665 (E.D. Mich. 2011) (Florida); *Fravel v. Ford Motor Co.*, 973 F. Supp. 2d 651, 658 (W.D. Va. 2013) (Virginia). Further, Plaintiffs' claims under **Arkansas**, **South Carolina**, and **Missouri** consumer protection laws fail because Plaintiffs do not allege conduct that is unconscionable, unfair, deceptive, or contrary to public policy. *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 958 (D. Minn. 2020), *aff'd*, 9 F.4th 981 (8th Cir. 2021) (Missouri); *Daisy Outdoor Advert. Co. v. Abbott*, 322 S.C. 489, 493 (1996) (South Carolina); *In re Graphic Processing Units (GPU) Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029-30 (N.D. Cal. 2007) (Arkansas).

### 4.    Failure to Provide Notice

The antitrust laws of **Arizona**, **Colorado**, **Connecticut**, **Hawaii**, **Nevada**, **New York**, **Rhode Island**, and **Utah** require prospective plaintiffs to provide notice to their respective state attorneys general, and **Oregon's** Rules of Civil Procedure require prospective plaintiffs to provide notice to defendants.[9]  The failure to allege compliance with these requirements is fatal.  *See In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 388-390 (D.N.J. 2018) (Arizona, Nevada, Utah).

### CONCLUSION

Fanatics respectfully requests that the Court grant its Motion to Dismiss.

---

[9] Ariz. Rev. Stat. Ann. § 44-1415A (Arizona); Colo. Rev. Stat. Ann. § 6-4-116 (Colorado); Haw. Rev. Stat. Ann. §§ 480-13.3(a), (a)(1), (a)(2)(C) (Hawaii); Nev. Rev. Stat. Ann. § 598A.210(3) (Nevada); N.Y. Gen. Bus. Law § 340(5) (New York); Or. R. Civ. P. 32(H) (Oregon); 6 R.I. Gen. Laws Ann. § 6-36-21 (Rhode Island); Utah Code Ann. § 76-10-3109(9) (Utah).

26

Dated: January 29, 2026

Respectfully submitted,

**LATHAM & WATKINS LLP**

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
lawrence.buterman@lw.com

Amanda P. Reeves (*pro hac vice*)
David L. Johnson (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
amanda.reeves@lw.com
david.johnson@lw.com

Christopher S. Yates (*pro hac vice*)
Alicia R. Jovais (*pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
chris.yates@lw.com
alicia.jovais@lw.com

*Counsel for Defendants Fanatics, Inc.; Fanatics, LLC; Fanatics Collectibles Intermediate Holdco, Inc.; Fanatics SPV, LLC; and Fanatics Holdings, Inc.*

27

## CERTIFICATION OF WORD COUNT COMPLIANCE

I, Lawrence E. Buterman, hereby certify that the Memorandum of Law in Support of Fanatics' Motion to Dismiss complies with the word-count limitations set forth in Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and Section A.2h of Chief Judge Laura Taylor Swain's Individual Practices. According to the word processing software used to prepare this document, the memorandum contains 8,719 words, excluding the parts of the document exempted by Section A.2h.

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman