**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

PHILLIP JONES; SAAD AMER; SEAN AULD;
KYLENE COMEAU; DANIEL ENRIQUEZ; CHIP
FURR; GLEN GAY; MITCHELL GOLDBERGER;
STAVEN HODGE; BRUCE HONNOLD; JOSEPH
KELLY; ALEXANDROS KOLAZAS; TIMOTHY
MCCANN JR.; RYAN MEUSE; AARON MURPHY;
EDGAR NAVA; JOHN SCHOLL; and RICHARD
CRAIG SMITH on behalf of themselves and all others
similarly situated,

                Plaintiffs,

      v.

FANATICS, INC.; FANATICS, LLC; FANATICS
COLLECTIBLES INTERMEDIATE HOLDCO,
INC.; FANATICS SPV, LLC; FANATICS
HOLDINGS, INC.; MAJOR LEAGUE
BASEBALL; MAJOR LEAGUE BASEBALL
PROPERTIES, INC.; MAJOR LEAGUE
BASEBALL PLAYERS ASSOCIATION; MLB
PLAYERS, INC.; NATIONAL FOOTBALL
LEAGUE; NFL PROPERTIES LLC; NATIONAL
FOOTBALL LEAGUE PLAYERS
ASSOCIATION; NFL PLAYERS INC.;
NATIONAL BASKETBALL ASSOCIATION;
NBA PROPERTIES, INC.; NATIONAL
BASKETBALL PLAYERS ASSOCIATION; AND
ONETEAM PARTNERS LLC,

               Defendants.

Case No. 1:25-cv-05776-LTS-VF

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF THE NATIONAL BASKETBALL**
**PLAYERS ASSOCIATION'S MOTION TO DISMISS PLAINTIFFS' AMENDED**
**CONSOLIDATED CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................1

SUMMARY OF COMPLAINT ..................................................................................4

    A.    The Parties, the Alleged Market, the Lack of Market Power Allegations, and Industry Background ..........................................................................4

    B.    The Complaint's Allegations Against the NBPA ....................................5

LEGAL STANDARD....................................................................................................7

ARGUMENT ................................................................................................................8

I.    PLAINTIFFS LACK STANDING TO PURSUE CLAIMS AGAINST THE NBPA ............................................................................................................8

    A.    Plaintiffs Lack Antitrust Standing ..........................................................8

    B.    Plaintiffs' Claims Are Barred by *Illinois Brick* ....................................13

    C.    Plaintiffs Lack Standing to Seek Injunctive Relief................................13

II.    PLAINTIFFS FAIL TO PLEAD A PLAUSIBLE SHERMAN ACT SECTION 1 RULE OF REASON CLAIM AGAINST THE NBPA ....................................14

    A.    The NBPA-Fanatics Licensing Agreement Is Presumptively Lawful..................15

    B.    Plaintiffs Fail to Allege a Plausible Relevant Market............................16

        1.    Plaintiffs' Mass Market and Premium Pro Sports Trading Cards Markets Fail ............................................................................17

        2.    Plaintiffs' Proposed NBA Trading Cards Submarkets Fail ......19

    C.    Plaintiffs Have Not Pleaded Facts Showing Any Actual Harm to Competition as a Result of the NBPA's Licensing Agreement............................21

    D.    Plaintiffs Fail to Allege or Offer Any Evidence that the NBPA Has Market Power in Any Trading Card Market ....................................22

    E.    Plaintiffs Plead No Other Grounds Suggesting that the NBPA's Licensing Agreement Harmed Competition..........................................23

III.    PLAINTIFFS FAIL TO PLEAD A CLAYTON ACT § 3 CLAIM .................................24

IV.    PLAINTIFFS' STATE LAW CLAIMS FAIL .......................................................25

    A.    Plaintiffs Fail to Plead an Antitrust Claim Against the NBPA Under Any State Law ................................................................................26

B.    Plaintiffs Fail to Plead a Consumer Protection Claim Against the NBPA
Under Any State Law............................................................................................27

CONCLUSION.................................................................................................................................27

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*1-800 Contacts, Inc. v. FTC*,
   1 F.4th 102 (2d Cir. 2021) ......................................................................................22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................7

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)........................................................................................8, 9, 26

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994).................................................................................10, 22

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
   813 F. Supp. 2d 569 (S.D.N.Y. 2011).....................................................................16

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................7

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
   985 F. Supp. 2d 612 (S.D.N.Y. 2013).............................................................20, 23

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)............................................................................................9, 10

*Buonasera v. Honest Co.*,
   208 F. Supp. 3d 555 (S.D.N.Y. 2016)......................................................................13

*Castaneda v. Amazon.com, Inc.*,
   679 F. Supp. 3d 739 (N.D. Ill. 2023) ......................................................................22

*Chapman v. New York State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008)......................................................................................18

*City of New York v. Grp. Health Inc.*,
   649 F.3d 151 (2d Cir. 2011)......................................................................................16

*Com. Data Servers, Inc. v. IBM*,
   262 F. Supp. 2d 50 (S.D.N.Y. 2003)..................................................................21, 25

*Contant v. Bank of Am. Corp.*,
   2018 WL 5292126 (S.D.N.Y. Oct. 25, 2018) .........................................................13

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006)..................................................................................................8

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
    129 F.3d 240 (2d Cir. 1997)..................................................................................14

*Faber v. Metro. Life Ins. Co.*,
    648 F.3d 98 (2d Cir. 2011)......................................................................................7

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
    658 F.2d 139 (3d Cir. 1981)..................................................................................15

*FTC v. Tapestry, Inc.*,
    755 F. Supp. 3d 386 (S.D.N.Y. 2024)..................................................................17

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013)..........................................................................9, 11, 13

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004)..................................................................................16

*Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*,
    960 F. Supp. 701 (S.D.N.Y. 1997)..................................................................18, 20

*Graham v. UMG Recordings, Inc.*,
    2025 WL 2879607 (S.D.N.Y. Oct. 9, 2025) ........................................................21

*Harry v. Total Gas & Power N. Am., Inc.*,
    889 F.3d 104 (2d Cir. 2018)..................................................................................11

*IBM Corp. v. Platform Sols., Inc.*,
    658 F. Supp. 2d 603 (S.D.N.Y. 2009)..................................................................11

*Idaho Potato Comm'n v. M&M Produce Farm & Sales*,
    335 F.3d 130 (2d Cir. 2003)..................................................................................15

*Ill. Tool Works Inc. v. J-B Weld Co., LLC*,
    419 F. Supp. 3d 382 (D. Conn. 2019)..................................................................21

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)........................................................................................3, 4, 13

*In re Aggrenox Antitrust Litig.*,
    94 F. Supp. 3d 224 (D. Conn. 2015)....................................................................25

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016)........................................................................11, 26, 27

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    19 F.4th 127 (2d Cir. 2021) ............................................................................10, 13

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    361 F. Supp. 3d 324 (E.D.N.Y. 2019) ...............................................................19, 20

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    2023 WL 6006525 (S.D.N.Y. July 31, 2023) ...................................................15, 24

*In re Bystolic Antitrust Litig.*,
    583 F. Supp. 3d 455 (S.D.N.Y. 2022)........................................................25, 26, 27

*In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*,
    714 F. Supp. 3d 65 (E.D.N.Y. 2024) ........................................................................23

*In re Platinum & Palladium Antitrust Litig.*,
    61 F.4th 242 (2d Cir. 2023) .................................................................10, 11, 12

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    2017 WL 4642285 (E.D. Pa. Oct. 17, 2017).........................................................27

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
    691 F. Supp. 1262 (N.D. Cal. 1988) ......................................................................17

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)......................................................................9

*Innomed Labs, LLC v. ALZA Corp.*,
    368 F.3d 148 (2d Cir. 2004)...................................................................................25

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
    713 F. Supp. 2d 286 (S.D.N.Y. 2010)..........................................................18, 19, 20

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995)......................................................................14, 21, 23

*Labs. Ajorelle SAS v. Apricus Biosciences, Inc.*,
    2018 WL 11222863 (S.D.N.Y. Sept. 21, 2018).....................................................19

*Laydon v. Coöperatieve Rabobank U.A.*,
    55 F.4th 86 (2d Cir. 2022) .......................................................................................12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)................................................................................................14

*Linzer Prods. Corp. v. Sekar*,
    499 F. Supp. 2d 540 (S.D.N.Y. 2007)....................................................................25

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................8

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
   833 F.3d 172 (2d Cir. 2016)..................................................................14, 24

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008)..............................................................................20

*Maldonado v. NFL*,
   2023 WL 4580417, at *4 (S.D.N.Y. July 18, 2023) ...........................................3

*McCagg v. Marquis Jet Partners, Inc.*,
   2007 WL 2454192 (S.D.N.Y. Mar. 29, 2007) ...................................................16

*Mooney v. AXA Advisors, LLC*,
   19 F. Supp. 3d 486 (S.D.N.Y. 2014)..................................................................19

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016)..............................................................................14

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018)...........................................................................................14

*Panini Am., Inc. v. Fanatics*,
   2025 WL 753954 (S.D.N.Y. Mar. 10, 2025) ............................................ *passim*

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
   467 F.3d 283 (2d Cir. 2006)..............................................................................12

*Ramos v. Patrician Equities Corp.*,
   765 F. Supp. 1196 (S.D.N.Y. 1991)..............................................................8, 13

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
   22 F.4th 103 (2d Cir. 2021) .........................................................................12, 13

*Somosky v. Consumer Data Industry Ass'n*,
   2022 WL 596480 (S.D.N.Y. Feb. 28, 2022)........................................................8

*Spinelli v. NFL*,
   903 F.3d 185 (2d Cir. 2018)..............................................................................21

*Spinelli v. NFL*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015).............................................15, 16, 19, 24

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)..............................................................................................8

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)....................................................................14, 19, 20

*U.S. v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016) ..................................................................................... 22

**Statutes**

Clayton Act § 3 ......................................................................................... 3, 5, 24, 25

Sherman Act § 1 ............................................................................................. 3, 5, 14

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................. 9

**Other Authorities**

Areeda & Hovenkamp, Antitrust Law ¶ 1810 (4th ed. 2020) ................................... 15

## PRELIMINARY STATEMENT

Plaintiffs' Amended Consolidated Class Action Complaint, ECF No. 149 ("Complaint" or "Compl.")—their *fourth* attempt at levying allegations against Defendants—amounts to nothing more than an effort to punish Defendant National Basketball Players Association (the "NBPA") for entering into a routine and lawful licensing agreement.  Plaintiffs initially sued Defendants in July and August 2025, claiming they were overcharged for newly issued, fully licensed National Basketball Association ("NBA") trading cards produced by Defendant Fanatics SPV and Fanatics, Inc. (collectively, "Fanatics") and sold by third-party retailers.  That was impossible.  The NBPA's agreement with Fanatics was not yet in effect, and Fanatics therefore did not (and could not) produce any newly issued, fully licensed NBA trading cards.

Since filing their initial complaints, Plaintiffs have filed three more.  On October 6, 2025— days after the NBPA's licensing agreement with Fanatics became effective—Plaintiffs filed their Consolidated Class Action Complaint, ECF No. 133, falsely claiming that a named Plaintiff had purchased a newly issued, fully licensed NBA trading card produced by Fanatics and sold by a third-party retailer.  On October 23, 2025, Plaintiffs filed their Corrected Consolidated Class Action Complaint retracting that allegation.  ECF No. 141.  And lastly, on December 22, 2025, Plaintiffs filed the instant Complaint, alleging that some named Plaintiffs have now purchased newly issued, fully licensed NBA trading cards produced by Fanatics and sold by third-party retailers.

Plaintiffs' amendments are of no help to them.  As to the NBPA, the facts are straightforward: (1) since 2009, Panini America, Inc. ("Panini") has held a license to use NBA players' intellectual property to manufacture and sell fully licensed NBA trading cards, Compl. ¶¶ 134 n.16, 153; (2) in 2021, the NBPA signed a 10-year exclusive licensing agreement with

Fanatics, granting Fanatics the right to use NBA players' intellectual property to manufacture and sell fully licensed NBA trading cards, Compl. ¶¶ 5, 153; and (3) in October 2025, the NBPA's licensing agreement with Fanatics commenced after its licensing agreement with Panini expired. Compl. ¶¶ 134, 153.  Despite the fact that (i) the Complaint's allegations regarding purchases of NBA trading cards are entirely conclusory and still say nothing about the prices Plaintiffs allegedly paid and (ii) the NBPA merely swapped one licensee for another, Plaintiffs nonetheless assert that the NBPA's agreement with Fanatics somehow unlawfully restrained the market for trading cards, causing them to pay higher prices—allegations that have remained unchanged since their initial complaints in July and August 2025.  Compl. ¶¶ 275, 325, 362.  In reality, the bulk of the Complaint focuses on allegations against other Defendants, treating the NBPA as an afterthought.  Viewed in isolation, the Complaint's sparse and conclusory NBPA-specific allegations describe commonplace, lawful conduct.

The Complaint falls far short of pleading a plausible claim against the NBPA for at least three independent reasons.  ***First***, Plaintiffs lack standing, as they cannot plausibly allege injury-in-fact traceable to the NBPA or that they are efficient enforcers for their claims against the NBPA.  Plaintiffs' own theory places them so far down the chain of causation from the NBPA's licensing agreement with Fanatics that any purported harm to Plaintiffs is too speculative and attenuated to be attributable to NBPA conduct.  Moreover, Plaintiffs cannot recover damages for federal antitrust violations under *Illinois Brick*.  In an attempt to circumvent this black letter law, Plaintiffs seek injunctive relief under federal law and damages under state laws.  But the state laws they invoke are largely modeled on federal antitrust law and fail with their federal law claims.

***Second***, Plaintiffs fail to plead an unreasonable restraint of trade by the NBPA in violation of Section 1 of the Sherman Act.  Vertical licensing agreements, such as the NBPA-Fanatics

agreement, are presumptively lawful and analyzed under the rule of reason, which requires Plaintiffs to allege, among other things, a plausible relevant market and market-wide harm to competition. They have done neither. Plaintiffs' relevant markets, as pleaded, are incoherent and implausibly narrow, and in any event, Plaintiffs do not (and cannot) show harm resulting from the NBPA-Fanatics agreement. Although Plaintiffs attempt to tack on a Clayton Act § 3 claim, that claim fails because the NBPA's licensing agreement concerns intellectual property, not tangible goods.

*Third*, Plaintiffs improperly assert a string of state law claims supported only by conclusory allegations, without specificity as to any required elements. Such deficient pleading alone warrants dismissal. But Plaintiffs in any event fail to plausibly plead antitrust standing under federal antitrust principles (which they must do even in *Illinois Brick* repealer states). Their state antitrust and consumer protection claims fail for the same reasons as their Sherman Act Section 1 claim—and for several independent reasons.

For these reasons, Plaintiffs' claims against the NBPA fail and should be dismissed.[1]

---

[1] The NBPA also incorporates by reference the arguments advanced in Defendants Fanatics, MLB, MLBPI/A, NBA, and NBPA's concurrently-filed Motion to Compel Arbitration ("MTCA"). As explained in the MTCA, the claims of 12 named Plaintiffs are governed by the applicable Terms of Use on Fanatics.com and are subject to the arbitration agreements therein. Plaintiffs' claims against the NBPA must likewise be compelled to arbitration under the doctrine of equitable estoppel, which allows non-signatory defendants to enforce arbitration agreements. *Maldonado v. NFL*, 2023 WL 4580417, at *4 (S.D.N.Y. July 18, 2023) (compelling arbitration between signatories and non-signatories where plaintiffs' allegations were "based on the same facts, are inherently inseparable, [and] fall within the scope of the arbitration clauses at issue") (internal citation omitted). While the NBPA disputes the plausibility of Plaintiffs' allegations, Plaintiffs' antitrust claims are plainly "connected with" Fanatics.com and rely on shared alleged facts. *See* Compl. ¶¶ 76-77, 121 (alleging "harm [to] competition in the market for Pro Sports Trading Cards," purportedly including "newly issued, fully licensed" NBA trading cards sold on Fanatics' websites); *id*. Ninth Cause of Action (pleaded against "Fanatics and NBPA"). Plaintiffs' claims against the NBPA thus fall within the scope of the relevant arbitration agreements. *See Maldonado*, 2023 WL 4580417, at *4.

## SUMMARY OF COMPLAINT

### A.    The Parties, the Alleged Market, the Lack of Market Power Allegations, and Industry Background

***The Parties.***  The named Defendants are Fanatics; three professional sports leagues (Major League Baseball ("MLB"), the National Football League ("NFL"), and the National Basketball Association ("NBA")); subsidiaries of the professional sports leagues (MLB Properties, Inc., NFL Properties LLC, and NBA Properties, Inc.); the respective players associations for each professional sports league (the Major League Baseball Players Association, National Football League Players Association, and the NBPA); subsidiaries of certain of the players associations (MLB Players, Inc. and NFL Players, Inc.); and OneTeam Partners LLC.

Plaintiffs are self-proclaimed purchasers of MLB or NBA trading cards "from an entity other than Defendants" (Compl. ¶¶ 26–43) and purport to represent two classes of individuals:  a "Nationwide Class" including persons in the U.S. who "purchased, not for resale, an unopened pack, box, or case of newly issued, fully licensed Pro Sports Trading Cards" since January 1, 2022, Compl. ¶ 202; and a "Damages Class" including all persons or entities in the alleged *Illinois Brick* repealer states who "purchased, not for resale, an unopened pack, box, or case of newly issued, fully licensed MLB or NBA trading cards produced by Fanatics."  Compl. ¶ 203.

***The Alleged Markets.***  Plaintiffs define the relevant market as "the market for all Major U.S. Professional Sports Leagues trading cards—Pro Sports Trading Cards—a combined market including NBA trading cards, NFL trading cards, and MLB trading cards."  Compl. ¶ 76.  Within this broader market, Plaintiffs also define submarkets that include "NBA trading cards, NFL

trading cards, and MLB trading cards." Compl. ¶ 96.  Plaintiffs allege that these submarkets are further divided into markets for Mass Market and Premium cards.  Compl. ¶ 101.[2]

**Market power.**  Plaintiffs include no allegations regarding the NBPA's market power. Plaintiffs devote an entire section to Fanatics' purported market power.  Compl. § VI.

**Industry Background.**  For decades, leagues and players associations have licensed the intellectual property rights to athletes' identifying information, including their names, images, and likenesses ("NIL"), to companies that manufacture and sell trading cards, often on an exclusive basis.  Compl. ¶¶ 3, 68–73.  The Complaint does not allege that the NBPA manufactures or sells trading cards or otherwise participates in the trading card industry.  The NBPA simply licenses NIL rights of its players to companies, such as Panini and Fanatics, which then use the licensed rights to manufacture and sell trading cards.  Compl. ¶¶ 3, 69.

In August 2021, Fanatics announced exclusive trading card licensing agreements with the MLB and NBA, as well as their respective players associations, and the NFL Players Association. Compl. ¶¶ 5, 113.  At some point thereafter, Fanatics acquired an exclusive trading card licensing agreement with the NFL.  Compl. ¶ 113.  According to the Complaint, once those agreements become effective, "Fanatics will control 100% of the Relevant Markets for a term of at least ten years."  Compl. ¶ 113.

### B.    The Complaint's Allegations Against the NBPA

The Complaint alleges that the NBPA's vertical licensing agreement with Fanatics unreasonably restrained trade in violation of Section 1 of the Sherman Act, Section 3 of the Clayton

---

[2] Plaintiffs contradict themselves with respect to whether they are alleging a single Pro Sports Trading Cards market that includes both Mass Market and Premium cards.  In one instance, the Complaint alleges that Pro Sports Trading Cards constitute a relevant market.  Compl. ¶ 76.  In another, the Complaint explicitly excludes a single Pro Sports Trading Cards market from the "eight markets" that are collectively referred to as the "Relevant Markets."  Compl. ¶ 102.

Act, and various state antitrust and unfair and deceptive trade practices statutes.[3]  The agreement at issue is an exclusive licensing agreement under which the NBPA simply licenses the intellectual property of its players to Fanatics to manufacture and sell fully licensed NBA trading cards for a 10-year term.  Compl. ¶¶ 69, 113, 116.  The agreement took effect in October 2025, well after Plaintiffs filed their initial complaints.  Compl. ¶¶ 134, 153.  From 2009 until October 2025, the NBPA licensed its intellectual property to Panini, Fanatics' rival, to manufacture and sell fully licensed NBA trading cards.  Compl. ¶ 153.

The NBPA's decision to substitute Fanatics for Panini alone is the basis for the NBPA's inclusion in this lawsuit.  Plaintiffs allege that Fanatics obtained its license with the NBPA in a "back room" deal by "promising [the NBPA] an equity stake in [Fanatics'] future monopoly profits," Compl. ¶ 6, but offer no factual allegations that the NBPA's decision to contract with Fanatics was anything more than a sound business decision resulting from an arm's-length, ordinary-course negotiation.

Plaintiffs do not allege a horizontal conspiracy among the NBPA and any other Defendant.  And while the Complaint discusses Fanatics' alleged anticompetitive conduct *ad nauseum*—e.g., Fanatics' acquisition of Topps, its alleged raiding of Panini's employees, or its alleged coercion of distributors and big-box retailers—the NBPA is not alleged to have taken part in any of that conduct.  *See, e.g.*, Compl. § V(B).  And at no point does the Complaint allege that any Plaintiff purchased NBA trading cards at inflated prices.  In fact, the Complaint includes no allegations relating to the price of NBA trading cards at any point in time.

---

[3] Plaintiffs' claims against the NBPA are limited to the Ninth (Federal Antitrust Claims), Eleventh (State Antitrust Claims), and Twelfth (State Unfair and Deceptive Trade Practices Claims) Causes of Action.

The Complaint's allegations lay out an attenuated chain of causation as it relates to the NBPA:  (1) the NBPA announced a licensing agreement with Fanatics in 2021 (effective October 2025), Compl. ¶¶ 5, 153; (2) under that agreement, Fanatics replaced Panini as the licensor with the rights to use the NBPA's intellectual property to manufacture and sell newly issued, fully licensed NBA trading cards, Compl. ¶¶ 3–5, 153; (3) the agreement somehow restrained competition and, in combination with licensing agreements with other Defendants, gave Fanatics (but not Panini before it) the ability to raise the prices of trading cards to distributors and big-box retailers, Compl. ¶¶ 15, 184–194, 275; (4) those distributors and big-box retailers in turn passed the price increases through to consumers, Compl. ¶¶ 195–199, 275; and (5) Plaintiffs purchased trading cards from those distributors and big-box retailers at inflated prices, Compl. ¶¶ 195–199, 275.

## **LEGAL STANDARD**

To survive a motion to dismiss, a complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible on its face when the "pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 663.  In deciding the motion to dismiss, a court must "draw all reasonable inferences in [p]laintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  But the Court is not "bound to accept as true a legal conclusion couched as a factual allegation," and mere "naked assertions devoid of 'further factual enhancement'" are insufficient.  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007) (alterations omitted).  Indeed, in antitrust cases, "a district court []

retain[s] the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983) ("AGC").

Here, the Complaint's sparse and conclusory allegations directed at the NBPA fail to plead facts sufficient to support a plausible claim. Specifically, Plaintiffs have failed to allege facts sufficient to show they have standing, or that the NBPA's licensing agreement unreasonably restrains trade in any cognizable market.

## ARGUMENT

## I.     PLAINTIFFS LACK STANDING TO PURSUE CLAIMS AGAINST THE NBPA

Plaintiffs must demonstrate standing for "each claim [they] seek[] to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (requiring plaintiff to "clearly … allege facts demonstrating" each element at the pleading stage) (cleaned up). Applying that principle to putative class actions, class representatives cannot assert a claim on behalf of absent class members that the representatives could not bring themselves. *Ramos v. Patrician Equities Corp.*, 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991) (they "must have individual standing to assert the claims in the complaint against each defendant"). Plaintiffs do not and cannot meet this threshold requirement.

### A.     Plaintiffs Lack Antitrust Standing[4]

The Complaint should be dismissed because Plaintiffs lack antitrust standing. *See AGC*, 459 U.S. at 534 ("Congress did not intend the antitrust laws to provide a remedy in damages for

---

[4] Plaintiffs' failure to plead an injury-in-fact also deprives them of Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (to establish Article III standing, a plaintiff must allege "an injury in fact"); *Somosky v. Consumer Data Industry Ass'n*, 2022 WL 596480, at *3, 7 (S.D.N.Y. Feb. 28, 2022) (granting dismissal where plaintiff was "unable to sufficiently allege that the alleged unlawful conduct [was] traceable to [d]efendant's actions" to meet the threshold Article III requirement); *see also id.* at *3 ("In an antitrust case, a plaintiff must have not only constitutional standing under Article III … but also antitrust standing."); *Panini Am., Inc. v. Fanatics,* 2025 WL 753954, at *4 (S.D.N.Y. Mar. 10, 2025) ("Antitrust injury is more demanding than (and therefore necessarily satisfies)

all injuries that might conceivably be traced to an antitrust violation."). "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the Court] must dismiss it as a matter of law." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013).

The Supreme Court identified six factors to consider in assessing antitrust standing, *AGC*, 459 U.S. at 537–545,[5] the foremost of which is "antitrust injury"—that is, "an injury of the type the antitrust laws were intended to prevent and that *flows from* that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis added). The Second Circuit has distilled the factors to two independent requirements: that a private plaintiff plausibly allege "(a) that it suffered a special kind of antitrust injury, and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws." *Gatt Commc'ns*, 711 F.3d at 76 (internal quotation marks omitted). Plaintiffs meet neither.

***First***, Plaintiffs do not—and cannot—plausibly allege any antitrust injury-in-fact with respect to the NBPA. The Complaint contains no allegations regarding the price of NBA trading cards at any point in time. Plaintiffs fail to plausibly allege any injury attributable to the NBPA-Fanatics licensing agreement, let alone an injury that is "concrete, particularized, and actual." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 357 (S.D.N.Y. 2016). Plaintiffs' conclusory allegation of "paying higher prices for NBA trading cards … than would have been paid in the absence of

---

the injury and causation elements of the Article III standing threshold."). Accordingly, Plaintiffs' claim against the NBPA should also be dismissed under Rule 12(b)(1).

[5] The Supreme Court identified the following factors: (1) the causal connection between the violation and the harm; (2) improper motive; (3) the type of injury and whether it was one Congress sought to address (i.e., "antitrust injury"); (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex damage apportionment. *AGC*, 459 U.S. at 537–545.

the antitrust violation," Compl. ¶ 275; *see id.* ¶¶ 325, 362, is insufficient to allege they have suffered an injury-in-fact that flows from any alleged anticompetitive effects caused by the NBPA's licensing agreement with Fanatics. *Brunswick Corp.*, 429 U.S. at 489.

Moreover, Plaintiffs cannot plausibly allege antitrust injury stemming from the NBPA's decision to merely switch licensing partners—from Panini to Fanatics—which left unchanged the competitive dynamics for downstream consumers of fully licensed NBA trading cards. *See* Compl. ¶¶ 134, 153; *Balaklaw v. Lovell*, 14 F.3d 793, 798–799 (2d Cir. 1994) (no antitrust injury where all that occurred was a "reshuffling of [upstream] competitors" and "from the consumers' point of view, nothing about the market has changed").

**Second**, even accepting Plaintiffs' allegations as true, they are not "efficient enforcers" of the antitrust laws for their claims against the NBPA. *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021). In the Second Circuit, courts consider four factors in determining whether a plaintiff is an efficient enforcer: (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other. *Id*. Where a plaintiff seeks only injunctive relief—as Plaintiffs do with their federal claims—the third and fourth factors are irrelevant. *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 266 n.5 (2d Cir. 2023). Plaintiffs plainly fail to satisfy the first two factors.

Plaintiffs fail to satisfy the first factor because their purported injuries, as they relate to the NBPA, are indirect and attenuated. "The first efficient-enforcer factor—whether the violation was

a direct or remote cause of the injury—turns on familiar principles of proximate causation." *In re Platinum*, 61 F.4th at 259 (internal quotation marks omitted). "In the context of antitrust standing, proximate cause generally follows the first-step rule." *Id.* "That rule 'requires some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.*; *see also Gatt*, 711 F.3d at 78 ("Directness in the antitrust context means close in the chain of causation.") (quoting *IBM Corp. v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 611 (S.D.N.Y. 2009)).

Plaintiffs claim the NBPA restrained markets for trading cards. Compl. ¶¶ 271–276. But Plaintiffs do not allege that the NBPA manufactures or sells trading cards, nor do they allege the NBPA has any role in setting card prices. Instead, the Complaint makes clear that the NBPA merely licenses its players' intellectual property for use in trading cards. Compl. ¶¶ 3, 69–75. That conduct occurs in an *upstream* licensing market—not the *downstream* trading card markets Plaintiffs claim were harmed.

Plaintiffs do not—and cannot—plausibly allege they suffered harm in the *upstream* market for licensing in which the NBPA participates. *See Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018) (explaining that "[g]enerally, only those that are participants in the defendants' market can be said to have suffered antitrust injury"); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158, 161 (2d Cir. 2016) (applying market participant requirement where plaintiffs sought only injunctive relief for federal claims).

The second factor—"the existence of more direct victims of the alleged conspiracy," *In re Platinum*, 61 F.4th at 261—is met by Panini, Fanatics' rival, which is suing Fanatics over many of the same issues alleged by Plaintiffs here. The existence of Panini, who has "directly transacted with" the NBPA, "diminishes the justification for allowing a more remote party to perform the office of a private attorney general." *In re Platinum*, 61 F.4th at 261; *see also Paycom Billing*

*Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 293 (2d Cir. 2006) (dismissing antitrust claims because "any injury suffered by [plaintiff] … flowed from the injuries" suffered more directly by the defendant's competitors). Indeed, this Court has already recognized that "many of [Panini's] allegations involve harm primarily affecting Panini." *Panini Am., Inc.* v. *Fanatics,* 2025 WL 753954, at *7 (S.D.N.Y. Mar. 10, 2025). There is no reason for the Court to reach a different conclusion here.

Plaintiffs similarly fail to satisfy the third and fourth efficient-enforcer factors—which apply only to their state-law damages claims. *In re Platinum*, 61 F.4th at 266 n.5. With respect to the third factor, Plaintiffs' allegations of harm arising from the NBPA's agreement with Fanatics are far too speculative to support antitrust standing. Plaintiffs plead no facts from which *any* damages attributable to the NBPA could be estimated, let alone a damages estimate that would be "just and reasonable." *Id.* at 262; *see also Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 119 (2d Cir. 2021) (no standing where plaintiffs "would essentially have to 'create an alternative universe' based on 'multiple layers of speculation'") (alterations omitted).

Plaintiffs also fail to satisfy the fourth factor—"the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *In re Platinum*, 61 F.4th at 261. Any apportionment here would be especially difficult because Plaintiffs "had no direct dealings with" the NBPA, rendering their theory of liability "indirect and imprecise." *Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 100 (2d Cir. 2022). Further, the existing *Panini* lawsuit "present[s] the problem of upstream and downstream

purchasers," whereby Panini is "clearly in a position to enforce the antitrust laws." *Schwab*, 22 F.4th at 119.[6]

Because each efficient-enforcer factor weighs against antitrust standing, Plaintiffs are not efficient enforcers of the antitrust laws, and the Complaint should accordingly be dismissed.

**B.    Plaintiffs' Claims Are Barred by *Illinois Brick***

Plaintiffs' claims against the NBPA are also barred by the Supreme Court's holding in *Illinois Brick*:  only direct purchasers from a purported antitrust violator can sue for damages based on an alleged overcharge.  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745–746 (1977).  Plaintiffs, by their own allegations, are not direct purchasers of anything from the NBPA.  Compl. ¶¶ 26–43; *supra* at 4.  In an attempt to sidestep this black letter law, Plaintiffs seek injunctive relief under federal law and damages under state laws.  But courts reject such federal claims where, as here, Plaintiffs do not plausibly allege ongoing or threatened injury.  *See Contant v. Bank of Am. Corp.*, 2018 WL 5292126, at *4 (S.D.N.Y. Oct. 25, 2018).  Further, as explained below, the state laws that Plaintiffs invoke are largely modeled after federal antitrust law, and Plaintiffs' federal and state claims fail together.  *See infra* at 25–27; Defendant Fanatics' Mem. of Law in Supp. of Mot. to Dismiss, Section IV.B (arguing that Plaintiffs' state-law claims fail for the same reasons their federal claims fail).

**C.    Plaintiffs Lack Standing to Seek Injunctive Relief**

Plaintiffs also lack standing to seek injunctive relief.  *See Ramos*, 765 F. Supp. at 1199; *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 564 (S.D.N.Y. 2016) ("[T]he named plaintiffs must have standing in order to seek injunctive relief on behalf of the class.").  To obtain injunctive relief,

---

[6] Even if the Court were to find that the fourth factor is neutral or weighs in favor of standing, it is "not of primary concern here" given that the other three factors weigh heavily against Plaintiffs.  *Gatt*, 711 F.3d at 79; *see also In re Am. Express*, 19 F.4th at 143 (holding that "the fourth factor was non-dispositive").

a plaintiff must plausibly allege a "real or immediate threat" of injury in fact—something Plaintiffs

fail to do. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016).

Plaintiffs cannot plausibly allege that they themselves are likely to be injured in the future.

As an initial matter, the Complaint contains no factual allegations concerning the future prices of

NBA trading cards. *See id.* ("past injuries … do not confer standing to seek injunctive relief unless

the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way").

Further, Plaintiffs' allegations regarding their purported "past" injuries, Compl. ¶ 269, rely on

wholly conclusory and baseless assertions that do not flow from any conduct of the NBPA. *See*

*supra* at 8–10.

## II.    PLAINTIFFS FAIL TO PLEAD A PLAUSIBLE SHERMAN ACT SECTION 1 RULE OF REASON CLAIM AGAINST THE NBPA

Plaintiffs challenge nothing more than an individually negotiated vertical intellectual

property licensing agreement.  Such vertical agreements are presumptively lawful and analyzed

under the rule of reason, whereby each vertical agreement is analyzed separately. *Leegin Creative*

*Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *Ohio v. Am. Express Co.*, 585 U.S.

529, 541 (2018); *Panini*, 2025 WL 753954, at *9.  Further, for a Section 1 rule of reason claim,

Plaintiffs must plausibly allege either direct evidence of harm to "competition market-wide,"

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127–129 (2d Cir. 1995),[7] or that

Defendants have market power, "'plus some other ground for believing that the challenged

behavior' has harmed competition." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d

---

[7] *See also Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) ("An antitrust plaintiff must allege not only cognizable harm to herself, but an adverse effect on competition market-wide." (quoting *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 242 (2d Cir. 1997)).

172, 182 (2d Cir. 2016); *see also In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *24 (S.D.N.Y. July 31, 2023) (same).  Plaintiffs have done neither.

### A.    The NBPA-Fanatics Licensing Agreement Is Presumptively Lawful

Vertical licensing agreements—such as the NBPA-Fanatics agreement—are presumptively lawful.  *Spinelli v. NFL*, 96 F. Supp. 3d 81, 118 (S.D.N.Y. 2015); *see also* 11 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1810 (4th ed. 2020) (exclusive licenses should be "presumptively lawful in all but a few carefully defined circumstances").  This is because intellectual property owners are "free to grant licenses to any competitor, or none at all."  *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 153 (3d Cir. 1981); *Spinelli*, 96 F. Supp. 3d at 116 (explaining that "an exclusive license is something that the NFL can legally achieve without the aid of a licensee").  That presumption can only be overcome with "facts showing exceptional circumstances, such as evidence of predatory practices or a 'unique' opportunity to leverage two distinct monopolies."  *Spinelli*, 96 F. Supp. 3d at 118; *Panini*, 2025 WL 753954, at *10.  Plaintiffs allege no such facts.

The NBPA has the undisputed right to license players' intellectual property—and merely exercising such a right is not an antitrust violation.  *See Panini*, 2025 WL 753954, *10 ("[A] licensor does possess a natural and unobjectionable monopoly over its own intellectual property"); *Idaho Potato Comm'n v. M&M Produce Farm & Sales*, 335 F.3d 130, 138 (2d Cir. 2003) ("[T]rademark owners are granted a monopoly over their marks and can choose to license the marks to others on whatever conditions they deem appropriate."); *see also Spinelli*, 96 F. Supp. 3d at 116, 118 (exclusive licenses generally "cannot harm competition," as they "merely confer[] upon the licensee the ability to exploit the licensor's exclusive intellectual property rights" and doing so "does not violate the antitrust laws").  Though Plaintiffs complain that there was no "open" or

"public" bidding process and that the NBPA received an "equity stake" in Fanatics, Compl. ¶¶ 4, 6, 111, 123, there is no authority for Plaintiffs' position that antitrust laws require an open bidding process, or that a failure to do so constitutes an "exceptional circumstance" of the kind envisioned by *Spinelli*. The same is true for Plaintiffs' allegations relating to the NBPA's alleged equity stake in Fanatics, which amounts to nothing more than a lawful exchange of consideration. Thus, there is nothing "exceptional" about the NBPA-Fanatics agreement—or the NBPA merely switching licensees—to overcome the presumption of legality.

### B.     Plaintiffs Fail to Allege a Plausible Relevant Market

Plaintiffs fail to define any plausible relevant market, a threshold step under the rule of reason. *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). All eight of Plaintiffs' proposed relevant markets fail, Compl. ¶ 102, either because they are not defined with reference to the rule of interchangeability, are improper single-brand markets, or both.

To state a claim for relief, the complaint must "allege a plausible relevant market in which competition will be impaired." *Grp. Health Inc.*, 649 F.3d at 155. The relevant market must be defined to include "all products 'reasonably interchangeable by consumers for the same purposes.'" *Id*. (quoting *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004)). Plaintiffs must also "offer 'a theoretically rational explanation for why the boundaries of the market are defined as they are.'" *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 576 (S.D.N.Y. 2011). Dismissal is warranted where "the proposed market makes no rational or economic sense and is far too narrow." *McCagg v. Marquis Jet Partners, Inc.*, 2007 WL 2454192, at *6 (S.D.N.Y. Mar. 29, 2007).

16

1.      **Plaintiffs' Mass Market and Premium Pro Sports Trading Cards Markets Fail**

Plaintiffs fail to allege facts sufficient to plead separate markets for "Premium" and "Mass Market" trading cards, relying instead on a legal conclusion for purported differentiation. Plaintiffs baldly assert that "[a]mong consumers, the product interchangeability between Mass Market … and Premium trading cards is limited" because of "[l]arge price differences" and "transparent quality differences." Compl. ¶ 92. Courts have routinely rejected efforts to define markets based on generalized allegations of "price variances or product quality variances." *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) ("Such distinctions are economically meaningless where the differences are actually a spectrum of price and quality differences."); *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 418 (S.D.N.Y. 2024) ("[I]f 'the differences are actually a *spectrum* of price and quality differences' within an otherwise indivisible market – then gradations based solely on price and quality will not be 'sufficient to establish separate relevant markets.'") (emphasis in original). But that is precisely what Plaintiffs do, alleging that "Premium" cards "include such features as hand-signed autographs or pieces of jerseys integrated into the cards" (Compl. ¶ 89), while also alleging in the very next paragraph that "[s]ome Mass Market trading card lines [also] include cards with signatures or other special features"—just at a lower "frequency." Compl. ¶ 90. Plaintiffs simply do not plead sufficient factual allegations to distinguish the proposed markets.

Plaintiffs' proposed Mass Market and Premium Pro Sports Trading Cards markets are also far too narrow. Plaintiffs define these markets as "newly issued, fully licensed" trading cards within "a combined market including NBA trading cards, NFL trading cards, and MLB player

trading cards." Compl. ¶¶ 76–77, 87.[8] But Plaintiffs make no attempt to justify the exclusion of obvious interchangeable substitutes from these markets. *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (where Plaintiffs "allege[] a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff[s'] favor, the relevant market is legally insufficient and a motion to dismiss may be granted").

Aside from the conclusory position that these alleged markets are "distinct from the resale—or 'secondary'—market," the Complaint offers no explanation for excluding previously issued or vintage trading cards from the markets. Compl. ¶ 77. Nor do Plaintiffs explain—beyond mere conclusory allegations—why other NBA, NFL, and MLB collectibles and memorabilia do not compete with fully licensed trading cards. Plaintiffs' failure to account for these obvious substitutes, and thus their failure to define their alleged markets by reference to the rule of interchangeability, "is, standing alone, valid grounds for dismissal." *Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (rejecting proposed relevant market for "tickets for travel on [Trans World Airlines] between certain city pairs" because "[t]ickets on [Trans World Airlines] are reasonably interchangeable with tickets on other airlines"). "Cases in which dismissal on the pleadings is appropriate frequently involve" a "failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298–99 (S.D.N.Y. 2010) (rejecting proposed relevant market where "[p]laintiff has not alleged a lack of substitutes").

---

[8] As discussed *supra* at 5 n.2, Plaintiffs contradict themselves with respect to whether they are alleging a single Pro Sports Trading Cards market that includes both Mass Market and Premium cards. But whether Plaintiffs are in fact alleging a Pro Sports Trading Cards market that includes both Mass Market and Premium cards is irrelevant—either way, Plaintiffs have not alleged a cognizable market.

## 2.     Plaintiffs' Proposed NBA Trading Cards Submarkets Fail

Plaintiffs' alternative submarkets for newly issued, fully licensed Mass Market and Premium NBA trading cards are improper single-brand product markets.  Compl. ¶ 102.  In both purported markets, Plaintiffs attempt to limit the relevant markets to the specific product covered by the NBPA's licensing agreement with Fanatics.  In doing so, Plaintiffs ignore that there exists "widespread rejection of single-brand markets."  *Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486, 500 (S.D.N.Y. 2014).  Courts in the Second Circuit routinely dismiss complaints involving single-brand product markets. *Todd*, 275 F.3d at 200 (noting that complaints are often dismissed when they involve "failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes"); *Labs. Ajorelle SAS v. Apricus Biosciences, Inc.*, 2018 WL 11222863, at *5 (S.D.N.Y. Sept. 21, 2018) ("Courts, therefore, routinely reject markets defined by a single product or brand."); *Integrated Sys.*, 713 F. Supp. 2d at 298  ("Courts in this district have consistently held that [a] single brand name product cannot define a relevant market."); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) ("It is an understatement to say that single-brand markets are disfavored."); *Spinelli*, 96 F. Supp. 3d at 111 (rejecting single-brand market defined as the "market for commercial licensing of NFL-related stock photographs").  To overcome this "heavy presumption" against single-brand markets, Plaintiffs "must point to 'exceptional market conditions' that have created a market for a single brand that would otherwise be just 'one brand in a market of competing brands.'" *Amex Anti-Steering*, 361 F. Supp. 3d at 343.

Plaintiffs attempt to justify their single-brand markets primarily in one paragraph, alleging that "many consumers do not view trading cards for players from one League as interchangeable with cards for players from another League,"  Compl. ¶ 99, an allegation that belies their claim

19

that a Pro Sports Trading Card market exists. But Plaintiffs' naked assertion that *some* fans prefer NBA trading cards to MLB or NFL trading cards does not justify limiting the relevant market to a single brand, and it certainly does not amount to the "exceptional market conditions" that must be pleaded to overcome the "heavy presumption" against single-brand markets. *Amex Anti-Steering*, 361 F. Supp. 3d at 343. Plaintiffs' argument that the alleged preferences of some unknown number of fans justify a single-brand market is "analogous to a contention that a consumer is 'locked into' Pepsi because she prefers the taste, or NBC because she prefers 'Friends,' 'Seinfeld,' and 'E.R. … but at base, Pepsi is one of many sodas, and NBC is just another television network." *Glob. Disc. Travel Servs., LLC*, 960 F. Supp. at 705. Further, Plaintiffs' conclusory allegations fail to offer factual allegations that there are no available league-specific interchangeable substitutes for newly issued NBA trading cards (e.g., previously issued or vintage NBA trading cards and other basketball collectibles and memorabilia). Because Plaintiffs fail to explain why the "market should be limited in a particular way," dismissal is warranted. *Integrated Sys.*, 713 F. Supp. 2d at 298; *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013).

Thus, Plaintiffs' attempt to define single-brand markets for Mass Market and Premium NBA trading cards—supported only by conclusory statements regarding the preferences of some unknown number of fans—represents another "failed attempt[] to limit a product market to a single brand." *Todd*, 275 F.3d at 200. Plaintiffs' failure in this regard is particularly egregious given that the Second Circuit has already rejected a market definition limited to the intellectual property of a single professional sports league. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 330 (2d Cir. 2008) (holding that "there are available substitutes for MLB Intellectual Property").

**C.    Plaintiffs Have Not Pleaded Facts Showing Any Actual Harm to Competition as a Result of the NBPA's Licensing Agreement**

Plaintiffs make the conclusory allegation that the NBPA's licensing agreement with Fanatics—together with Fanatics' other alleged anticompetitive conduct—resulted in consumers "paying higher prices for NBA trading cards … than would have been paid in the absence of the antitrust violation." Compl. ¶ 275. But that is improper. Plaintiffs offer no evidence, as they must, that the NBPA's licensing agreement with Fanatics on it is own caused higher prices for them—or, more importantly, the market as a whole. *See K.M.B. Warehouse Distribs.*, 61 F.3d at 128 ("The overarching standard is whether defendants' actions 'diminish overall competition.'"); *Com. Data Servers, Inc. v. IBM*, 262 F. Supp. 2d 50, 78 (S.D.N.Y. 2003) (same).

Nor could Plaintiffs offer any such evidence. The Complaint contains no factual allegations relating to the pricing of NBA trading cards at any point or how the NBPA-Fanatics agreement led to market-wide price increases. Grasping at straws, Plaintiffs rely on an anonymous Reddit thread and "press reports" (a single quotation from a single source) to allege price increases and decreased quality of NBA trading cards. Compl. ¶¶ 182, 186 n.25. Such cherry-picked and conclusory allegations fall far short of plausibly alleging higher prices or lower quality, *Spinelli v. NFL*, 903 F.3d 185, 212 (2d Cir. 2018) ("[C]onclusory allegation that prices have increased will not suffice to state anticompetitive effect."). And courts routinely reject conclusory allegations based on online commentary like the ones Plaintiffs offer. *E.g.*, *Ill. Tool Works Inc. v. J-B Weld Co., LLC*, 419 F. Supp. 3d 382, 399 (D. Conn. 2019) (declining to consider "internet reviews" to assess product quality because "online reviews are 'bimodal' and reflect extreme positions"); *Graham v. UMG Recordings, Inc.*, 2025 WL 2879607, at *14 (S.D.N.Y. Oct. 9, 2025) ("small sample of users' possible experience, communicated through Tweets and other anonymized commentary" failed to plausibly support defamation claim); *Castaneda v. Amazon.com, Inc.*, 679

F. Supp. 3d 739, 750-51 (N.D. Ill. 2023) (finding that "[w]hen it comes to particularity (and plausibility, too), the experience of a no-name person" from a small set of anonymous customer reviews "does not add much heft to the complaint").  Moreover, inferring anything about *market-wide* price changes for NBA trading cards from a handful of online comments is speculative and implausible.  *See 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 & n.11 (2d Cir. 2021) (evidence of price changes for certain products is not direct evidence of market-wide anticompetitive effects).

In any event, Plaintiffs' own pleading reveals that the harm they are alleging is based on the "*cumulative effect* of the[] anticompetitive actions,"  Compl. ¶ 192 (emphasis added), not the NBPA's licensing agreement with Fanatics itself.  Any purported "cumulative effect" is irrelevant. Absent allegations of a horizontal conspiracy involving the NBPA, as is the case here, the effects of the NBPA's individual vertical licensing agreement with Fanatics must be analyzed on their own.  *Panini*, 2025 WL 753954, at *9–10.  And Plaintiffs offer no plausible explanation of how the NBPA's agreement, on its own, could cause the price or quality effects Plaintiffs allege.  *See* Compl. ¶ 182.  Again, the NBPA's decision to merely switch licensing partners leaves unchanged the competitive dynamics for downstream consumers of newly issued, fully licensed NBA trading cards.  *See Balaklaw*, 14 F.3d at 798–799.

### D.    Plaintiffs Fail to Allege or Offer Any Evidence that the NBPA Has Market Power in Any Trading Card Market

If a plaintiff, like Plaintiffs here, cannot show an actual adverse effect on competition, "it must at least establish that defendants possess the requisite market power and thus the capacity to inhibit competition market-wide."  *U.S. v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016) (quoting *K.M.B. Warehouse Distribs.*, 61 F.3d at 129) (internal quotation marks and citation omitted). "Market power may be shown by evidence of specific conduct indicating the defendant's power to control prices or exclude competition" or "market share may be used as a proxy for

market power." *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 96 (E.D.N.Y. 2024) (quoting *K.M.B. Warehouse Distribs.*, 61 F.3d at 129).

As an initial matter, the Complaint offers no direct evidence that the NBPA has market power in any trading card market because Plaintiffs do not plead any facts that show that the NBPA can control pricing or exclude competition in any trading card market. The NBPA is not even a participant in the markets in which Plaintiffs plead harm, *supra* at 11, and Plaintiffs offer nothing to suggest otherwise.

Plaintiffs also fail to plead that the NBPA has a sufficiently large market share to infer market power. Even accepting Plaintiffs' allegations as true, Fanatics would have 100 percent market share in the Mass Market and Premium Pro Sports Trading Cards markets, and the NBPA would have, at most, 16.67 percent market share (one-sixth of the Pro Sports Trading Cards markets). "Multiplying these percentages together," any agreement between the NBPA and Fanatics would foreclose only 16.67 percent of the market. *Bookhouse*, 985 F. Supp. 2d at 622. A market share below 30 percent is inadequate to demonstrate market power; 16.67 percent does not come close. *Id.* Thus, Plaintiffs have not alleged that the NBPA has market power, either via direct or indirect evidence.

### E. Plaintiffs Plead No Other Grounds Suggesting that the NBPA's Licensing Agreement Harmed Competition

Even if Plaintiffs could show that the NBPA had market power, Plaintiffs would still need to establish that Defendants have "sufficient market power to cause an adverse effect, plus … offer other grounds to believe that the defendant's behavior will harm competition marketwide." *MacDermid*, 833 F.3d at 182–183 (internal quotation marks omitted); *see also In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *24 (similar). Such "other grounds" may include the "inherently anticompetitive nature of a defendant's behavior" and whether the behavior reduces

consumer choice or "significantly restrict[s] competitors' ability to enter the relevant market and compete." *MacDermid*, 833 F.3d at 183–184 (alterations omitted).

Plaintiffs plead no "other grounds" suggesting that the NBPA's licensing agreement with Fanatics harmed competition. *First*, vertical licensing agreements—like the one at issue here—are presumptively lawful. *Spinelli*, 96 F. Supp. 3d 81 at 118. *Second*, under the NBPA's agreement with Fanatics, the NBPA merely switched Panini with Fanatics, which by definition could not reduce the number of competitors in any relevant market. *Third*, Plaintiffs challenge just two aspects of the NBPA-Fanatics agreement—the 10-year term and the NBPA's equity stake in Fanatics—but they do not allege that these provisions had or will have any price or output effects, nor do they offer any facts suggesting that these terms are in any way unlawful.[9]

Thus, Plaintiffs have failed to plead facts showing "other grounds" suggesting that the NBPA's licensing agreement with Fanatics harmed competition.

## III.    PLAINTIFFS FAIL TO PLEAD A CLAYTON ACT § 3 CLAIM

Plaintiffs also allege that the NBPA's licensing agreement with Fanatics violates Section 3 of the Clayton Act, Compl. ¶¶ 271–276, but in doing so they ignore both the text of the statute and long-settled law holding that only contracts involving tangible goods can violate Section 3. To state a claim under Section 3, a plaintiff must show: "(1) sales of goods for use, consumption or resale within the United States; (2) sales conditioned on the purchasers not dealing in the goods of a competitor; and (3) a potential effect or substantial lessening of competition." *Com. Data Servers*, 262 F. Supp. 2d at 75.

---

[9] Continuing their pattern of ignoring reality, Plaintiffs state that "Fanatics' exclusive deals with the Major U.S. Professionals Sports Leagues and their Players Associations were [sic] of unprecedented length." Compl. ¶ 115. Yet this Court has already noted that Panini's current license with the NFLPA—similar to the NBPA-Fanatics agreement––has a 10-year term. *Panini*, 2025 WL 753954, at *2.

Licenses of intellectual property rights—such as the NBPA's agreement with Fanatics—fall squarely outside of the ambit of Section 3 because they do not involve the sale of goods for use, consumption, or resale. *See, e.g.*, *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 556 (S.D.N.Y. 2007) (Section 3 is "limited to leases or sales of commodities" and is inapplicable to a "patent licensing agreement (rather than a sale or lease of tangible goods)"). It is irrelevant that the NBPA's intellectual property may ultimately be used as an input in Fanatics' trading cards, because even "contracts that explicitly grant a license to exploit the intellectual property contained in a commodity have been viewed as primarily concerned with intangible rights, and are therefore not covered" by Section 3. *Id.* (quoting *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 161 n.4 (2d Cir. 2004)).

## IV.    PLAINTIFFS' STATE LAW CLAIMS FAIL

Plaintiffs' state law claims fail for multiple reasons. ***Chiefly***, Plaintiffs seek to tack on conclusory state antitrust and consumer protection law allegations that are virtually identical across all of their state claims. Plaintiffs largely reiterate the same generic language 33 times and seven times in the Eleventh and Twelfth Causes of Action, respectively. Compl. ¶¶ 328–360, 363–369. That is improper. Plaintiffs "cannot simply enumerate a long list of state-law claims" and "rely on the defendants and the court to sort out whether or how those laws can act as surrogates for antitrust law." *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 498 (S.D.N.Y. 2022); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255–256 (D. Conn. 2015) (same). Plaintiffs here "fail[] to explain adequately how the defendants' conduct violated any of the state consumer protection and unfair trade statutes in the conclusory list." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 163. Dismissal is warranted where, as here, Plaintiffs bring "claims under myriad state [laws] arising out of the same anticompetitive allegations underlying the antitrust claims," but the

Complaint "list[s] a couple dozen state statutes in alphabetical order by state, without pleading any of their elements." *Id.* (affirming dismissal of all state consumer protection and antitrust claims); *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d at 498 (dismissing state consumer protection claims, including claims under each of the laws Plaintiffs here invoke, when they are based solely on deficient federal antitrust claims and plaintiffs "have not provided a basis on which these claims survive when federal antitrust claims based on the same factual foundation fail"). This is precisely what Plaintiffs have done. Compl. ¶¶ 285–369.

## A.    Plaintiffs Fail to Plead an Antitrust Claim Against the NBPA Under Any State Law

Plaintiffs' state antitrust law claims fail for additional independent reasons. ***First***, Plaintiffs have failed to plead antitrust injury in states that follow *AGC*. Plaintiffs concede their state antitrust law claims are expressly derivative of their federal claims, "realleg[ing] and repeat[ing]" the same allegations. Compl. ¶ 321. For the reasons discussed above, Plaintiffs lack antitrust standing under *AGC*. *Supra* at 8–13. Plaintiffs' claims brought under the laws of 31 states, the District of Columbia, and Puerto Rico that follow *AGC*, or modified versions of *AGC*—even where those states may allow indirect purchaser suits—must be dismissed. *See* Defendant Fanatics' Mem. of Law in Supp. of Mot. to Dismiss, Section IV.B.1 (arguing that Plaintiffs' state antitrust claims are derivative of their federal claims).[10]

***Second***, Plaintiffs have failed to plead the substantive elements of an antitrust claim under the laws of all of the states under which they allege antitrust violations because each of those states interprets its antitrust laws in parallel with, or more narrowly than, the federal antitrust laws. *See*

---

[10] The 31 states are:  Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Minnesota, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and Wyoming.

Defendant Fanatics' Mem. of Law in Supp. of Mot. to Dismiss, Section IV.B.1 (arguing that Plaintiffs' state antitrust claims fail for the same reasons their federal claims fail).

**B.    Plaintiffs Fail to Plead a Consumer Protection Claim Against the NBPA Under Any State Law**

Plaintiffs also assert a damages claim against all Defendants under the consumer-protection laws of seven states—Arkansas, Florida, Massachusetts, Missouri, Montana, South Carolina, and Virginia—by "realleg[ing] and repeat[ing]" the same factual allegations as their federal antitrust claims.  Compl. ¶ 361.  As discussed above, this is improper and Plaintiffs' consumer-protection claim against the NBPA should be dismissed on that basis alone.  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016); *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d at 498; *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2017 WL 4642285, at *1 n.1, *13-14 (E.D. Pa. Oct. 17, 2017) (dismissing consumer-protection claims where plaintiffs "fail[ed] to identify any activities by [defendant], aside from those set forth in support of the federal antitrust claims, that would invoke liability under any of the identified state statutes"). *See* Defendant Fanatics' Mem. of Law in Supp. of Mot. to Dismiss, Section IV.B.2 (arguing that Plaintiffs' state consumer protection claims fail for the same reasons their federal claims fail).

Plaintiffs' state law and consumer-protection claims against the NBPA fail for additional independent reasons, all of which are incorporated by reference to Defendant Fanatics' Mem. of Law in Supp. of Mot. to Dismiss, Section IV.C (arguing that Plaintiffs fail to satisfy essential elements of various state statutes).

## CONCLUSION

For the foregoing reasons, the NBPA's motion to dismiss should be granted, and Plaintiffs' Amended Consolidated Class Action Complaint should be dismissed with prejudice as against the NBPA.

Dated: January 29, 2026

Respectfully submitted,

/s/ C. Scott Lent

C. Scott Lent
Esther Ha Yoon Sohn
Timothy A. Roche (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 W. 55th Street
New York, NY 10019
Telephone: (212) 836-8220
Facsimile: (212) 836-8689
scott.lent@arnoldporter.com
esther.sohn@arnoldporter.com
timothy.roche@arnoldporter.com

Keron J. Morris (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-6537
Facsimile: (202) 942-5999
keron.morris@arnoldporter.com

*Counsel for National Basketball Players Association*

## CERTIFICATE OF COMPLIANCE

I certify that the number of words in the foregoing memorandum of law complies with Local Rule 7.1(c) and Rule A(2)(h) of Chief Judge Laura Taylor Swain's Individual Practices.  The memorandum of law contains 8,718 words, excluding the caption, any index, table of contents, table of authorities, signature blocks, and this certification exempted by Local Rule 7.1(c), as counted by Microsoft Word.

Dated: January 29, 2026                              */s/ C. Scott Lent*
                                                     C. Scott Lent