UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHILLIP JONES; SAAD AMER; SEAN AULD; KYLENE COMEAU; DANIEL ENRIQUEZ; CHIP FURR; GLEN GAY; MITCHELL GOLDBERGER; STAVEN HODGE; BRUCE HONNOLD; JOSEPH KELLY; ALEXANDROS KOLAZAS; TIMOTHY MCCANN JR.; RYAN MEUSE; AARON MURPHY; EDGAR NAVA; JOHN SCHOLL; and RICHARD CRAIG SMITH on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; FANATICS HOLDINGS, INC.; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS, INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL ASSOCIATION PLAYERS ASSOCIATION; and ONETEAM PARTNERS LLC,

Defendants.

Case No. 1:25-cv-05776-LTS-VF

**ORAL ARGUMENT REQUESTED**

**INDIRECT-PURCHASER PLAINTIFFS' OPPOSITION TO MOVING DEFENDANTS' MOTION TO COMPEL ARBITRATION OF CLAIMS OF CERTAIN PLAINTIFFS AND TO STAY CLAIMS OF ALL PLAINTIFFS**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. LEGAL STANDARD ................................................................................................... 3

III. ARGUMENT ............................................................................................................... 4

A. Plaintiffs' Claims Fall Outside the Scope of Fanatics' Arbitration Clause ......................... 4

B. Arbitrability Is for the Court to Decide Because the Fanatics TOU Does Not Delegate Arbitrability to the Arbitrator ........................................................................................ 8

C. As a Matter of Either Unconscionability or Contract Formation, Defendants Cannot Force Plaintiffs to Arbitrate Arbitrability of Claims That Are Plainly Not Arbitrable ..... 13

D. Plaintiffs' Claims Against Non-Fanatics Defendants Are Not Arbitrable ......................... 14

1. Nonsignatory Defendants Cannot Assert Equitable Estoppel ..................................... 14

2. The Question of Arbitrability for Nonsignatories Is for the Court to Decide ............... 18

E. Defendants Failed to Provide Grounds for Staying the Claims of Remaining Plaintiffs ................................................................................................................ 19

IV. CONCLUSION ............................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**

*Aggarao v. MOL Ship Mgmt. Co.*,
675 F.3d 355 (4th Cir. 2012) ..... 17

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
183 F.3d 568 (7th Cir. 1999) ..... 6

*Bell v. Cendant Corp.*,
293 F.3d 563 (2d Cir. 2002) ..... 3, 4

*Blash v. BCS Placements, LLC*,
No. 19-cv-6321 (AJN), 2020 WL 2832777 (S.D.N.Y. May 31, 2020) ..... 12

*Byrne v. Charter Commc'ns, Inc.*,
581 F. Supp. 3d 409 (D. Conn. 2022) ..... 19

*Calderon v. Sixt Rent a Car, LLC*,
5 F.4th 1204 (11th Cir. 2021) ..... 3, 4

*Cavlovic v. J.C. Penney Corp., Inc.*,
884 F.3d 1051 (10th Cir. 2018) ..... 6

*Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*,
271 F.3d 403 (2d Cir. 2001) ..... 15

*Colony Cap. Inc. v. Flaherty*,
No. 21-cv-4645-LTS, 2022 WL 2440993 (S.D.N.Y. July 5, 2022) ..... 14, 16

*Contec Corp. v. Remote Sol., Co.*,
398 F.3d 205 (2d Cir. 2005) ..... 18

*Corcovado Music Corp. v. Hollis Music, Inc.*,
981 F.2d 679 (2d Cir. 1993) ..... 10

*Davitashvili v. Grubhub Inc.*,
131 F.4th 109 (2d Cir. 2025) ..... *passim*

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
6 F.4th 308 (2d Cir. 2021) ..... 8, 9, 10, 13

*Delgado v. Donald J. Trump for President, Inc.*,
No. 19 Civ. 11764 (AT), 2022 WL 767166 (S.D.N.Y. Mar. 14, 2022) ..... 12

*Denney v. BDO Seidman, L.L.P.*,
412 F.3d 58 (2d Cir. 2005) .....16

*Denney v. Jenkens & Gilchrist*,
412 F. Supp. 2d 293 (S.D.N.Y. 2005) .....17

*Doe v. Trump Corp.*,
6 F.4th 400 (2d Cir. 2021) .....15

*Donaldson Co., Inc., v. Burroughs Diesel, Inc.*,
581 F.3d 726 (8th Cir. 2009) .....17

*Douzinas v. Am. Bureau of Shipping, Inc.*,
888 A.2d 1146 (Del. Ch. 2006) ..... 17-18

*GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*,
590 U.S. 432 (2020) .....15

*Gov't Emps. Ins. Co. v. Grand Med. Supply, Inc.*,
No. 11 Civ. 5339(BMC), 2012 WL 2577577 (E.D.N.Y. July 4, 2012) .....16

*GPS Int'l Techs., Inc. v. Verizon Commc'ns, Inc.*,
No. 24-cv-07758 (ALC), 2025 WL 2776095 (S.D.N.Y. Sept. 30, 2025) .....7

*Greenwich Cap. Fin. Prods., Inc. v. Negrin*,
903 N.Y.S.2d 346 (2010) .....13

*Grigson v. Creative Artists Agency, L.L.C.*,
210 F.3d 524 (5th Cir. 2000) .....16

*Ishimaru v. Fung*,
No. Civ.A. 929, 2005 WL 2899680 (Del. Ch. Oct. 26, 2005) .....16

*Johnson v. Walmart Inc.*,
57 F.4th 677 (9th Cir. 2023) .....4

*LAVVAN, Inc. v. Amyris, Inc.*,
No. 21-1819, 2022 WL 4241192 (2d Cir. Sept. 15, 2022) .....12

*Maldonado v. Nat'l Football League*,
No. 1:22-cv-02289 (ALC), 2023 WL 4580417 (S.D.N.Y. July 18, 2023) .....12, 17

*Mavashev v. Kaldykulov*,
No. 22-cv-906 (PKC) (ST), 2024 WL 1345802 (E.D.N.Y. Mar. 30, 2024) .....12

*McFarlane v. Altice USA, Inc.*,
524 F. Supp. 3d 264 (S.D.N.Y. 2021) ....................4, 13, 14

*Metro. Life Ins. Co. v. Bucsek*,
919 F.3d 184 (2d Cir. 2019) ....................9, 11, 12

*MS Dealer Service Corp. v. Franklin*,
177 F.3d 942 (11th Cir. 1999) ....................17

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
770 F.3d 1010 (2d Cir. 2014) ....................11, 13

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019) ....................3, 5

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) ....................4

*Querette v. Chromalloy Gas Turbine LLC*,
No. 22-cv-00356 (PMH), 2023 WL 145014 (S.D.N.Y. Jan. 10, 2023) ....................12

*Ragone v. Atl. Video at Manhattan Ctr.*,
595 F.3d 115 (2d Cir. 2010) .................... 15-16

*Rent-A-Center, W., Inc. v. Jackson*,
561 U.S. 63, 67 (2010) ....................3

*Revitch v. DIRECTV, LLC*,
977 F.3d 713 (9th Cir. 2020) ....................6

*Ross v. Am. Express Co.*,
547 F.3d 137 (2d Cir. 2008) ....................3, 17

*SDJ Invs., LLC v. Collector's Coffee Inc.*,
No. 21-2070-cv, 2022 WL 17097231 (2d Cir. Nov. 22, 2022) ....................19

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
322 F.3d 115 (2d Cir. 2003) ....................10

*Sierra Rutile Ltd. v. Katz*,
937 F.2d 743 (2d Cir. 1991) ....................19

*Standard Fire Ins. Co. v. Knowles*,
568 U.S. 588 (2013) ....................7

*Viking River Cruises, Inc. v. Moriana*,
596 U.S. 639 (2022) .......... 4

*Wells Fargo Advisors, LLC v. Sappington*,
884 F.3d 392 (2d Cir. 2018) .......... 12

*Wexler v. AT & T Corp.*,
211 F. Supp. 3d 500 (E.D.N.Y. 2016) .......... 14

*In re Wholesale Grocery Prods. Antitrust Litig.*,
707 F.3d 917 (8th Cir. 2013) .......... 6

*Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*,
No. Civ.A.2037-N, 2006 WL 2473665 (Del. Ch. Aug. 22, 2006) .......... 16

*Xiaohong v. Dingledine*,
No. 23 Civ. 11094 (GHW) (RFT), 2025 WL 1604001 (S.D.N.Y. June 6, 2025) .......... 19

**Statutes**

9 U.S.C. § 2 .......... 3, 4

**Other Authorities**

21 Williston on Contracts § 57:19 (4th ed. 2001) .......... 16, 19

## I. INTRODUCTION

The Indirect-Purchaser Plaintiffs ("Plaintiffs") allege that they purchased sports trading cards *indirectly*, meaning from entities other than Defendants. Those indirect transactions are the only transactions at issue in this case. Accordingly, there are *no* transactions between the Plaintiffs and Fanatics, or any other Defendant, for which Plaintiffs are seeking redress. *See* Plaintiffs' Amended Consolidated Class Action Complaint dated Dec. 22, 2025, ECF No. 149 ("Cmpl."), ¶¶ 202-06. Nevertheless, some Defendants argue—contrary to controlling precedent in *Davitashvili v. Grubhub, Inc.*, 131 F.4th 109 (2d Cir. 2025)—that the claims are subject to the Terms of Use (TOU) that govern sales on Fanatics' websites Fanatics.com and MLBShop.com ("Fanatics TOU").[1]

Specifically, Fanatics moves to compel arbitration against twelve Plaintiffs who signed up for accounts on Fanatics.com or MLBShop.com and/or made purchases from those platforms. To be clear, those purchases are not at issue in this litigation. *See* ECF No. 164 ("the Motion" or "Mot."), at 3.[2] Both platforms are run by Fanatics and contain materially identical arbitration provisions. *See* Mot. at 4, 10-11. MLB, MLBPA, NBA, and NBPA also seek to invoke Fanatics

[1] Because the arbitration provisions on Fanatics.com and MLBShop.com are substantially the same and contain the same material clauses, Plaintiffs refer to them collectively as the Fanatics TOU.

[2] The Motion is brought by Defendants Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LLC, and Fanatics Holdings, Inc. (collectively, "Fanatics"); Major League Baseball and Major League Baseball Properties, Inc. (collectively, "MLB"); the Major League Baseball Players Association and MLB Players, Inc. (collectively, "MLBPA"); the National Basketball Association and NBA Properties, Inc. (collectively, "NBA"); and the National Basketball Players Association ("NBPA"). Collectively, these Defendants are referred to as the Moving Defendants. Defendants OneTeam, National Football League and NFL Properties ("NFL"), and National Football League Players Association and NFL Players Inc. ("NFLPA") do not seek to compel arbitration. Neither Fanatics nor the other four Moving Defendants seek to compel arbitration against six end-user plaintiffs who have never used Fanatics' platforms.

TOU's arbitration provision through equitable estoppel. *See* Mot. at 22. Moving Defendants move to stay all remaining claims pending arbitration. *See* Mot. at 24.

Moving Defendants' motion must fail because none of the sales at issue occurred through Fanatics' websites; no amount of contractual bootstrapping can justify application of the Fanatics TOU to unrelated sales. As the Second Circuit held in *Davitashvili*, 131 F.4th at 119, the Federal Arbitration Act ("FAA") reaches only controversies "caused by" a contractual relationship, and Plaintiffs' antitrust claims exist wholly independent of any Fanatics TOU.

Moving Defendants also fail to show that the question of arbitrability has been delegated to an arbitrator. Merely incorporating American Arbitration Association ("AAA") Rules into the TOU does not suffice where, as here, the contract's own language creates ambiguity about the arbitration clause's reach, which states that users waive their right to "assert or defend your rights *under this contract*." ECF No. 165-1 (Fanatics.com TOU, ¶ 22) (emphasis added). That ambiguity keeps arbitrability squarely before this Court.

Further, Defendants MLB, MLBPA, NBA, and NBPA are not parties to the Fanatics TOU. Their sole theory—equitable estoppel—requires that Plaintiffs' claims be "intertwined" with the contract containing the arbitration clause. But equitable estoppel exists to prevent a signatory from having it both ways: invoking a contract to press claims while disclaiming the contract's arbitration clause. Plaintiffs do not rely on the Fanatics TOU at all. There is no inequity to estop, and no basis for nonsignatories to conscript Plaintiffs into arbitration.

Finally, even if the Court compels arbitration for certain plaintiffs, it should not stay the remaining plaintiffs' claims. Any arbitration ruling would have no preclusive effect on non-arbitrating plaintiffs, and an unnecessary stay would prolong the harm from Fanatics' ongoing anticompetitive conduct.

For these reasons and those explained below, the Court should deny Moving Defendants' motions to compel.

## II. LEGAL STANDARD

Courts must "place[ ] arbitration agreements on an equal footing with other contracts." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citations omitted). The Federal Arbitration Act ("FAA") "reflects the fundamental principle that arbitration is a matter of contract." *Id.* Thus, despite the FAA's liberal federal policy favoring arbitration agreements, "a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit." *Ross v. Am. Express Co.*, 547 F.3d 137, 143 (2d Cir. 2008).

For the FAA to empower a court to compel arbitration of a particular dispute, that dispute must have a causal nexus to the contract containing the arbitration clause. *See Davitashvili*, 131 F.4th at 119 ("The FAA's scope is limited to agreements to arbitrate controversies that 'arise out of' the parties' contractual relationship—that is, controversies that were 'cause[d]' by the relationship."); *see also* 9 U.S.C. § 2 (referring to controversies "arising out of" arbitration contracts or transactions). When claims do not "arise out of" the contract at issue, that means no federal presumption of arbitrability. *Id.* at 124 (Perez, J., concurring) (citing *Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1213-14 (11th Cir. 2021)); *see also New Prime Inc. v. Oliveira*, 586 U.S. 105, 110 (2019) (discussing the antecedent statutory provisions of the FAA).

Before deciding whether an agreement requires the dispute at issue to be arbitrated, a court must first determine (1) that an agreement to arbitrate between the parties exists, and (2) whether questions about the scope of the arbitration clause, or arbitrability, is for the court or for the arbitrator to decide. *See Davitashvili*, 131 F.4th at 115. In determining whether a valid agreement to arbitrate exists, courts apply "ordinary state-law principles that govern the formation of contracts." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002). Arbitrability is presumptively

for the court to decide unless "there is clear and unmistakable evidence from the arbitration agreement . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Id.*

In deciding a motion to compel, courts apply a "standard similar to that applicable for a motion for summary judgment" and must "draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

## III. ARGUMENT

### A. Plaintiffs' Claims Fall Outside the Scope of Fanatics' Arbitration Clause

Moving Defendants seek to compel arbitration under the FAA, despite the fact that Plaintiffs' claims relate exclusively to sales not governed by the Fanatics TOU. Mot. at 13-14. As an initial matter, they ignore that the FAA "applies only to '[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter *arising out of such a contract or transaction*.'" *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 278-79 (S.D.N.Y. 2021) (quoting 9 U.S.C. § 2) (emphasis and alterations in original). The phrase "arising out of" in Section 2 of the FAA limits the FAA to only controversies "cause[d]" by "the parties' contractual relationship." *Davitashvili*, 131 F.4th at 119 (quoting *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 652 n.4 (2022)).[3] If a dispute falls outside of the scope of the parties' contract, the FAA "will not apply to any attempts to send that dispute to arbitration." *Id.* at 124 (Perez, J., concurring). In other words, to invoke a court's statutory powers to compel arbitration

[3] Courts in other circuits have similarly recognized this statutory limitation. *See Calderon*, 5 F.4th at 1212 ("The Act governs an arbitration agreement only to the extent that it compels arbitration of 'controversies' that 'arise out of' the 'contract' containing the arbitration agreement."); *accord Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023) ("Section 2 of the FAA requires arbitration of controversies that arise out of a contract containing a valid, enforceable arbitration provision.").

and stay litigation under §§ 3 and 4, "a court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2." *New Prime*, 586 U.S. at 111. Plaintiffs' claims fall outside that limitation. Their claims relate exclusively to purchases from non-Fanatics entities that were made outside the Fanatics platforms (*i.e.*, Fanatics.com and MLBShop.com), and all eighteen proposed class representatives bring the same claims regardless of whether they have ever used either Fanatics platform. The fact that some class members used Fanatics' website or app is "purely coincidental" to claims based entirely on off-platform purchases. *Davitashvili*, 131 F.4th at 120. The causal requirement is absent where, as here, identical claims could be brought by plaintiffs who never entered into the contract at issue at all.

*Davitashvili* is directly on point. There, plaintiffs alleged that Grubhub, Uber, and Postmates entered no-price competition clauses (NPCCs) with restaurants, under which restaurants agreed not to sell meals at lower prices through channels other than the defendants' platforms. *Davitashvili*, 131 F.4th at 112. The class of plaintiffs sued regarding meals purchased directly from restaurants, alleging that the NPCCs caused them to pay artificially inflated prices at the restaurants themselves. *Id.* at 113. The defendants moved to compel arbitration for the customers who had used the defendants' platforms at any point, on the basis of the arbitration clauses in the defendants' respective "Terms of Use," even though the meals subject to the suit had not been delivered through any of the defendants' services. *Id.* at 114. The Second Circuit rejected that argument, finding that "[p]laintiffs who never used [the defendant's platform] are just as much class members as those who have," meaning the plaintiffs' claims could not have been caused by the contractual relationship. *Id.* at 120.

The Second Circuit's reasoning in *Davitashvili* applies squarely here. Plaintiffs' claims have nothing to do with any plaintiffs' (and class members') individualized use of Fanatics'

website or mobile application. Plaintiffs' claims do not arise out of any contractual relationship with Fanatics—they are based on purchases from non-Fanatics entities and specifically exclude purchases made directly from any Defendant. *See* Cmplt. ¶ 206. Thus, "Plaintiffs who never used [Fanatics] are just as much class members as those who have." *Davitashvili,* 131 F.4th at 120. If class members who never used Fanatics have identical claims, then use of Fanatics' platforms cannot "qualify as a 'cause' of Plaintiffs' antitrust claims." *Id.*

Moving Defendants barely try to distance the facts of *Davitashvili* from this case, and they never squarely confront its legal holding that a causal nexus is required under the law of this Circuit.[4] Nor is *Davitashvili* an outlier. Courts around the country have followed the same principle in rejecting attempts to compel arbitration of claims that exist independently of the contract containing the arbitration clause. *See, e.g.*, *Cavlovic v. J.C. Penney Corp., Inc.*, 884 F.3d 1051, 1060 (10th Cir. 2018) ("The complaint's allegations . . . do not 'arise from' the [contract containing the arbitration provision]."); *In re Wholesale Grocery Prods. Antitrust Litig.*, 707 F.3d 917, 924 (8th Cir. 2013) (refusing to compel arbitration where the claims "do not involve violation of the terms of the contract" and "the face of the contract does not provide the basis for the alleged injuries"); *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573 (7th Cir. 1999) (holding that the antitrust claims "do not arise under the [contract] and hence are not subject to arbitration"); *see also Revitch v. DIRECTV, LLC*, 977 F.3d 713, 723 (9th Cir. 2020) (O'Scannlain, J., concurring) ("I

[4] Moving Defendants' one passing attempt to distinguish *Davitashvili* shows how similar this case is to *Davitashvili*. Moving Defendants note that the *Davitashvili* claims sought relief from inflated prices at non-defendant entities. That is precisely what Plaintiffs seek here: damages from inflated off-platform prices in the downstream distribution channels impacted by Fanatics' monopolization conduct. *See* Mot. at 21. Moving Defendants' claim that the *Davitashvili* plaintiffs did not allege market-wide effects, as Plaintiffs do here, is similarly incorrect. The *Davitashvili* plaintiffs alleged that the conduct allowed Grubhub to maintain supracompetitive prices *on and off its platform*, not that the conduct impacted only off-platform prices. *See* Second Am. Compl. ¶¶ 6-7, *Davitashvili v. Grubhub, Inc.*, 1:20-cv-03000, ECF No. 147 (S.D.N.Y. Oct. 3, 2025).

have been unable to locate any case in which the Supreme Court enforced an arbitration clause when the underlying claim was wholly unrelated to the contract in which the clause was contained.").

Moving Defendants contend that Plaintiffs with Fanatics accounts "cannot avoid" that contractual relationship by "selectively seeking damages" for indirect purchases. Mot. at 20-21. They further argue that Fanatics' arbitration agreement covers any claims "connected with [Fanatics'] Properties," Mot. at 20, and that Plaintiffs' claims are sufficiently "connected with" Fanatics' properties merely because they make the economically intuitive allegation that Fanatics has the market power to charge market-wide supracompetitive prices in a relevant market that includes both its own direct sales from Fanatics.com as well as its sales through third-party channels. Mot. at 21.

Moving Defendants have it backwards. Plaintiffs are "the masters of their complaint," *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013), and courts "focus on the factual allegations in the complaint" to determine if a claim falls within the scope of an arbitration agreement. *Davitashvili*, 131 F.4th at 119. Plaintiffs' claims concern purchases of Pro Sports Trading Cards from *other* channels, not on Fanatics' platforms. Moving Defendants themselves concede that Plaintiffs "do not seek damages for direct purchases." Mot. at 21. Moreover, Moving Defendants fail to explain how this purported connection rises to the level of causation—the standard *Davitashvili* requires.[5] In fact, *Davitashvili* rejected as speculative and attenuated similar

[5] Moving Defendants' sole authority on this argument, *GPS International Technologies*, is consistent with *Davitashvili*. There, the court correctly found the plaintiff's tort claims "touch[ed] matters covered by the parties' contract," because the claims necessarily implicated factual questions around whether defendant Verizon could "terminate services or impose fees as contemplated by the Agreement"—meaning the claims were "expressly within the scope of said Agreement." *GPS Int'l Techs., Inc. v. Verizon Commc'ns, Inc.*, No. 24-cv-07758 (ALC), 2025 WL 2776095, at *7 (S.D.N.Y. Sept. 30, 2025).

arguments Moving Defendants make here, that allegations about the relevant market or market power could provide the necessary contractual nexus to bring claims within the ambit of Grubhub's arbitration provision. *See id.* at 119-20 ("And to the extent Plaintiffs' use of Grubhub helped improve Grubhub's market share, thereby enabling Grubhub to act anticompetitively, this alleged relation is both too speculative and too attenuated to qualify as a 'cause' of Plaintiffs' antitrust claims.").

In short, that trading cards sold on Fanatics' website may fall within the relevant antitrust market does not establish that any contractual relationship between Fanatics and certain plaintiffs caused their claims. *Davitashvili* makes this clear: "Plaintiffs who never used [Fanatics]" make the same allegations of market-wide harm in the relevant market as "those who have." *Id.* at 120. The question is not whether the relevant market includes Fanatics' direct sales; it is whether Plaintiffs' use of Fanatics' website caused their claims. As indirect purchasers, the answer is no. As a result, Moving Defendants cannot invoke the FAA and/or the Fanatics TOU to compel arbitration.

### B. Arbitrability Is for the Court to Decide Because the Fanatics TOU Does Not Delegate Arbitrability to the Arbitrator

Arbitrability "presumptively should be resolved by the court and not referred to the arbitrator." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021). To overcome this presumption, Defendants must show "clear and unmistakable evidence of the parties' intent" to delegate. *Id.* at 323. There is no express delegation in the Fanatics TOU. Instead, Fanatics argues that incorporating the American Arbitration Association arbitration rules, combined with the purportedly broad scope of the arbitration provision, suffices. *See* Mot. at 19-20. The Second Circuit has cautioned that incorporating procedural rules does not *per se* show the intent to delegate where "other aspects of the contract create ambiguity as to the parties' intent." *DDK Hotels*, 6 F.4th at 318.

When the arbitration agreement is "narrower, vague, or contains exclusionary language," incorporation of AAA rules "standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability." *Id.* at 319. In other words, when "there is a qualifying provision (whether described as a carve-out or carve-in) that arguably excludes the present dispute from the scope of the arbitration agreement, that provision creates ambiguity regarding the parties' intent to delegate arbitrability to the arbitrator." *Id.* at 322; *see also Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019) ("[V]ague provisions as to whether the dispute is arbitrable are unlikely to provide the needed clear and unmistakable inference of intent to arbitrate its arbitrability.").

A court may consider "all evidence of the intentions of the arbitration agreement," including the likelihood that the parties intended to arbitrate this dispute, in determining whether arbitrability was intended to be delegated. *Id.* at 195-96.[6] Considering all such evidence is essential to preserve "the right of access to courts" and to guard against the "unacceptable risk that parties might be compelled to surrender their right to court adjudication, without their having consented." *Id.* at 190.

Here, Fanatics' arbitration provision does not unmistakably delegate arbitrability because there is significant ambiguity about its reach. While Fanatics insists that the TOU contains a broad arbitration clause, the provision narrows its own scope by specifying what is being waived: "You understand and agree that you are waiving your right to sue or go to court to assert or defend your

[6] Moving Defendants misconstrue the Supreme Court's decision in *Henry Schein* when they state (incorrectly) that the Court "cannot decide . . . any other arbitrability question." Mot. at 18. As the Second Circuit has repeatedly explained in response to this strand of argument, *Henry Schein* eliminates a judicially created exception where parties *have in fact agreed* to delegate arbitrability. It does nothing to displace a court's proper role in evaluating all evidence of the intent of the agreement in determining whether arbitrability has in fact been delegated. *See DDK Hotels*, 6 F.4th at 323 n. 6; *Bucsek*, 919 F.3d at 195-96.

**rights under this contract**." ECF No. 165-1, ¶ 22 (emphasis added). Similarly, the MLBShop.com TOU states "You understand and agree that you are waiving your right to sue or go to court to assert or defend your **rights under these shop terms**." ECF No. 165-14, ¶ 22 (emphasis added). Rights under a contract means "contractual rights arising from that agreement." *See Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 682 (2d Cir. 1993) (equating "rights under a contract" with "contractual rights arising from that agreement."). This language limits—or at a minimum creates ambiguity about—the preceding sentence's reference to arbitrating "any and all disputes . . . arising out of or connected with the Properties." ECF No. 165-1, ¶ 22. Principles of contract interpretation require giving "full meaning and effect" to all provisions in a contract; an interpretation that renders a clause "superfluous or meaningless . . . is not preferred and will be avoided if possible." *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003).

Thus, by its own terms, Fanatics' arbitration clause conveys to users of its websites that what is being waived is the right to sue under Fanatics' TOU contract. Plaintiffs here assert statutory antitrust claims—not contractual rights. *See* Cmplt. ¶¶ 216-378 (describing claims under federal and state antitrust law). At a minimum, Fanatics' own adhesion contract creates ambiguity about the agreement's scope, which cannot serve as the unmistakable evidence of intent required for delegation. *See DDK Hotels*, 6 F.4th at 318-19; *see also Shaw Grp.*, 322 F.3d at 121 ("[A]mbiguous language should be construed against the interest of the drafting party.").

Moreover, the arbitration provision's carveouts reinforce this ambiguity. It states that "Either you or we may seek a court injunction regarding intellectual property infringement" and that "either party may seek temporary or emergency equitable relief to enforce its rights in any court of competent jurisdiction." ECF No. 165-1, ¶ 22; *see also* ECF No. 165-14, ¶ 22 (containing identical provision). These carveouts in the arbitration provision contemplate a judicial role in

deciding arbitrability: a court would necessarily determine whether a claim qualifies as one for "intellectual property infringement" or "temporary equitable relief" before reaching the merits of that claim—in effect, deciding arbitrability.

Where issues are carved out or there is ambiguity about what disputes are covered by the arbitration agreement, this "delays application of AAA rules until a decision is made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitrability is decided." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014). The Fanatics TOU's limitation to claims asserting "rights under this contract," combined with carveouts for IP infringement and equitable relief, does not provide a "clear and unmistakable" inference of intent to delegate arbitrability. *Id.* at 1031.

As the Second Circuit explained in *Bucsek*, where "the agreement cannot be reasonably interpreted to provide for arbitration of the dispute," that is "a substantial makeweight against" finding delegation. *Bucsek*, 919 F.3d at 194-95. In *Bucsek*, the court found it "untenable" to force arbitration under the circumstances, and after considering "all evidence of the intentions of the arbitration agreement, including the groundlessness of [the defendant]'s claim of arbitrability," held that the parties had not delegated arbitrability. *Id.* at 195-96. The court reached a similar conclusion in *NASDAQ OMX*, finding that where "at least arguably" the claims were not arbitrable, the parties had not unmistakably delegated arbitrability. 770 F.3d at 1032. Here, *Davitashvili* makes clear that Plaintiffs' claims—not "caused by" any contractual relationship—are plainly not arbitrable. *See* Section III.A, *supra*.

Applying *DDK* and *Bucsek*, courts in this district have frequently found arbitration agreements sufficiently narrow or ambiguous to maintain the arbitrability question for the court. Where an agreement "commits some types of disputes to litigation" or there is language suggesting

the parties "consented to arbitrate a limited subset of disputes," there is not an unmistakable delegation of arbitrability to an arbitrator. *Querette v. Chromalloy Gas Turbine LLC*, No. 22-cv-00356 (PMH), 2023 WL 145014, at *4 (S.D.N.Y. Jan. 10, 2023) (first quoting *LAVVAN, Inc. v. Amyris, Inc.*, No. 21-1819, 2022 WL 4241192, at *2 (2d Cir. Sept. 15, 2022)); *see also Delgado v. Donald J. Trump for President, Inc.*, No. 19 Civ. 11764 (AT), 2022 WL 767166, at *6 (S.D.N.Y. Mar. 14, 2022) (agreement limited to "any dispute arising under or relating to" the agreement rather than "all disputes between the parties" was sufficiently narrow to find arbitrability not delegated despite incorporation of the AAA rules).

Defendants rely on *Maldonado*, which construed the Fanatics' TOU in a different context—direct purchaser claims with little challenge to the delegation of arbitrability. *See Maldonado v. Nat'l Football League*, No. 1:22-cv-02289 (ALC), 2023 WL 4580417, at *1 (S.D.N.Y. July 18, 2023) ("Fundamentally, Plaintiffs contest the validity of their assent to the arbitration agreement.").[7] The *Maldonado* plaintiffs sued for purchases made directly from Fanatics' website, making it highly likely that the underlying claims were arbitrable under the TOU. The court thus had no occasion to consider the Second Circuit's instruction in *Bucsek* that "the clearer it is that the terms of the arbitration agreement reject arbitration of the dispute, the less likely it is that the parties intended to be bound to arbitrate the question of arbitrability." *Bucsek*, 919 F.3d at 191.

[7] Defendants' other citations are similarly inapposite either because, unlike here, the claims were clearly encompassed by the arbitration provision, *see Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 394 (2d Cir. 2018) (claims seeking unpaid overtime under an employment contract), or because the arbitration provision at issue contained an unequivocal express statement of intent to arbitrate arbitrability. *See Blash v. BCS Placements, LLC*, No. 19-cv-6321 (AJN), 2020 WL 2832777, at *4 (S.D.N.Y. May 31, 2020) (arbitration clause "specifically provides that the question of 'whether a matter is governed by this arbitration clause' is expressly committed to binding arbitration"); *Mavashev v. Kaldykulov*, No. 22-cv-906 (PKC) (ST), 2024 WL 1345802, at *15 (E.D.N.Y. Mar. 30, 2024) (agreements contained "explicit statement that even disputes 'concerning the interpretation' of the Agreements shall be submitted to arbitration").

Here, where the claims are plainly outside the reach of the arbitration agreement, there is no reason to think that the parties intended to arbitrate arbitrability of those claims. Defendants' citation to *Contec* for the proposition that incorporating AAA rules suffices ignores the Second Circuit's own clarifications about the import of incorporating AAA rules in cases of ambiguity, a narrow arbitration provision, or carveouts. *See DDK Hotels*, 6 F.4th at 321 (distinguishing the broad arbitration provision in *Contec* because the narrower provision in *DDK Hotels* "creates ambiguity as to the parties' intent to delegate arbitrability" despite incorporating the AAA rules); *NASDAQ OMX*, 770 F.3d at 1032 (carving out certain issues from arbitration "delays application of AAA rules . . . until arbitrability is decided.").

### C. As a Matter of Either Unconscionability or Contract Formation, Defendants Cannot Force Plaintiffs to Arbitrate Arbitrability of Claims That Are Plainly Not Arbitrable

Even assuming *arguendo* that the Fanatics TOU delegated arbitrability to the arbitrator, the Court should reject Fanatics' attempt to circumvent Second Circuit law by trying to send to arbitration claims that are plainly non-arbitrable. Courts have declined to compel arbitration of claims under exceedingly broad arbitration clauses where "the claims at issue lack any nexus whatsoever to the agreement containing the clause," finding either that it would be unconscionable or that, as a matter of contract formation, it would be "absurd, commercially unreasonable or contrary to the reasonable expectations of the parties" to enforce such an agreement. *McFarlane*, 524 F. Supp. 3d at 276, 277 (quoting *Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (2010)). In *McFarlane*, the court found that both analytical frameworks led to the same result, since no reasonable person, including "no 'reasonable company in the [d]efendant's position'" could understand a customer's assent to an arbitration agreement to manifest assent to arbitrate claims unrelated to the agreement. *Id.* at 276. Thus, despite the arbitration clause requiring arbitration of all claims (including arbitrability), the court refused to enforce the clause "according

to its literal terms," finding that both unconscionability and principles of contract formation meant the arbitration agreement could not be enforced. *Id.* at 277; *see also Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500, 504-05 (E.D.N.Y. 2016) ("Whether framed in terms of unconscionability or contract formation, the end result is the same: the arbitration clause is not enforced."). As Judge Perez explained in her *Davitashvili* concurrence—while not necessary to decide the appeal in that case—"many courts have already declined to enforce exceptionally broad arbitration clauses or to interpret them to reach absurd results." 131 F.4th at 124 (collecting cases).[8] The Court should likewise reject Defendants' attempt to stretch the arbitration clause beyond all reasonable bounds.

### D. Plaintiffs' Claims Against Non-Fanatics Defendants Are Not Arbitrable

Nonsignatory Defendants MLBPA, MLB, NBPA, and NBA seek to compel arbitration, despite not being parties to the Fanatics' TOU. *See* Mot. at 22. Their motion should be denied for two independent reasons. First, equitable estoppel is unavailable because there is no inequity to estop. Plaintiffs do not rely on the Fanatics' TOU to allege their claims. Second, the nonsignatory Defendants cannot show that Plaintiffs agreed to arbitrate arbitrability *as to them*, and under *Davitashvili* the claims are not arbitrable.

#### 1. Nonsignatory Defendants Cannot Assert Equitable Estoppel

"Traditional principles of state contract law" govern equitable estoppel claims. *Colony Cap. Inc. v. Flaherty*, No. 21-cv-4645-LTS, 2022 WL 2440993, at *4 n.4 (S.D.N.Y. July 5, 2022) (Swain, J.). "[T]he FAA permits a nonsignatory to rely on state-law equitable estoppel doctrines

---

[8] Although the plaintiffs in *Davitashvili* failed to challenge the delegation clause as unconscionable and therefore waived that argument (*id.* at 118), Plaintiffs here specifically contend that it would be unconscionable to permit Moving Defendants to compel arbitration of arbitrability when controlling Second Circuit authority now makes clear that the underlying claims are not arbitrable. In short, the plaintiffs there did not have the benefit of the *Davitashvili* decision itself, which demonstrates that enforcing a delegation clause to require arbitration of non-arbitrable claims would be both absurd and unconscionable.

to enforce an arbitration agreement," but only "where a signatory to the written agreement must rely on the terms of that agreement in asserting its claims against the nonsignatory." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 438 (2020).

Estoppel may apply where "the claims that the nonsignatory sought to arbitrate were intimately founded in and intertwined with the underlying contract obligations." *Doe v. Trump Corp.*, 6 F.4th 400, 412 (2d Cir. 2021) (quoting *Choctaw Generation Ltd. Partnership v. American Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)). There also "must be a relationship among the parties of a nature that justifies a conclusion" that estoppel is appropriate. *Id.* at 412-13. Applying this test, courts in this Circuit have applied estoppel to cases where a nonsignatory "has had some sort of *corporate* relationship to a signatory" such as "subsidiaries, affiliates, agents, and other related business entities." *Id.* at 413 (emphasis in original). Limited application outside of a corporate relationship includes instances where "the signatory seeking to avoid arbitration treated the other signatory and nonsignatory as interchangeable with respect to its rights and responsibilities under the relevant contract." *Id.* Where, as here, "the nonsignatory is alleged to be a third-party wrongdoer . . . we have made clear that the arbitration contract 'in no way' extends to the non-signatory." *Id.* at 413-14.

Moving Defendants assume, with little justification, that Delaware law governs their equitable estoppel claims based on the choice-of-law provisions in Fanatics' TOU (a contract that they did not sign). *See* Mot. at 22. But this reasoning is circular: it assumes that the Fanatics' TOU's terms—including the choice-of-law provision—apply to nonsignatory Defendants, which is the very conclusion that Defendants seek to establish. The Second Circuit instead routinely applies federal "common law principles of contract law" to questions of equitable estoppel. *See Ragone v.*

*Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126-27 (2d Cir. 2010) (applying Second Circuit case law on equitable estoppel despite a New York choice of law clause in the arbitration agreement); *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 62, 70 (2d Cir. 2005) (same).[9]

Estoppel can only be invoked where the claims derive from the underlying contract, and Moving Defendants' brisk analysis of equitable estoppel in the arbitration context elides this fundamental linchpin of equitable estoppel. It is hornbook law that courts will bind a signatory to arbitrate at a nonsignatory's insistence only "because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract and the fact *the claims were intimately founded in and intertwined with the underlying contract obligations*." 21 Williston on Contracts § 57:19 (4th ed. 2001) (emphasis added).

This makes sense because the purpose of equitable estoppel is to prevent unfairness. *See Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) ("The linchpin for

[9] Federal common law in this context refers to Second Circuit decision law incorporating general principles of contract law, which mirrors what New York courts apply. *See Gov't Emps. Ins. Co. v. Grand Med. Supply, Inc.,* No. 11 Civ. 5339(BMC), 2012 WL 2577577, at *3 (E.D.N.Y. July 4, 2012) (noting that the distinction between federal law and New York law on equitable estoppel is insignificant). While Plaintiffs maintain that Second Circuit law is the appropriate law to evaluate Defendants' equitable estoppel claim, this Court has previously suggested that the substantive principles of equitable estoppel under Delaware (the TOU's choice of law), New York (where this Court sits), and Second Circuit law are consistent. *See id.*; *Colony Cap.*, 2022 WL 2440993, at *4 n.4. Plaintiffs agree—and note that this consistency undercuts Defendants' suggestion that Delaware law does not require the claims to be intertwined with the underlying contract. To the contrary, Delaware courts have consistently required such intertwining. *See Ishimaru v. Fung*, No. Civ.A. 929, 2005 WL 2899680, at *18 (Del. Ch. Oct. 26, 2005) (applying equitable estoppel to claims "intimately founded in and intertwined with the underlying contract obligations" to prevent the signatory from "hav[ing] it both ways" but denying that the arbitration clause applied); *Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, No. Civ.A.2037-N, 2006 WL 2473665, at *5 (Del. Ch. Aug. 22, 2006) (claims were "intertwined" with interpreting parties' "rights under the Agreement" such that there was a "close interconnection of [plaintiff's] claims and the rights granted by the Agreement to [the parties]").

equitable estoppel is equity—fairness."). "The purpose of the doctrine of equitable estoppel" is to prevent a plaintiff from "trying to have his cake and eat it too" by relying on the contract "when it works to his advantage by establishing the claim, and repudiating it when it works to his disadvantage by requiring arbitration." *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005). That rationale is entirely absent here. Thus, the reason to deny equitable estoppel as to the nonsignatory Defendants is the same reason to deny arbitration as to Fanatics—Plaintiffs do not rely on any portion of the Fanatics' TOU in pressing their claims. There is no selective invocation, no inequity, and no basis for estoppel.

Moving Defendants point to Plaintiffs' antitrust conspiracy allegations as "concerted misconduct" sufficient to invoke equitable estoppel. But equitable estoppel may not be based "*exclusively* on allegations of collusion." *Ross*, 547 F.3d at 148 (rejecting that an antitrust conspiracy was sufficient to invoke equitable estoppel (emphasis in original)). Courts apply equitable estoppel only where the allegations of "concerted misconduct" by signatory and nonsignatory bear directly on the contract containing the arbitration provision. *See id.* at 147-48 (claims that "did not arise from the [contracts] themselves" could not support estoppel); *accord Aggarao v. MOL Ship Management Co.*, 675 F.3d 355, 373–75 (4th Cir. 2012); *Donaldson Co., Inc., v. Burroughs Diesel, Inc.*, 581 F.3d 726, 734 (8th Cir. 2009); *Grigson*, 210 F.3d at 527-28; *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947-48 (11th Cir. 1999).

None of the nonsignatory Defendants' cited cases supports application of equitable estoppel to claims that exist independently of the contract—each involved claims necessarily relying on reference to a contract. *See Maldonado*, 2023 WL 4580417, at *4 (noting that equitable estoppel applied where a signatory "must rely on the terms of that agreement in asserting its claims against the nonsignatory"); *Douzinas v. Am. Bureau of Shipping, Inc.*, 888

A.2d 1146, 1149-51 (Del. Ch. 2006) (distinguishing a Delaware Supreme Court case that found claims that "did not depend" on an underlying contract not arbitrable because the contract provisions were "clearly implicated by" the claims at issue). Nonsignatory Defendants thus cannot invoke equitable estoppel to compel arbitration of claims that have nothing to do with the Fanatics' TOU.

#### 2. The Question of Arbitrability for Nonsignatories Is for the Court to Decide

Nonsignatory Defendants also cannot compel arbitration because they cannot meet their burden on delegation. Nonsignatory Defendants appear to presume that Fanatics' arguments on delegation of arbitrability similarly apply to them. Not so. "[J]ust because a signatory has agreed to arbitrate issues of arbitrability with another party does not mean that it must arbitrate with any non-signatory." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 209 (2d Cir. 2005). For nonsignatories, the court must first determine "whether the parties have a sufficient relationship to each other and to the rights created under the agreement." *Id.* In the estoppel context, a sufficient relationship only exists where "the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Id.* Thus, even if antitrust conspiracy allegations alone could support equitable estoppel (they do not), the court must still determine whether arbitrability has been delegated as to the nonsignatory defendants.

Here, under the framework laid out in *Contec*, arbitrating arbitrability as to nonsignatory Defendants is not appropriate. The issues sought to be resolved in arbitration are Plaintiffs' antitrust claims against Defendants, which, as explained above, are not at all "intertwined" with Fanatics' TOU. They exist entirely independently of the Fanatics' TOU. Because the claims are not intertwined with the Fanatics' TOU, nonsignatory Defendants cannot force Plaintiffs to

arbitrate arbitrability.[10] Accordingly, the Court, and not an arbitrator, must decide arbitrability for any nonsignatory Defendants.

**E. Defendants Failed to Provide Grounds for Staying the Claims of Remaining Plaintiffs**

A party seeking a stay pending arbitration "bears a heavy burden of showing necessity for the stay." *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991). District courts are afforded "great discretion in declining to stay nonarbitrable claims pending arbitration of related claims." *SDJ Invs., LLC v. Collector's Coffee Inc.*, No. 21-2070-cv, 2022 WL 17097231, at *2 (2d Cir. Nov. 22, 2022). Defendants cannot meet that burden here. Six plaintiffs have never used Defendants' platforms and indisputably cannot be bound by Fanatics' arbitration clause.[11] Defendants make no showing—nor could they—that the individual arbitrations would have preclusive effect on non-consenting plaintiffs. It is "beyond the power of [an arbitration agreement] to prevent the exercise of a right of action by those who are not parties to the agreement." 21 Williston on Contracts § 57:19 (4th ed. 2001).[12] Since the claims of these plaintiffs must be litigated in federal court, a stay would not conserve judicial resources. For similar reasons, even if certain plaintiffs' claims against

---

[10] Defendants point out that Plaintiffs bring "antitrust claims relating to trading cards produced by Fanatics that contain league intellectual property" and contend that this connection demonstrates their claims are intertwined with the Fanatics' TOU. *See* Mot. at 24 n.8. But this argument proves too much. The same could be said of the claims of the six Plaintiffs who have never used Fanatics' platforms, negating any argument that this fact indicates intertwinement.

[11] *See* Mot. at 1 (identifying twelve of eighteen total plaintiffs who created accounts on Fanatics' websites).

[12] Indeed, the Fanatics TOU itself disclaims any potential preclusive effect of an arbitration judgment. The TOU's arbitration provision states that "You and we further agree that an award and any judgment confirming it only applies to the arbitration in which it was awarded and cannot be used in any other proceeding except to enforce the award itself." ECF No. 165-1, ¶ 22. For that reason, both cases cited by Defendants are inapposite, since both emphasized the possible preclusive effect of an arbitration decision in granting the stay. *See Xiaohong v. Dingledine*, No. 23 Civ. 11094 (GHW) (RFT), 2025 WL 1604001, at *12 (S.D.N.Y. June 6, 2025); *Byrne v. Charter Commc'ns, Inc.*, 581 F. Supp. 3d 409, 423 (D. Conn. 2022).

Fanatics are sent to arbitration, claims against nonsignatory Defendants are distinct and would not be resolved by that arbitration. Accordingly, there are no grounds for a stay.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Moving Defendants' motion to compel arbitration in its entirety.

DATED: April 30, 2026

Respectfully submitted,

*/s/ Christopher T. Micheletti*
Christopher T. Micheletti (*pro hac vice*)
Qianwei Fu (*pro hac vice*)
**ZELLE LP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com

*/s/ Geoffrey H. Kozen**
Geoffrey H. Kozen
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
gkozen@robinskaplan.com

Jonathan Edelman (*pro hac vice*)
**ROBINS KAPLAN LLP**
800 Boylston Street, Suite 2500
Boston, MA 02199
Telephone: (617) 267-2300
jedelman@robinskaplan.com

Ellen Jalkut
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Suite 2601
New York NY 10019
Telephone: (212) 980-7400
ejalkut@robinskaplan.com

*/s/ Gregory S. Asciolla**
Gregory S. Asciolla

Alexander E. Barnett
Jonathan S. Crevier
Noah L. Cozad
Corey Lipton
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Telephone: (646) 933-1000
gasciolla@dicellolevitt.com
abarnett@dicellolevitt.com
jcrevier@dicellolevitt.com
ncozad@dicellolevitt.com
clipton@dicellolevitt.com

*Interim Co-lead Counsel for Plaintiffs and Members of the Class*

* Plaintiffs use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of April 2026, a copy of the foregoing document was filed electronically on the Court's Electronic Case Filing (ECF) system. A Notice of Electronic Filing (NEF) will be sent by operation of the Court's ECF system to the filing party, the assigned Judge, and any registered user in the case as indicated on the NEF. To the best of my knowledge, there are no other attorneys or parties who require service by U.S. Mail.

DATED: April 30, 2026

Respectfully submitted,

*/s/ Christopher T. Micheletti*

Christopher T. Micheletti (*pro hac vice*)
Qianwei Fu (*pro hac vice*)
**ZELLE LP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com

*Counsel for Plaintiffs and Members of the Class*

**CERTIFICATE OF WORD-COUNT COMPLIANCE**

I hereby certify that pursuant to the word limitation of Individual Practices of Chief Judge Laura Taylor Swain, Civil Rule 2(h), this brief is in compliance because it contains 6,536 words, including all text, headings, footnotes, and quotations, other than the parts of the brief exempted by Rule 2(h).

Date: April 30, 2026

*/s/ Christopher T. Micheletti*

Christopher T. Micheletti