UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHILLIP JONES; SAAD AMER; SEAN AULD; KYLENE COMEAU; DANIEL ENRIQUEZ; CHIP FURR; GLEN GAY; MITCHELL GOLDBERGER; STAVEN HODGE; BRUCE HONNOLD; JOSEPH KELLY; ALEXANDROS KOLAZAS; TIMOTHY MCCANN JR.; RYAN MEUSE; AARON MURPHY; EDGAR NAVA; JOHN SCHOLL; and RICHARD CRAIG SMITH, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; FANATICS HOLDINGS, INC.; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS, INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL ASSOCIATION PLAYERS ASSOCIATION; and ONETEAM PARTNERS LLC,

Defendants.

1:25-CV-05776-LTS-VF

MEMORANDUM OPINION AND ORDER

This case concerns professional sports trading cards. Named Plaintiffs Phillip Jones, Saad Amer, Sean Auld, Kylene Comeau, Daniel Enriquez, Chip Furr, Glen Gay, Mitchell

Goldberger, Staven Hodge, Bruce Honnold, Joseph Kelly, Alexandros Kolazas, Timothy McCann, Jr., Ryan Meuse, Aaron Murphy, Edgar Nava, John Scholl, and Richard Craig Smith (collectively, "Plaintiffs") bring a thirteen-count putative class action complaint against major U.S. professional sports players associations and leagues—Major League Baseball ("MLB"), Major League Baseball Properties, Inc. ("MLBP"), Major League Baseball Players Association ("MLBPA"), MLB Players, Inc. ("MLBPI"), National Football League ("NFL"), NFL Properties LLC ("NFLP"), NFL Players Association ("NFLPA"), NFL Players, Inc. ("NFLPI"), National Basketball Association ("NBA"), NBA Properties, Inc. ("NBAP"), and National Basketball Players Association ("NBPA")—as well as Fanatics, Inc., Fanatics, LLC, Fanatics Holdings, Inc., Fanatics Collectibles Intermediate Holdco, Inc., and Fanatics SPV, LCC (collectively, "Fanatics") and OneTeam Partners, LLC ("OneTeam" and, together with all of the foregoing defendants, "Defendants"). (Docket entry no. 149 ("ACC") ¶¶ 44-61.)

Counts One and Two are monopolization and attempted monopolization claims, respectively, under Section 2 of the Sherman Act, 15 U.S.C. § 2 (Westlaw through P.L. 119-111), against Fanatics. (Id. ¶¶ 216-31.) Counts Three and Four are claims for violations of Section 7 of the Clayton Act, 15 U.S.C. § 18, against Fanatics, regarding its acquisitions of GC Packaging and Topps, respectively. (Id. ¶¶ 232-44.) Counts Five through Nine are conspiracy in restraint of trade claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, and exclusive dealings claims under Section 3 of the Clayton Act, 15 U.S.C. § 14, against various groups of Defendants.[1] (Id. ¶¶ 245-276.) Count Ten consists of numerous claims of monopolization under

[1] Specifically, Count Five is asserted against Fanatics, MLB, and MLBP; Count Six is asserted against Fanatics, MLBPA, MLBPI, NFLPA, NFLPI, and OneTeam; Count Seven is asserted against Fanatics, NFL, and NFLP; Count Eight is asserted against Fanatics, NBA, and NBAP; and Count Nine is asserted against Fanatics and NBPA.

various state laws against Fanatics. (Id. at ¶¶ 277-320.) Counts Eleven and Twelve contain numerous claims of unreasonable restraint of trade and unfair and deceptive trade practices, respectively, under various state laws against Fanatics, MLB, MLBPA, MLBPI, NBA, NBAP, NBPA, and OneTeam. (Id. at ¶¶ 321-369.) Finally, Count 13 is an unjust enrichment claim against Fanatics. (Id. at ¶¶ 370-378.)

Each Defendant has moved to dismiss the ACC under Federal Rules of Civil Procedure 12(b)(1)[2] and 12(b)(6). (Docket entry nos. 151, 153, 155, 157, 166, 167.) Defendants Fanatics, MLB, MLBPI, MLBPA, NBA, and NBPA also move to compel arbitration. (Docket entry nos. 154, 158, 163, 166, 168.) The Court has considered carefully the parties' submissions. Because Plaintiffs have failed to demonstrate that they have standing to invoke the Court's jurisdiction and for the reasons set forth below, all of the Defendants' motions to dismiss are granted pursuant to Rule 12(b)(1), and the motions to compel arbitration are denied as moot. The ACC is dismissed in its entirety.

## I. BACKGROUND[3]

The following background is drawn from the ACC, the well-pleaded factual allegations of which are taken as true, and other party filings in this case. See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court, as it did here, may refer to evidence outside the pleadings."); Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145

---

2 OneTeam, MLB, and MLBP do not cite Federal Rules of Civil Procedure 12(b)(1) directly but do move to dismiss the ACC for lack of standing. (See docket entry no. 161 at 7; docket entry no. 162-1 at 12-17.)

3 All pincites to materials on the docket refer to ECF-designated pages.

(2d Cir. 2011) ("In reviewing a facial attack to the court's jurisdiction, we draw all facts—which we assume to be true unless contradicted by more specific allegations or documentary evidence—from the complaint and from the exhibits attached thereto.").

A. The Sports Trading Card Industry

A number of inputs are required to create fully licensed professional sports trading cards, including intellectual property from the relevant sports teams and players. (ACC ¶¶ 72, 75, 89, 103.) That intellectual property is generally owned and/or licensed by the sports leagues (such as the team and league names, marks, and logos) and the players associations (such as players' names, images, and likenesses). (Id. ¶¶ 68-69.) Thus, companies that want to create fully licensed cards generally must have licensing agreements with both the relevant sports leagues and the related players associations. These companies can also enter into additional agreements to further enhance the cards, such as agreements with individual players to get handwritten autographs. (Id. ¶ 75.) Once the necessary rights are secured, the cards are designed, marketed, and physically created using specialized manufacturers. (Id. ¶ 103.) The cards are then sold to consumers directly, or indirectly by selling first to retailers or to distributors which supply retailers. (Id. ¶ 197.)

B. Fanatics' Licenses & Alleged Anticompetitive Conduct

Beginning in 2021, Fanatics entered into the professional sports trading card industry and acquired exclusive trading card licenses with the MLB, MLBPA, NBA, NBPA, NFL, and NFLPA. (ACC ¶ 5.) Fanatics also acquired a controlling share of GC Packaging, which was the primary manufacturer for Panini America Inc. ("Panini"), Fanatics' main competitor in the professional sports trading card industry. (Id. ¶¶ 8, 187.) The exclusive licenses that Fanatics acquired were long-term ones, running for 10 or 20 years depending on the

license. (Id. ¶ 6.) In January 2022, Fanatics also acquired Topps, another industry participant, which had an exclusive license with the MLB until 2025 and a semi exclusive license with the MLBPA through 2022. (Id. ¶ 7.) This acquisition made Fanatics the sole producer of newly issued, fully licensed, MLB trading cards beginning in 2022. (Id. ¶ 114.)

Not all of Fanatics' licenses were effective immediately, however. The exclusive licenses with the NBA, NBAPA, NFL, and NFLPA did not activate until after the expiration of Panini's exclusive licenses with those organizations, making Fanatics unable to sell fully licensed NBA or NFL Trading Cards until October 2025 and April 2026, respectively. (Id. ¶ 153.)

Plaintiffs allege that, historically, licenses have been awarded through a public bidding process that resulted in non-exclusive license agreements or exclusive licenses of five or fewer years and with staggered terms, so that no single licensee had exclusive rights across all of the major sports leagues and players associations at one time. (Id. ¶ 4.) Plaintiffs claim that, through "back room" deals, Fanatics changed this norm and became the first licensee to ever hold all of the exclusive licenses for professional basketball, football, and baseball simultaneously. (Id. ¶¶ 5-6.)

Plaintiffs allege that Fanatics secured its controlling position by "promising Major U.S. Professional Sports Leagues and Players Associations an equity stake in its future monopoly profits in exchange for those long-term exclusive licenses." (Id. ¶ 6.) The collective equity owned by the leagues and players associations in Fanatics' "venture" is worth billions of dollars.[4] (Id. ¶ 123.)

---

4 This collective figure includes the equity stakes owned by National Hockey League and Major League Soccer. (ACC ¶ 123.)

Plaintiffs also allege that OneTeam (which is a joint venture between the MLBPA and NFLPA that pools the intellectual property of the MLBPA and NFLPA and sells that combined intellectual property) played an important role in Fanatics' acquisition of the MLBPA and NFLPA licenses. (Id. ¶¶ 124-126.) They cite statements by executives of the players' associations in which they claim that the exclusive deals with the MLBPA and NFLPA "would never have happened" if the MLBPA and NLFPA had not "joined forces to create OneTeam." (Id. at ¶ 125 (internal quotations omitted).)

Plaintiffs allege a variety of anticompetitive conduct from Fanatics in the professional sports trading card market beyond entering into the long-term exclusive licensing agreements. They allege that Fanatics, using its market power, also threatened to: blacklist Panini employees from the industry unless they quit Panini to work for Fanatics (id. ¶ 9); "strong-armed" athletes into exclusive agreements (id. ¶ 10); spread false statements about Panini and pressured third parties to "cut ties" with Panini (id. ¶ 11): used its monopoly over sports jerseys to block other manufacturers from accessing jerseys for use in certain trading cards (id. ¶ 12); and pressured third-party retailers (by threatening to cut off supply) to give Fanatics higher margins on the cards, to reduce the number of non-Fanatics cards sold, and to accept specified minimum prices for the cards (id. ¶¶ 13-16).

C. Named Plaintiffs' Purchases of Trading Cards

Plaintiffs allege in their ACC that each of the named Plaintiffs "purchased Pro Sports Trading Cards, including an unopened pack, box, or case of newly issued, fully licensed MLB trading cards, not for resale, from an entity other than Defendants." (Id. ¶¶ 26-43.) Six of the named Plaintiffs also allege purchasing "Topps NBA trading cards, not for resale, from an entity other than Defendants." (Id. ¶¶ 27-28, 33, 36-37, 40.) No named Plaintiffs are alleged to

have purchased any NFL cards. Each named Plaintiff also alleges that he "faces a real and immediate threat of future injury because Defendants' anticompetitive conduct will inflate the prices of any future purchases of Pro Sports Trading Cards." (Id. ¶¶ 26-43.)

Plaintiffs do not allege which trading cards they purchased, nor do they proffer any facts about their purchased cards, such as the price or quality of the cards or where or when they were purchased. Plaintiffs also do not allege any facts related to their individual purchasing histories or behaviors, such as what type of cards or products they typically purchase or want to purchase.

D. Plaintiffs' Claimed Injuries

Plaintiffs claim that their "injury consists of: (i) paying higher prices for MLB and NBA trading cards produced by Fanatics than would have been paid in the absence of the antitrust violation; (ii) purchasing MLB and NBA trading cards produced by Fanatics that suffered from diminished quality; and (iii) reduced consumer choices for Pro Sports Trading Cards;" as well as (iv) "reduced output." (Id. ¶¶ 223, 230, 249, 257, 269, 275, 184.)

In support of these contentions, Plaintiffs point to: three Reddit threads,[5] in which users comment on price increases of MBA and NLB cards (id. ¶¶ 180, 182, 186); a YouTube podcast, in which the host states that Fanatics-owned Topps "prices are more expensive now than they've ever been" (id. ¶ 180 (internal quotation omitted)); and a blog-style article from The Athletic that recounts the experiences of three of the publication's staff members opening 2025-26 Topps Basketball Hobby Boxes created by Fanatics shortly after Fanatics acquired its NBA licenses, in which the staff members state (among other comments) that two of the boxes

5 Reddit threads are online forums wherein pseudonymous users discuss a wide range of topics.

contained cards with "dinged corners" and that "quality control might need a tweak" (id. ¶¶ 182, 186; docket entry no. 160-1 at 5).

## II. Discussion

Defendants move to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) for lack of standing and 12(b)(6) for failure to state a claim. Defendants Fanatics, MLB, MLBPI, MLBPA, NBA, and NBPA also move to compel arbitration.

Under Rule 12(b)(1), a claim must be dismissed for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it." Makarova, 201 F.3d at 113 (citation omitted). On a Rule 12(b)(1) motion, the Court "must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014). That said, the Court "need not credit 'a legal conclusion couched as a factual allegation' or a 'naked assertion devoid of further factual enhancement.'" Calcano v. Swarovski N. Am. Ltd., 36 F.4th 68, 75 (2d Cir. 2022) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "Instead, [the Court] must refer to a complaint's 'factual context' to discern whether to accept 'a complaint's conclusory statements.'" Id. (quoting Iqbal, 556 U.S. at 686).

As here, "'[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings . . . .'" Tandon, 752 F.3d at 243 (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)); see also Makarova, 201 F.3d at 113 (2d Cir. 2000); Amidax, 671 F.3d at 145. Ultimately, "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova, 201 F.3d at 113.

Furthermore, "[w]hen a defendant moves to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, and also moves to dismiss on other grounds . . . the Court must consider the Rule 12(b)(1) motion first." Bobrowsky v. Yonkers Courthouse, 777 F. Supp. 2d 692, 703 (S.D.N.Y. 2011) (citing Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990)). Similarly, subject matter jurisdiction must be addressed prior to considering a motion to compel arbitration. See Branch of Citibank, N.A. v. De Nevares, 74 F.4th 8, 21-22 (2d Cir. 2023).

A. Whether Named Plaintiffs Have Standing

As an initial matter, the Court notes that it recently dismissed a virtually identical complaint in its entirety for lack of standing. See Scaturo v. Fanatics, Inc., No. 1:25-CV-02202-LTS, 2026 WL 810372 (S.D.N.Y. Mar. 23, 2026). In light of that ruling, the Court ordered the parties to specifically address standing and any implications of Scaturo for the instant action. (Docket entry no. 185). They did so, and the Court has reviewed carefully their filings. (See docket entry nos. 185, 186, 192.)

As in Scaturo, the dispositive issue here is whether any of named Plaintiffs have standing to bring this litigation. The requirement of standing ensures that the power of federal courts remains limited "to the resolution of 'Cases' and 'Controversies,'" as required under Article III of the Constitution. TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "[W]hether the plaintiff has made out a 'case or controversy' between himself and the defendant . . . is the threshold question in every federal case, determining the power of the court to entertain the suit." Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 62 (2d Cir. 2012) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)) (alterations in original). To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must meet three requirements with respect to

their claim: (1) an "'injury in fact'—a harm that is both 'concrete' and 'actual or imminent, not conjectural or hypothetical'"; (2) causation—a "'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant"; and (3) redressability—a "'substantial likelihood' that the requested relief will remedy the alleged injury in fact." Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 771 (2000) (citations omitted, alterations in original). Further, "the injury must affect the plaintiff in a personal and individual way." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 n.1 (1992).

These three prongs are assessed as of the time of filing of the complaint. See Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."); Lujan, 504 U.S. at 569 n.4 (explaining that standing is "assessed under the facts existing when the complaint is filed"); Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo., 458 F. Supp. 2d 160, 167 (S.D.N.Y. 2006) ("A plaintiff's standing is evaluated at the time the complaint is filed." (citing Robidoux v. Celani, 987 F.2d 931, 938 (2d Cir. 1993))). Here, the initial complaint was filed on July 14, 2025 (docket entry no. 1), an amended complaint was filed on October 6, 2025 (docket entry no. 133), a corrected amended complaint was filed on October 23, 2025 (docket entry no. 141), and the amended, corrected complaint was filed on December 22, 2025 (ACC).

The requirements of Article III standing are no less demanding in the class action context than they are for individual plaintiffs. "To establish Article III standing in a class action . . . for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant . . . ." NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 159 (2d Cir. 2012); see also Lewis v. Casey, 518 U.S. 343, 357 (1996)

("'That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" (alterations in original, cleaned up)).

With respect to injury, the named Plaintiffs claim that they purchased newly issued, fully licensed MLB and NBA cards at supracompetitive prices, that the cards "suffered from diminished quality," and that Plaintiffs experienced reduced consumer choices and reduced output for newly issued, fully licensed MLB, NBA, and NFL trading cards. (ACC ¶¶ 184, 223, 230, 249, 257, 269, 275, 77 (limiting the allegedly relevant market to "newly issued, fully licensed" sports trading cards); docket entry no. 192 ("Pls. Mem.") at 26.) If properly alleged, these types of injuries can support a finding of standing, especially in the antitrust context. See, e.g., John v. Whole Foods Mkt. Grp., Inc., 858 F.3d 732, 736 (2d Cir. 2017) ("[O]verpaying for a product results in a financial loss constituting a particularized and concrete injury in fact."); New York Medscan LLC v. New York Univ. Sch. of Med., 430 F. Supp. 2d 140, 148 (S.D.N.Y. 2006) ("[C]ourts have repeatedly held that a decline in quality is among the injuries that the antitrust laws were designed to prevent"); Ross v. Bank of Am., N.A.(USA), 524 F.3d 217, 223 (2d Cir. 2008) ("reduced choice and diminished quality" can be antitrust injuries in fact); DirecTV, LLC v. Nexstar Media Grp., Inc., 162 F.4th 295, 302 (2d Cir. 2025) ("Lost profits resulting from a reduction in output represent a cognizable antitrust injury . . . .").

None of the named Plaintiffs adequately alleges, however, facts demonstrating that they, individually and in particularized respects, have been or will imminently be injured in the manners alleged. Accordingly, as explained in detail below, the named Plaintiffs lack standing, and the ACC must be dismissed.

1. NFL Trading Cards

First, the Court considers whether named Plaintiffs have standing to pursue their NFL trading card claims (Counts Six and Seven). Plaintiffs do not allege that they purchased NFL trading cards, and Fanatics' licenses to create fully licensed cards did not begin until almost four months after Plaintiffs filed their ACC. Thus, "[b]ecause named Plaintiffs did not purchase any . . . NFL Trading Cards when they filed the [complaint], they lack individual Article III standing to raise claims with respect to those cards." Scaturo, 2026 WL 810372, at *8 (citations omitted). Plaintiffs do not and cannot allege a past injury with respect to NFL trading cards.

As for future injury, despite Plaintiffs titling a section of their response brief "Plaintiffs Will Purchase Fanatics-Produced NFL Trading Cards" (Pls. Mem. at 54), their allegations and argumentation suggest the opposite. Plaintiffs argue that the Court should look at the purchase histories of the named Plaintiffs to "confirm the frequency with which purchasers buy newly issued trading cards across leagues." (Id.) A review of that history, however, shows that Plaintiffs have never purchased NFL cards. Further, Plaintiffs allege that, while some fans purchase sets of trading cards from all three major sports (MLB, NBA, and NFL) each year, "many consumers do not view trading cards for players from one League as interchangeable with cards for players from another League . . . [and] prefer to collect cards from one of the Major U.S. Professional Sports Leagues over the cards from other Leagues." (ACC ¶¶ 98-99.) Plaintiffs elaborate, "[i]n fact, some consumers prefer to collect full sets of cards from one League, but not the other Leagues—while other consumers are interested in one sport but not the other. For example, some consumers do not view MLB trading cards as interchangeable with NFL trading cards." Id. at ¶ 99. These allegations suggest to the Court that, because named Plaintiffs do not allege that they ever purchased an NFL card, they are unlikely to do so in the

future. Plaintiffs, therefore, fail to plausibly allege that a future injury is "sufficiently actual or imminent." Frey v. City of New York, 157 F.4th 118, 137 (2d Cir. 2025) ("[a]n alleged future injury is sufficiently actual or imminent if it is 'certainly impending' or there is 'substantial risk' of harm") (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013)); see also Lujan, 504 U.S. at 564 ("'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

Because Plaintiffs demonstrate neither a past nor future injury in fact related to NFL trading cards, their claims regarding the NFL cards are dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of standing.

2. MLB & NBA Trading Cards

Next, the Court considers whether named Plaintiffs have standing to pursue their remaining claims on the theory that they suffered injuries related to purchases of MLB and NBA trading cards. The Court finds that Plaintiffs' allegations regarding such injuries are also insufficient to establish standing.[6]

First, the Court turns to Plaintiffs' argument that they demonstrate injury through a "structural inference," in that "Plaintiffs allege that Fanatics' monopoly power over the trading

---

6 As an initial matter, it is unclear whether Plaintiffs' allegations that six of them purchased newly issued, fully licensed NBA cards after the filing of the initial complaint could cure their standing problem because it is an "uncertain question" whether events that occurred after the filing of the original complaint can cure a jurisdictional defect. Scaturo, 2026 WL 810372, at *8 n.14; see Travelers Ins. Co. v. 633 Third Assocs., 973 F.2d 82, 87-88 (2d Cir. 1992); see also Scahill v. D.C., 909 F.3d 1177, 1183 (D.C. Cir. 2018) (noting a Circuit split and citing cases). Regardless, Plaintiffs' amended allegations related to NBA trading cards included in the ACC still fail to demonstrate an injury-in-fact, so the Court need not weigh in on the question.

card market is already affecting prices, output, and quality across the entire market." (Pls. Mem. at 44-45, 66-67.) In their words, "[t]he economic logic is straightforward: monopoly tends to raise prices and reduce output and quality." (Id. at 45.) While this may be true as an economic matter, Article III standing demands that the named Plaintiffs demonstrate that they themselves have suffered a concrete, particularized injury. See Lujan, 504 U.S. at 561 n.1. A showing of anticompetitive conduct without a clear connection to the experience of any named Plaintiff does not, by itself, demonstrate an injury in fact. The Court rejected similar arguments in Scaturo and again finds here that "Plaintiffs' proposed inferential leap is too great" to demonstrate an injury to any of the individual named Plaintiffs. 2026 WL 810372, at *12.

Second, the Court examines Plaintiffs' allegations of injury through reduced product choice and reduced output. Plaintiffs' theory of injury regarding reduced product choice is that (1) Fanatics leveraged its market control to pressure third-party sellers into carrying only Fanatics cards by threatening to withhold supply (ACC ¶¶ 14, 156, 189) and (2) that "Fanatics limited the availability of autographed rookie cards and prevented Plaintiffs from purchasing them." (Pls. Mem. at 41; ACC ¶¶ 154, 190.) Plaintiffs' theory of injury regarding reduced output is that Fanatics acquired control over the primary manufacturer of its chief-competitor Panini, which resulted in "significant supply disruptions and delayed product releases for Panini's trading cards," "forc[ing] consumers to purchase Fanatics' products." (ACC ¶ 187.) These disruptions resulted in "an output shortfall of over 100 million packs, leading to canceled orders and lost sales" for Panini. (Id.)

While the Court accepts these allegations as true for purposes of this motion practice, Plaintiffs still fail to demonstrate a concrete and particularized injury to themselves. Plaintiffs make no allegations that they personally experienced reduced product choice, such as

allegations that they could not obtain particular cards that they collect. Although the ACC asserts that Fanatics' actions "have deprived Plaintiffs and the Classes of access to highly sought-after autographed rookie cards and diverse case-breaking experiences"[7] (id. ¶ 190), there is no allegation that any of the Plaintiffs actually seek out these products or experiences and, thus, no way for the Court to identify an individualized injury to any named Plaintiff.

Similarly, Plaintiffs' allegations of injury through reduced output also do not demonstrate a concrete, particularized injury to any of the named Plaintiffs. While Panini may have experienced an output shortfall and other harms due to Fanatics' conduct,[8] Plaintiffs do not explain how harms to Panini translate to injuries to Plaintiffs. Plaintiffs do not allege a reduction in output from the customer's perspective, such as shortages at retailers, nor any particularized impact on any individual Plaintiff, such as a cancelled order or inability to access a desired product as a result of Panini's reduced output. Without allegations of this variety, the Court is

---

7 Case breakers are people who "help bring new Pro Sports Trading Cards product to market, [by] 'breaking'—or opening—new trading card cases and packets by livestreaming over the internet." (ACC ¶ 166.) Plaintiffs allege that Fanatics leveraged its market power to force case breakers to "immediately migrate to Fanatics' new case-breaking platform, Fanatics Live, on terms so draconian as to run their case-breaking business[es] into the ground," allowing Fanatics to exercise control over the case breaker economy and to choose which case breakers will be successful, resulting "in reduced consumer choice and reduced output of case-breaking services" and higher prices. (Id.) Plaintiffs do not allege that any of the named Plaintiffs watch or otherwise engage in case breaking. Because Plaintiffs cannot sustain an injury from a product or service they do not use, their allegations related to case breaking also fail to demonstrate an injury for standing purposes. See Afriyie v. NBCUniversal Media, LLC, 775 F. Supp. 3d 791, 799 (S.D.N.Y. 2025) ("Plaintiffs lack individual Article III standing to raise claims with respect to the [product] because they did not use or purchase [the product]."); see also Scaturo, 2026 WL 810372, at *8 (same).

8 Indeed, Panini has challenged Fanatics' alleged anticompetitive conduct in its own lawsuit, in which several of its claims survived a motion to dismiss for lack of standing. See generally, Panini Am., Inc. v. Fanatics, Inc., No. 23-CV-9714-LTS-VF, 2025 WL 753954 (S.D.N.Y. Mar. 10, 2025).

unable to discern a cognizable, particularized injury to any named Plaintiff sufficient to support standing.

The Court next considers Plaintiffs' argument that they demonstrate an injury sufficient to support standing based on their purchases of MLB and NBA trading cards produced by Fanatics that suffered from diminished quality. With respect to MLB trading cards, Plaintiffs' allegations of diminished quality are sparse indeed. They argue simply that, "[w]ith the elimination of competitive pressure, Fanatics has had little incentive to maintain or improve the quality of its MLB and NBA trading cards." (ACC ¶ 188.) This is a rearticulation of Plaintiffs' "structural inference" argument that fails for the reasons described above: it does not demonstrate that Plaintiffs themselves have suffered a concrete, particularized injury. See Lujan, 504 U.S. at 561 n.1. Without more specific allegations (such as examples of particular MLB trading card products that have shown indicia of diminished quality), it is also overly speculative. Plaintiffs ask the Court to assume, first, that Fanatics' alleged anticompetitive conduct has necessarily resulted in lower quality MLB trading cards and, second, that named Plaintiffs have purchased these lower quality cards. With no information about which cards' quality has been diminished and which cards Plaintiffs have purchased, the Court cannot even begin to make a finding of that sort. See Maddox v. Bank of N.Y. Mellon Tr. Co., N.A., 19 F.4th 58, 65-66 (2d Cir. 2021) (Plaintiffs "must 'plead enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief.'" (quoting Harry v. Total Gas & Power N. Am., Inc., 889 F.3d 104, 110 (2d Cir. 2018))); Scaturo, 2026 WL 810372, at *11.

Plaintiffs similarly fail to establish injury premised on the purchase of NBA cards suffering from diminished quality. To support their claim that they have suffered this injury, Plaintiffs point to the same "structural inference" rejected above, and to an article from The

Athletic. (ACC ¶¶ 182, 188.) They also allege that Fanatics cut off Panini's supply of player jerseys to be used in certain premium cards, "thereby reducing the range and quality of products available." (Pls. Mem. at 45; ACC ¶ 168.)

The article cited by Plaintiffs is a blog-style account of three of the publication's staff members' experiences purchasing boxes of 2025-26 Topps hobby basketball cards shortly after Fanatics' exclusive NBA licenses became effective. (Docket entry no. 160-1). In the article, two of the staff members state that several of the cards they received had "dinged corners," leading one of them to comment that "quality control might need a tweak." (Id. at 5.) Plaintiffs use this article to support their allegation that "[p]ress reports have noted quality-control issues that consumers have come to dread from Fanatics, such as cards suffering dented corners." (ACC ¶ 182.) Even accepting Plaintiffs' allegation regarding press reports as true (though Plaintiffs notably cite only a single report that does not purport to reflect a widespread problem), Plaintiffs again fail to connect the experience of third parties to their own purchases or experiences. See Kell v. Lily's Sweets, LLC, No. 23-CV-0147-VM, 2024 WL 1116651, at *5 (S.D.N.Y. Mar. 13, 2024) ("[D]istrict courts . . . have still held plaintiffs to the burden of explaining why a third party's analysis can be reasonably extrapolated to the plaintiff's individual purchase."); Onaka v. Shiseido Americas Corp., No. 21-CV-10665-PAC, 2023 WL 2663877, at *5 (S.D.N.Y. Mar. 28, 2023); Scaturo, 2026 WL 810372, at *12 ("Two cherry-picked examples . . . cannot be reasonably extrapolated to the named Plaintiff's individual purchase." (internal quotations omitted)). Here, Plaintiffs do not allege that they bought the product described in the article, nor do they explain how any product they did buy is a comparable product or how the experiences described in the article can otherwise be extrapolated to any experience of an

individual named Plaintiff. The article and associated allegations, therefore, are insufficient to plausibly establish that Plaintiffs purchased NBA cards of diminished quality.

Plaintiffs also fail to demonstrate an injury for purposes of Article III standing through their related claim that they purchased NBA cards of reduced quality as a result of Fanatic's cutting off Panini's supply of player jerseys for use in certain premium cards. This is because Plaintiffs, again, do not allege what cards they bought, let alone that any named Plaintiff purchased a premium card that suffered from their described jersey problem. Without allegations suggesting that any named Plaintiff suffered an injury related to these allegedly degraded cards, Plaintiffs cannot demonstrate an injury on these facts.

Next, the Court turns to Plaintiffs' allegations that they paid "higher prices for MLB and NBA trading cards produced by Fanatics than would have been paid in the absence of the antitrust violation[s]." (ACC ¶¶ 223, 230, 249, 257, 269, 275, 372.) To support this claim, Plaintiffs point to three Reddit threads and a YouTube podcast. (Id. at ¶¶ 180, 182, 186.) Plaintiffs cite a thread that originates with a post complaining about the price of the NBA 2025-26 Topps Chrome Basketball Mega Box to which other users respond with their grievances about NBA trading cards generally. With regard to the other two threads, Plaintiffs direct the Court to two comments in particular: in one, a user complains that MLB Topps Chrome Value Boxes have increased from "$25/$30" to $39.00 (id. at ¶ 180); in the second, a commenter states they were "disappointed" to see that the number of cards per pack in their MLB 2024 Topps Series 1 Hobby Boxes had been reduced by "28% . . . for an increasingly higher price." (Id. at ¶ 186.) As for the YouTube podcast, Plaintiffs state that the cited episode is a discussion of professional sports trading card prices, and they specifically point to the host's statement that Fanatics-owned Topps' "prices are more expensive now than they've ever been." (Id. at ¶ 180.)

Courts in this District have found that plaintiffs fail to demonstrate an Article III injury when they try to demonstrate the injury using an outside analysis but do not show that the products they actually purchased suffered the same defect. See Kell, 2024 WL 1116651, *3-5 (holding that the plaintiff lacked standing to sue a chocolate company based on reports of the presence of heavy metals in their chocolate bars because the plaintiff failed to plausibly allege that she herself purchased chocolate that contained heavy metals); Onaka, 2023 WL 2663877, *4-6 (holding that plaintiffs lacked standing to bring a lawsuit against a cosmetic company based on tests showing the presence of PFAS in certain products because plaintiffs did not articulate how the testing could be extrapolated to their individual purchases).

Here, the Reddit threads and podcast cited by Plaintiffs are hardly equivalent to the testing considered by other courts, but, even if they did show that other people have experienced supracompetitve prices for trading cards, Plaintiffs make no allegations that connect the third-party accounts to any experience of the Plaintiffs themselves. There are no allegations about the prices of any of the products Plaintiffs allegedly bought. See Scaturo, 2026 WL 810372, at *8 ("Without any factual allegations about price, Plaintiffs' claim that [Plaintiff] was harmed by paying supracompetitive prices is wholly conclusory and implausible."). There are also no allegations about which products Plaintiffs bought nor any attempt to connect the experiences of the Reddit users or podcast speakers to the experiences or purchases of the named Plaintiffs.

Further, Plaintiffs have not sufficiently alleged facts demonstrating that the issue of supracompetitve pricing is so widespread in the professional sports trading card market as to render it plausible that any named Plaintiff purchased a supracompetitively priced card even once. Plaintiffs provide no market-wide analysis, data, or other evidence to support a finding of

market-wide supracompetitve pricing. Their Reddit and YouTube sources, at best, convey the anecdotal experiences and opinions of different individuals.

Having determined that Plaintiffs fail to plausibly allege any past injury-in-fact related to MLB or NBA trading cards, the Court turns to the last remaining question for its resolution: whether Plaintiffs adequately allege a future injury sufficient to support standing with respect to such cards. On this issue, Plaintiffs point again to the alleged anticompetitive conduct writ large and argue that, "[u]nless enjoined, Fanatics' conduct will continue to inflict ongoing and irreparable harm on Plaintiffs." (ACC ¶¶ 193-94.) This assertion fails to show standing for the same reason it failed to support Plaintiffs' allegations of past injuries and for the same reason it failed to show injury in Scaturo: the "Plaintiffs' proposed inferential leap is too great." 2026 WL 810372, at *12. Allegations of anticompetitive conduct, by themselves, do not demonstrate an individual, particularized injury to the named Plaintiffs.

Beyond this, Plaintiffs provide formulaic and conclusory allegations of future injury. (See ACC ¶¶ 26-43 ("He also faces a real and immediate threat of future injury because Defendants' anticompetitive conduct will inflate the prices of any future purchases of Pro Sports Trading Cards" is repeated in identical fashion for each Plaintiff); id. ¶¶ 224, 231, 250, 258, 264, 270, 276 (claiming that Plaintiffs are "threatened with future injury to their business and property in connection with their purchase of Pro Sports Trading Cards," a phrase presumably styled after the 15 U.S.C. § 15 right of action language).) However, "'conclusory invocations' of factors leading to standing [do] not themselves create standing." Mercedes v. Rest. Mgmt. Inc., No. 25-CV-5535-AS, 2026 WL 1213505, at *2 (S.D.N.Y. May 4, 2026) (citing Calcano, 36 F.4th at 75).

## III. Conclusion

For the reasons explained above, all of the Defendants' motions to dismiss the ACC are granted pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, the motions to compel arbitration are denied as moot, and the ACC is dismissed in its entirety. The Clerk of Court is directed to enter judgment accordingly and close this case.

This Memorandum Order resolves docket entry nos. 151, 153, 155, 157, 159, 162, 163, 166, and 167.

SO ORDERED.

Dated: New York, New York
September 29, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge